IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

_____

IN RE MICROSOFT CORP.        )
ANTITRUST LITIGATION        )
        )    MDL DOCKET NO. 1332
        )    Hon. J. Frederick Motz
This Document Relates To:        )
Gravity, Inc. v. Microsoft Corp.        )
        )
_____)

**MOTION OF DELL COMPUTER CORPORATION, COMPAQ COMPUTER
CORPORATION, AND PACKARD BELL NEC, INC.  TO
DISMISS THE AMENDED COMPLAINT PURSUANT TO
FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6)**

Defendants Dell Computer Corporation, Compaq Computer Corporation, and

Packard Bell NEC, Inc. ("OEM Defendants"), by their undersigned counsel, respectfully

move this Court to dismiss with prejudice the Amended Complaint in its entirety pursuant

to Federal Rule of Civil Procedure 12(b)(6).  The grounds for the motion are set forth in

the accompanying Statement of Points and Authorities.

OEM Defendants also hereby join and adopt in their entirety the arguments for

dismissal set forth in the Statement of Points and Authorities in Support of Defendant

Microsoft Corporation's Motion to Dismiss the Amended Complaint.

OEM Defendants respectfully request oral argument pursuant to Local Rule

105(6).

Respectfully submitted,

 s/  William D. Coston

William D. Coston
Melissa Landau Steinman
Martin L. Saad
VENABLE, BAETJER, HOWARD
  & CIVILETTI, L.L.P.
1201 New York Avenue, NW, Suite 1000
Washington, DC  20005-3917
(202) 962-4800
*Counsel for Defendant*
*Compaq Computer Corporation*

W. Stephen Smith
MORRISON & FOERSTER
2000 Pennsylvania Avenue, NW
Washington, DC  20006
(202) 887-1500

Penelope A. Preovolos
MORRISON & FOERSTER
425 Market Street
San Francisco, CA  94105
(415) 268-7000
*Counsel for Defendant Packard*
*Bell NEC, Inc.*

August 2, 2000

 s/  Paul M. Smith

Paul M. Smith
JENNER & BLOCK
601 13th Street, N.W.
Washington, DC 20005
(202) 639-6000

Jerold S. Solovy
Barbara S. Steiner
JENNER & BLOCK
One IBM Plaza
Chicago, Illinois 60611
(312) 222-9350

Samuel R. Miller
FOLGER LEVIN & KAHN LLP
Embarcadero Center West
275 Battery Street, 23rd Floor
San Francisco, CA 94111
(415) 986-2800
*Counsel for Defendant*
*Dell Computer Corporation*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

---

| | |
|---|---|
| IN RE MICROSOFT CORP. ) | |
| ANTITRUST LITIGATION ) | |
| ) | MDL DOCKET NO. 1332 |
| ) | Hon. J. Frederick Motz |
| This Document Relates To: ) | |
| <u>Gravity, Inc. v. Microsoft Corp.</u> ) | |
| ) | |

---

**STATEMENT OF POINTS AND AUTHORITIES IN SUPPORT OF
THE MOTION OF DELL COMPUTER CORPORATION, COMPAQ
COMPUTER CORPORATION, AND PACKARD BELL NEC, INC.
TO DISMISS THE AMENDED COMPLAINT PURSUANT TO
FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**

William D. Coston
Melissa Landau Steinman
Martin L. Saad
VENABLE, BAETJER, HOWARD
  & CIVILETTI, L.L.P.
1201 New York Avenue, NW, Suite 1000
Washington, DC 20005-3917
(202) 962-4800
*Counsel for Defendant*
*Compaq Computer Corporation*

W. Stephen Smith
MORRISON & FOERSTER
2000 Pennsylvania Ave N.W.
Suite 5500
Washington, DC   20006
(202) 887-1500

Penelope A. Preovolos
MORRISON & FOERSTER
425 Market Street
San Francisco, CA   94105
(415) 268-7000
*Counsel for Defendant*
*Packard Bell NEC, Inc.*

Paul M. Smith
JENNER & BLOCK
601 13th Street, N.W.
Washington, DC 20005
(202) 639-6000

Jerold S. Solovy
Barbara S. Steiner
JENNER & BLOCK
One IBM Plaza
Chicago, Illinois 60611
(312) 222-9350

Samuel R. Miller
FOLGER LEVIN & KAHN LLP
Embarcadero Center West
275 Battery Street, 23rd Floor
San Francisco, CA 94111
(415) 986-2800
*Counsel for Defendant*
*Dell Computer Corporation*

**TABLE OF CONTENTS**

INTRODUCTION…………………………………………………………….. 2

THE FACTS AS ALLEGED…………………………………………………….. 5

ARGUMENT…………………………………………………………………….. 9

I.      PLAINTIFFS' SECTION 2 CONSPIRACY CLAIM SHOULD BE
        DISMISSED BECAUSE IT RESTS ENTIRELY ON
        CONCLUSORY ALLEGATIONS AND MAKES NO
        ECONOMIC SENSE………………………………………………….    10

        A.      Plaintiffs' Conspiracy Theory Makes No Economic
                Sense……………………………………………………………..    12

        B.      Nothing in the Complaint Justifies Allowing Plaintiffs to
                Continue Pursuing Their Implausible Section 2 Claim…….    14

II.     PLAINTIFFS' SECTION 1 CONSPIRACY CLAIM IS
        EQUALLY DEFICIENT…………………………………………….…    24

III.    THE SPECIFIC CONTRACTUAL PROVISIONS CITED DO
        NOT CONSTITUTE RESTRAINTS OF TRADE ACTIONABLE
        AS TO THE OEM DEFENDANTS UNDER SECTION 1…………    27

        A.      Plaintiffs' Allegation Regarding Per-Processor Royalties
                And Long-Term Agreements Are Time-Barred…………….    29

        B.      Plaintiffs Do Not Allege That the OEMs Entered Into Any
                License Term That Has Been Found to Be Anticompetitive
                Under the "Rule of Reason"………………………………...    30

        C.      Even Setting Aside Their Non-Exclusive Nature and Short
                Term, the Challenged Provisions Do Not Establish a Claim
                As to the OEMs………………………………………………..    32

                1.      The Alleged Package Pricing Provisions……………    32

                2.      Provisions Allegedly Designed to Promote the
                        Microsoft Browser…………………………………..    35

CONCLUSION………………………………………………………………...    38

## INTRODUCTION

In this suit, plaintiffs Gravity, Inc. and Mark H. Dickson accuse Compaq Computer

Corporation, Dell Computer Corporation ("Dell"), and Packard Bell NEC, Inc. ("original

equipment manufacturer defendants" or "OEM defendants") and Microsoft Corporation

(collectively, "defendants") of conspiring to restrain trade in and to monopolize the markets for

computer operating system, word processing, and spreadsheet software under Sections 1 and 2 of

the Sherman Act, 15 U.S.C. §§ 1 & 2.  The OEM defendants respectfully submit that the First

Amended Complaint ("Complaint") should be dismissed in its entirety under Federal Rule of

Civil Procedure 12(b)(6), because plaintiffs' allegations  — to the extent they even relate to the

OEM defendants and are not time-barred  — do not begin to suggest a plausible claim that any of

the OEMs has joined in an actionable conspiracy with Microsoft to promote that company's

alleged monopolization of the specified software markets.

By plaintiffs' own description, this case is essentially an attempt to copy and capitalize on

the injunctive case that the United States pursued against Microsoft in the United States District

Court for the District of Columbia.  <u>See</u> Reply Br. for Gravity, Inc. in Further Supp. of Mot. to

Intervene [in <u>United States v. Microsoft</u>] for Purpose of Modifying Protective Order, No. 98-

1232 (TPJ), at 5 (D.D.C. filed Apr. 6, 1999) ("Gravity's allegations are so closely related to those

in this case that even a casual comparison of Gravity's complaint with the Government's

complaint <u>reveals the symbiotic relationship between the two cases</u>") (emphasis added).  As a

result, much of the Complaint is directed at conduct charged by the Government that has little or

nothing to do with the OEMs, such as Microsoft's arrangements with Internet Service and

Content Providers.   There are also non-class-based allegations about a dispute between named

plaintiff Gravity, Inc. and Microsoft over litigation management software.  Complaint ¶¶ 31-32, 75-89, 125-143.

Plaintiffs attempt to bring the OEMs into the case by labeling them "co-conspirators" of Microsoft.  But the only specific conduct they point to is the allegation that each OEM defendant separately signed license agreements with Microsoft containing provisions said to have furthered Microsoft's alleged scheme.  Those alleged contractual provisions, on their face, do not constitute restraints of trade actionable as to the OEMs.  Nor do those provisions plausibly support plaintiffs' broader conspiracy allegations.  After all, the essence of plaintiffs' conspiracy theory is that the three OEM defendants, vigorous competitors in the sale of personal computers, nonetheless worked in concert with Microsoft to preserve Microsoft's alleged monopolies in the sale of the operating system, word processing, and spreadsheet software that the OEMs buy from Microsoft.  Nowhere in the Complaint do plaintiffs offer a remotely plausible explanation why the OEMs would collectively conspire with Microsoft to raise the price of essential inputs into their product, thereby reducing their own sales and profits.

The evident reason for plaintiffs' decision to base this suit on such improbable conspiracy allegations, rather than suing Microsoft alone, is the Supreme Court's decision in Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977).  That ruling, limiting antitrust standing to "direct purchasers," would bar plaintiffs  — who sue as purchasers of personal computers ("PCs") from the OEM defendants — from obtaining treble damages directly from Microsoft.  As a result, in order to obtain damages based upon Microsoft's conduct, plaintiffs must somehow include the

OEMs in their suit.  Plaintiffs' solution is to attempt to fit this case within the "co-conspirator exception" to <u>Illinois Brick</u> that has been recognized by some courts.[1]

To our knowledge, the Fourth Circuit has not decided whether such an exception exists, and this Court only recognizes the exception when the policy considerations underlying <u>Illinois Brick</u> are not threatened.  <u>See</u> <u>In re Mid-Atlantic Toyota Antitrust Litig.</u>, 516 F. Supp. 1287  (D. Md. 1981).  The OEM defendants join and adopt in their entirety the arguments set forth in the "Statement of Points and Authorities in Support of Defendant Microsoft Corporation's Motion to Dismiss the Amended Complaint" regarding the inappropriateness of recognizing any exception to <u>Illinois Brick</u> in this case.

In any event, as plaintiffs have not sufficiently alleged an actionable conspiracy, the Court need not even reach the issue of whether a "co-conspirator" exception exists in this case.  For the reasons stated by Microsoft and in this brief, even if a "co-conspirator exception" exists, plaintiffs should not be allowed to proceed with their claims unless and until they can offer allegations promising at least the possibility of proof that the OEM defendants consciously committed to an illegal scheme to maintain Microsoft's alleged monopoly.  If a "co-conspirator exception" could be invoked where, as here, a company merely agrees to obtain a component of its product —  indeed, a component that the plaintiffs acknowledge is necessary and for which there is only one source —  from an alleged monopolist,[2] then such an exception would quickly

---

[1]  That the pleading is a contrivance to avoid the sting of <u>Illinois Brick</u> is made clear by the fact that the very same lawyers bringing this action have filed a virtually identical complaint in California, a state whose antitrust law does not follow the indirect purchaser doctrine.  <u>See</u> Cal. Bus. & Prof. Code § 16750(a) (West 1997) (statute repealing indirect purchaser doctrine in California).  The computer manufacturer defendants in this action are not named as co-defendants in that state court suit, filed at the same time as the present action.  Only Microsoft is sued.  The OEMs are absent in that parallel Complaint because, in California, <u>Illinois Brick</u> is not a bar to a suit for money damages by an indirect purchaser against a defendant.

[2]  OEMs license Microsoft software; they do not purchase or sell it.  For clarity's sake, however, we sometimes refer here to OEMs as "purchasing" an input for their products.

swallow the rule barring suit by indirect purchasers.  <u>Illinois Brick</u> would be rendered a nullity,

and <u>every</u> company that is forced to do business with an alleged monopolist would risk antitrust

liability.  Thus, as noted by the Sixth Circuit in dismissing equally conclusory claims of a vertical

conspiracy, allegations of this type should be rejected as "a transparent attempt to evade the rule

of <u>Illinois Brick</u>."  <u>Jewish Hosp. Ass'n v. Stewart Mech. Enters., Inc.</u>, 628 F.2d 971, 977 (6th

Cir. 1980).

**THE FACTS AS ALLEGED**

As required under Rule 12(b)(6), the OEMs will assume for purposes of this motion that

all of plaintiffs' factual allegations are true.  <u>Associated Gen. Contractors of Cal., Inc. v.</u>

<u>California State Council of Carpenters</u>, 459 U.S. 519, 526 (1983).  We do not, however, accept

as binding the many allegations that are purely conclusory.  As Judge Boudin has recently

explained, "the price of entry, even to discovery, is for the plaintiff to allege a factual predicate

concrete enough to warrant further proceedings, which may be costly and burdensome.

Conclusory allegations in a complaint . . . are a danger sign that the plaintiff is engaged in a

fishing expedition."  <u>DM Research, Inc. v. College of Am. Pathologists</u>, 170 F.3d 53, 55 (1st Cir.

1999).  Thus, "[i]t is not . . . proper to assume that the [plaintiff] can prove facts that it has not

alleged or that the defendants have violated the antitrust laws in ways that have not been

alleged."  <u>Associated Gen. Contractors</u>, 459 U.S. at 526.

Plaintiffs' basic claim in this case is that they were injured because (1) Microsoft achieved and preserved alleged monopolies in the sale of operating system, word processing, and spreadsheet software (i.e., "Windows," "Word," and "Excel"); (2) Microsoft was thus able to charge OEMs monopoly prices for these products; and (3) those excess prices were passed on when one of the OEMs loaded the software on PCs sold to plaintiffs.[3/]   As to the OEMs, plaintiffs do not allege that they develop or manufacture software for the relevant markets. Rather, plaintiffs allege that the OEM defendants, as sellers of PCs, conspired with Microsoft to preserve the latter's alleged monopolies in markets where the OEMs purchase inputs for the manufacture of those PCs.  But the only specific allegations plaintiffs offer to support this surprising claim involve a handful of alleged features of the license agreements between Microsoft and the OEMs.

Two of those features — "per processor" and "long term" royalty agreements, see Complaint ¶ 10  — are alleged to have affected competition "by the end of 1994," id. ¶ 63.  As we discuss infra p. 29, the inclusion of such features in OEM license agreements ended with the signing of a consent decree between Microsoft and the United States in 1994.  Those allegations accordingly are time-barred.  A third allegation is that the OEMs accepted discounts for packages of operating system, word processing, and spreadsheet software, thus allowing Microsoft to increase market share in the market for the latter two products, ¶¶ 119-22.  Finally, plaintiffs allege that Microsoft has worked to minimize a long-term threat to its alleged monopoly in operating system software by promoting its own Internet browser ("Internet Explorer") at the expense of competing browsers that might one day have emerged as potential competitors to

---

[3/] As noted, plaintiff Gravity also asserts a claim regarding alleged monopolization of the market for litigation support software.  Because it asserts that claim only against Microsoft, see Complaint ¶¶ 158-62, we do not address it here.

current operating system software.  See ¶¶ 64-69.  They further allege that the OEM defendants assisted in this effort to promote Microsoft's Internet Explorer by accepting provisions in the operating system software license agreements that restricted modification of the initial "boot-up" sequence and the computer "desktop" and that provided for purchase of "Windows 95" and "Windows 98" "bundled" with the browser.  ¶¶ 90-114.

In evaluating these allegations, it is important to understand what plaintiffs do <u>not</u> allege.  <u>First</u>, while plaintiffs devote considerable space to allegations regarding Microsoft's conduct, knowledge, and intent, the Complaint is notably bereft of specific allegations that the OEMs did anything other than sign licensing agreements containing the provisions noted above, let alone that they consciously committed to joining Microsoft's allegedly far-ranging scheme.  <u>Second</u>, although plaintiffs attempt to premise the OEM defendants' liability on their licensing agreements with Microsoft, plaintiffs do not allege that the OEMs have a practical option of not purchasing software from Microsoft.  Instead, they concede that purchase of Windows is a "commercial necessity" for OEMs.  ¶ 23.  <u>Third</u>, plaintiffs do not suggest that the OEM defendants ever agreed, either expressly or impliedly, to purchase software only from Microsoft or not to purchase software from Microsoft's competitors.  <u>Fourth</u>, plaintiffs do not allege that any of the OEMs has market power, or that the PC market is concentrated in any way (as indeed they could not, given the fiercely competitive nature of the market).  <u>Fifth</u>, plaintiffs do not allege the existence of any "horizontal" agreement among the OEMs.  To the contrary, plaintiffs' entire case against the OEMs seems to be premised on the separate software licensing and distribution agreements independently negotiated between Microsoft and each of the OEMs – in other words, a hub and spokes "conspiracy" without a rim.  <u>Sixth</u>, plaintiffs never allege that the supposedly illegal agreements between the defendant OEMs and Microsoft were confined to those parties.

To the contrary, the Complaint is premised on allegations that the defendant OEMs acquiesced in the <u>same</u> basic licensing arrangements Microsoft also was imposing on all of the other hundreds of OEMs that produce PCs and was also imposing on a variety of Internet Service Providers, Internet Content Providers, and other companies.

A clear picture thus emerges from the Complaint: plaintiffs' real quarrel is with Microsoft, which supposedly has charged monopoly prices for its software.  Plaintiffs do not allege any mechanism that would allow the defendant OEMs to collect a slice of any supracompetitive charges for themselves.  To the contrary, their allegations of conspiracy amount to nothing more than the claim that the named OEMs should be held liable — subject to treble damages — because they, like every other OEM in the PC business, independently negotiated with Microsoft on the terms under which they could obtain software that consumers generally needed and wanted, and then resold that software installed in their computers in a fully competitive marketplace.

Thus, the crux of the legal question before this Court is whether fierce competitors can be held accountable for independently distributing the products of an alleged monopolist that controls essential inputs.  If conclusory allegations of this type sufficed to establish a conspiracy, then <u>every</u> OEM in the country — if not every party that contracted with Microsoft — would have "conspired" to preserve Microsoft's alleged monopoly.  Moreover, any "co-conspirator" exception to <u>Illinois Brick</u> recognized by this Court would quickly swallow the rule:  every company that distributed an alleged monopolist's products would be deemed to have deliberately joined any illicit conspiracy that monopolist is alleged to have undertaken, and indirect purchasers could freely bring suit merely by including allegations establishing the existence of a

contract between the manufacturer and its distributors.  That should not be — and is not — the law.

## ARGUMENT

The First Amended Complaint fails to state a claim on which relief can be granted and should, accordingly, be dismissed.  Insufficiently pled antitrust claims, just like any other claims, are properly subject to dismissal under Rule 12(b)(6).  E.g., Estate Constr. Co. v. Miller & Smith Holding Co., 14 F.3d 213, 220-22 (4th Cir. 1994); Zachair, Ltd. v. Driggs, 965 F. Supp. 741, 749 (D. Md. 1997), aff'd, 141 F.3d 1162 (4th Cir. 1998).  Plaintiffs must make specific factual allegations that demonstrate and support each element of the antitrust theory on which the claim is based.  Zachair, 965 F. Supp. at 746-47.  In particular, claims of an illegal conspiracy premised on conclusory allegations or a "boilerplate recitation of a conspiracy" are inadequate as a matter of law.  Car Carriers, Inc. v. Ford Motor Co., 745 F.2d 1101, 1107 n.4 (7th Cir. 1984); see Estate Constr., 14 F.3d at 220-21;  TV Communications Network, Inc. v. Turner Network Television, Inc., 964 F.2d 1022, 1026 (10th Cir. 1992).

That rule is properly applied with greater vigilance where the alleged conspiracy makes no economic sense.  Indeed, courts regularly dismiss economically implausible antitrust claims supported only by conclusory allegations.  See, e.g., DM Research, 170 F.3d at 55-56 (dismissing Section 1 conspiracy claim under Rule 12(b)(6)); TV Communications Network, Inc., 964 F.2d at 1026 (dismissing conspiracy claims under Sections 1 and 2 on a motion to dismiss); Mylan Labs., Inc. v. Akzo, 770 F. Supp. 1053, 1065-68 (D. Md. 1991) (dismissing Section 1 conspiracy claim under Rule 12(b)(6)); infra pp. 10-14.

These legal principles require dismissal here.  All of plaintiffs' conspiracy claims hinge on the assumption that the OEMs would conspire to promote and extend Microsoft's alleged

monopoly in markets where the OEMs themselves are <u>buyers</u>.  But the Complaint contains nothing beyond mere conclusory allegations to explain how and why the OEMs entered into such counterintuitive arrangements, and their catalogue of the supposed "benefits" derived by the OEM defendants from Microsoft's alleged monopoly is both indirect and nonsensical.  For that reason, the Complaint offers no basis for inferring the existence of the broad conspiracy alleged, as required under Section 1, let alone for concluding that the OEMs specifically intended to further Microsoft's alleged monopoly, as required under Section 2.

Plaintiffs do include a handful of specific factual allegations regarding provisions in the OEMs' licensing agreements with Microsoft.  But these individual licensing terms provide absolutely no basis for inferring that the defendant OEMs deliberately joined a conspiracy to promote Microsoft's alleged monopolies.  To the contrary, it is well established that one cannot incur liability merely for doing business with an alleged monopolist.  Finally, to the extent that plaintiffs seek to challenge particular terms of the licensing agreements, rather than to pursue the broader conspiracy alleged, plaintiffs never allege that the OEMs, either expressly or impliedly, ever agreed to any provision of the kind that has been held to constitute a restraint of trade under Section 1.   In short, plaintiffs simply have failed to state a viable conspiracy claim.

I.     **PLAINTIFFS' SECTION 2 CONSPIRACY CLAIM SHOULD BE DISMISSED BECAUSE IT RESTS ENTIRELY ON CONCLUSORY ALLEGATIONS AND MAKES NO ECONOMIC SENSE.**

Plaintiffs have alleged that the OEM defendants and Microsoft violated Section 2 by engaging in a broad, far-ranging conspiracy to maintain and extend Microsoft's alleged monopoly in the markets for (1) operating system software, and (2) word processing and spreadsheet software.  Their theory presupposes that the OEMs conspired with Microsoft to maintain Microsoft's alleged monopoly in markets where the OEMs are <u>buyers</u> and thus could

only stand to lose from the success of the conspiracy.  The conclusory allegations contained in the First Amended Complaint fall far short of what would be required before plaintiffs could be allowed to press forward with such an implausible claim.

A plaintiff claiming a conspiracy to monopolize in violation of Section 2 must show (1) concerted action (2) a specific intent to achieve an unlawful monopoly, and (3) overt acts in furtherance of the conspiracy.  Advanced Health-Care Servs., Inc. v. Radford Cmty. Hosp., 910 F.2d 139, 150 (4th Cir. 1990); Genetic Sys., 691 F. Supp. at 420 (articulating similar test and citing numerous cases).  In the present case, the second element is key.  It means that plaintiffs must show that each of the defendants (not just Microsoft) "shared [the alleged monopolist's] specific intent to create a monopoly for [itself]."  SuperTurf, Inc. v. Monsanto Co., 660 F.2d 1275, 1283 (8th Cir. 1981); see Association for Intercollegiate Athletics for Women v. NCAA, 735 F.2d 577, 585 (D.C. Cir. 1984) (per curiam) ("specific intent in this context refers to a purpose to acquire monopoly power by driving one's rival from the market by exclusionary or predatory means").  Hence, plaintiffs must demonstrate that the OEMs' specific purpose in agreeing to the licensing terms at issue was to further Microsoft's schemes to monopolize the alleged markets.

Where, as here, a plaintiff's antitrust theory makes no economic sense, the plaintiff bears a particularly heavy burden.  See Genetic Sys., 691 F. Supp. at 421.  Indeed, the absence of any benefit to the alleged conspirators defeats any claim of specific intent under Section 2.  E.g., id. (dismissing claim of conspiracy to monopolize); TV Communications Network, 964 F.2d at 1026 (affirming dismissal).

### A.    Plaintiffs' Conspiracy Theory Makes No Economic Sense.

The essence of plaintiffs' Section 2 conspiracy claim is that the defendant OEMs conspired to maintain an alleged monopoly in sales to OEMs of operating system, word processing, and spreadsheet software.  That, on its face, would be conduct directly contrary to the OEMs' own economic interests.  See Stephen Jay Photography, Ltd. v. Olan Mills, Inc., 903 F.2d 988, 994 (4th Cir. 1990);  Coastal Transfer Co. v. Toyota Motor Sales,U.S.A. 833 F.2d 208, 211 (9th Cir. 1987); Car Carriers, 745 F.2d at 1110; TV Communications Network, 964 F.2d at 1024-27; Kramer v. Pollack-Krasner Found., 890 F. Supp. 250, 256 (S.D.N.Y. 1995); Genetic Sys., 691 F. Supp. at 421-22.  For obvious reasons, purchasers like the OEMs ordinarily prefer to buy inputs in competitive markets where they have choice and lower prices.  Car Carriers, 745 F. 2d. at 1109; Coastal Transfer , 833 F. 2d. at 211.  Being effectively forced to buy from an alleged monopolist can only increase the OEMs' costs and reduce their sales.  See Adams v. Pan Am. World Airways, Inc., 828 F.2d 24, 27 (D.C. Cir. 1987).  Thus, "[f]or purposes of antitrust analysis, courts assume that a firm generally wishes to 'minimize its input costs,'" and consequently refuse to infer that a firm would intend to purchase "its inputs from a monopolist at a monopoly price."  Campos v. Ticketmaster Corp., 140 F.3d 1166, 1170 (8th Cir. 1998) (internal citations omitted), cert. denied, 525 U.S. 1102 (1999).

Plaintiffs' own allegations confirm these common-sense conclusions.  For example, plaintiffs allege that the success of the alleged conspiracy resulted in an increase in the price of Microsoft operating system software.  Complaint ¶ 63.  That increase could only harm PC manufacturers — either because they will be forced to absorb those costs or because, by passing those costs on to consumers and raising prices, they lower demand for their products.

In such circumstances, courts naturally cast a skeptical eye on efforts by plaintiffs to transform normal commercial conduct into evidence that a buyer intentionally conspired to promote the interests of a seller.  In <u>Genetic Systems</u>, for example, a supplier of blood screening test equipment sued Red Cross and a competing supplier of test equipment (Abbott), alleging various violations of the antitrust laws in connection with an exclusive supply contract entered into between Abbott and Red Cross.  The court dismissed plaintiff's conspiracy-to-monopolize claim for failure to state a claim.  The court found it economically implausible that the Red Cross would conspire with another party to monopolize a market in which it was a buyer:  "that a purchaser such as the Red Cross would conspire with a supplier such as Abbott to facilitate the supplier's monopolization of the market to allow, for example, the supplier to charge the purchaser 'non-competitive monopoly prices' is sufficiently implausible to limit any inference of an antitrust violation."  691 F. Supp. at 422.  The court noted that the plaintiff had made a conclusory allegation of "intent" to exclude the plaintiff as a competitor of Abbott.  <u>Id.</u>  It held, however, that "[m]ere use of the word 'intent' . . . does not constitute a factual allegation of specific intent," that the plaintiffs' multi-faceted claim of conspiracy only "reveal[ed] the vagueness of plaintiffs' theory and does not remedy this legal deficiency," and that the "complaint is not supported by meaningful factual allegations."  <u>Id.</u>

Similarly, in <u>TV Communications Network, Inc.</u>, where a cable station sued other cable operators and TNT, a cable program supplier, on conspiracy grounds, the Tenth Circuit affirmed the district court's dismissal of the plaintiff's claims for similar reasons.  It explained that "[a]lthough the modern pleading requirements are quite liberal, a plaintiff must do more than cite relevant antitrust language to state a claim for relief. . . .  Conclusory allegations that the defendant violated those laws are insufficient."  964 F.2d at 1024.  The court further added:

> Although it is reasonable to infer that an entity would act to further its own
> monopoly power, it is implausible that the cable operator defendants
> would conspire with TNT to aid TNT in its efforts to acquire or to
> maintain a monopoly in the market for the TNT Channel.  If, as [plaintiff]
> alleges, the TNT Channel is "essential" to cable operators, then
> achievement of the goal of the conspiracy would actually be contrary to the
> interests of the cable operators.  In such a monopolistic environment, TNT
> would have the power and the incentive to charge the cable operators
> supercompetitive prices for the TNT service.  Because the cable operators
> would have no rational motive to create such an environment, TVCN's
> allegations do not provide an inference of specific intent to conspire to
> achieve the stated goal of the conspiracy.

Id. at 1026-27.  See also Association for Intercollegiate Athletics for Women, 735 F.2d at 588

n.18 (rejecting predatory pricing claim under Section 2 on the ground that conspiracy made no

economic sense); Kramer, 890 F. Supp. at 256 (dismissing complaint under Rule 12(b)(6)

because plaintiff "presents no coherent theory of participation by [the defendants] in the alleged

conspiracy");  Mylan Labs., 770 F. Supp. at 1067-68 (dismissing antitrust claim where plaintiffs

made only conclusory allegations of counter-intuitive conspiracy).

In sum, where, as here, plaintiffs' conspiracy claim is economically implausible, plaintiffs

must come forward with more specific factual allegations before that claim can proceed.  Cf.

Matsushita Elec. Indus., Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (when "claim is

one that simply makes no economic sense," plaintiffs "must come forward with more persuasive

evidence to support their claim than would otherwise be necessary").  In the absence of such

specific allegations, the appropriate course is dismissal.  See DM Research, 170 F.3d at 55-57.

**B.    Nothing in the Complaint Justifies Allowing Plaintiffs to Continue Pursuing
        Their Implausible Section 2 Claim.**

Plaintiffs offer no reason why this Court should accept at face value their

allegations that the OEMs intentionally agreed to help Microsoft maintain its alleged

monopolies.  First, they try, but fail, to allege how this conspiracy might have benefitted

the OEMs.  Second, their reliance on the specific alleged terms of the OEMs' licensing agreements with Microsoft is not remotely sufficient.

1.      <u>Supposed "Benefits."</u>  Plaintiffs suggest three basic ways in which the OEMs allegedly "benefit" from conspiring to harm themselves by preserving Microsoft's alleged monopoly, all of which stem from the licensing agreements challenged here.  But the fact that an OEM derived some financial or contractual "benefits" from Microsoft cannot, standing alone, establish that the OEMs conspired with Microsoft with the specific intent of helping Microsoft carry out its alleged monopolistic schemes.  <u>Contractor Util. Sales Co. v. Certain-Teed Prods. Corp.</u>, 638 F.2d 1061, 1075-76 (7th Cir. 1981).  Otherwise, any company that bargained to achieve favorable contractual terms from a manufacturer would be deemed to have intentionally joined any conspiracy undertaken by that manufacturer.

Moreover, none of the plaintiffs' allegations comes close to establishing a benefit of any sort, let alone a benefit that outweighs the economic harms the OEMs must suffer because of Microsoft's alleged monopoly.  <u>See</u> <u>Matsushita Elec. Indus., Co.</u>, 475 U.S. at 592 (conspiracy is irrational if losses outweigh benefits).  The main reason is that, as plaintiffs' own allegations confirm, the named OEM defendants are in essentially the same position as their competitors. All are alleged to compete subject to Microsoft's allegedly monopolistic control over the inputs into their product and under terms dictated by Microsoft, and all must sell their products in a competitive market.

Plaintiffs' first allegation of benefit is that the OEM defendants received various financial "incentives" or "discounts" from Microsoft in return for agreeing to purchase and use products on terms preferred by Microsoft.  <u>See</u> ¶ 153 ("discounts" to bundle software, "free" browser software to bundle with Windows, "consideration" for agreements not to modify desktop or boot-

up sequence).  There is no allegation, however, that these hypothetical rewards were received

solely by the OEM <u>defendants</u>.  In fact, plaintiffs allege that all OEMs accepted the contractual

restraints that were supposedly rewarded with the discounts and incentives alleged.  <u>See</u> ¶¶ 10,

90-99, 105, 113, 118-21.  In these circumstances, any "benefit" supposedly given to the three

defendant OEMs would be illusory because it would be dissipated by the fierce competition in

the OEM market.  Indeed, any OEM that tried to retain a supracompetitive profit would be

undersold by its competitors.  Hence any benefit in the form of discounts is a benefit passed on to

consumers.

Plaintiffs next claim that the OEM defendants earned "monopoly revenues" from

distributing Microsoft's software by charging "mark-ups on monopoly software prices secure in

the knowledge they would not be undercut."  ¶¶ 3(b), 59-60, 152, 155.  Conclusory allegations

regarding "monopoly revenues," however, cannot substitute for sound economic analysis, and

plaintiffs cannot simply ignore the inconvenient fact that the market for sale of PCs is very

competitive.  <u>See</u> <u>Digital Equip. Corp. v. UNIQ Digital Techs., Inc.</u>, 73 F.3d 756, 761 (7th Cir.

1996) ("Computer manufacturers are vigorous rivals . . . this is one of our economy's most

competitive sectors.").[4/]  For that reason, even assuming Microsoft were a monopolist that could

charge a supracompetitive rate for its products, Microsoft would inevitably keep all of the alleged

"monopoly" profits for itself; there is no way that the OEMs could benefit from such a situation

because no OEM, operating in the highly competitive market for sales of PCs, is in a position to

raise prices above the competitive level.  Thus, while it may be true that the retail price of PCs

would include a pass-on of the full monopoly price that Microsoft allegedly charges

---

[4/] This is consistent with Judge Jackson's factual findings in <u>United States v. Microsoft Corp</u>.  <u>See</u> Findings of Fact,
¶¶ 54, 155, 158, 170, 202, 203, 204, 213-15, 225; <u>see also</u> <u>United States v. Microsoft Corp.</u>, 87 F. Supp.2d 30, 41
(D.D.C. 2000) (Conclusions of Law) (noting that OEMs operate in a "very competitive PC market. . . .").

manufacturers (if the OEMs are able to pass on that surcharge at all), competition among OEMs would prevent any of the OEMs themselves from achieving a supracompetitive return on any component of a PC, whether software- or hardware-related.  See In re Beef Indus. Antitrust Litig., 600 F.2d 1148, 1161 (5th Cir. 1979) (no agreement can be inferred when direct purchasers merely pass on overcharges).

Third, plaintiffs allege that the OEM defendants are benefited because Microsoft's alleged monopolies allow the OEMs to force customers to buy extra product.  They allege, for example, that the OEMs can bundle extra Microsoft software on their machines "secure" in the knowledge that they will not be "substantially undercut by rivals offering hardware with software competitive with the Microsoft software, or without software." ¶¶ 3(c), 15, 154.  But even assuming that Microsoft has a monopoly on certain categories of software, that fact does not begin to explain how the OEMs could force consumers to buy more software than they want.  See Digital Equip., 73 F.3d at 762 ("In a competitive market . . . an attempt to charge for unwanted items . . . leads to ruin as rivals step in to take the business.").  Nor does it explain how the OEMs benefit from allegedly being forced to install expensive Microsoft software in lieu of competitive products.

Another variant of plaintiffs' "extra product" claim is the allegation that Microsoft's alleged monopoly results in operating system software that requires additional computer "memory" and that the OEMs are thus able to persuade consumers to buy more memory than they would need in a world with more competition among producers of operating systems.  See ¶¶ 3(c), 15, 155, 156.  But here again, such an attenuated, hypothetical claim cannot survive a motion to dismiss.  See Genetic Sys., 691 F. Supp. at 420; Adams, 828 F.2d at 30; infra pp. 36-38.  It is utterly speculative whether any competing operating system that might have emerged in

recent years would have used more or less memory than Windows.  And it is even more
speculative to suggest that any profit the three defendant OEMs could theoretically derive from
selling more memory in the fiercely competitive PC market would outweigh the many costs
associated with preserving Microsoft's alleged monopoly, including Microsoft's purportedly
unfettered ability to control the price of essential inputs.  Here again, the fact that all OEMs
would be identically situated would cut strongly against any supposition of substantial benefits.

       2.      <u>The Specific Contractual Provisions.</u>  In addition to cataloguing "benefits" the
OEMs supposedly derive from participating in a conspiracy to harm themselves, plaintiffs offer
one other type of specific allegation to support their claim that an agreement existed among the
parties: they cite a handful of specific licensing provisions allegedly contained in the OEMs'
licensing agreements with Microsoft.  But these provisions by themselves do not come close to
providing any basis for allowing plaintiffs to proceed with their inherently implausible Section 2
claim.

       It is well established that one is not liable for violating the antitrust laws merely because
one deals with an alleged monopolist.  <u>See</u> <u>In re Beef Indus. Antitrust Litig.</u>, 600 F.2d at 1161.
Indeed, it is a "fundamental antitrust concept that the alleged sins of [the] seller should not be
visited on buyers because of the risk of chilling competition." <u>Genetic Sys.</u>, 691 F. Supp. at 415;
<u>see also</u> <u>49er Chevrolet, Inc. v. General Motors Corp.</u>, 803 F.2d 1463, 1467 (9th Cir. 1986)
(courts should be reluctant to infer conspiratorial behavior from normal commercial conduct);
6 Phillip E. Areeda, <u>Antitrust Law</u> ¶ 1408b (1986).  But plaintiffs are trying to do just that by
resting their broad conspiracy claim on a handful of contractual terms in the licensing agreements
that allegedly served Microsoft's purposes.  As explained <u>infra</u> Part III, the provisions challenged
by plaintiffs, standing alone, fall well short of constituting an actionable claim as to the OEMs.

But even if one or more of these provisions could be challenged individually under Section 1 as a "contract . . . restrain[ing] trade," 15 U.S.C. § 1, they certainly cannot establish that plaintiffs joined with Microsoft in a broad conspiracy with the specific purpose of preserving Microsoft's alleged monopolies.

To begin with, plaintiffs offer nothing to suggest that these provisions were the result of anything other than the unilateral demands of Microsoft, the alleged monopolist. Indeed, plaintiffs themselves allege that the restrictive provisions were also imposed on non-defendant OEMs. See ¶¶ 10, 90-99, 105, 113, 119-22. That being the case, the provisions say nothing about the OEMs' supposed specific intent to help Microsoft. See Tidmore Oil Co. v. BP Oil Co., 932 F.2d 1384, 1388-89 (11th Cir. 1991) (no conspiracy where dealer's help or acquiescence is not necessary for supplier to achieve its anticompetitive goal); Contractor Util. Sales, 638 F.2d at 1075 (a manufacturer's decision to market its products through a particular supplier establishes "nothing more than unilateral action by [the manufacturer]" and cannot establish the existence of a conspiracy absent proof that the distributor "encouraged or participated in" the alleged conspiracy).

Moreover, an examination of the specific contractual provisions cited[5/] demonstrates that they offer no basis for inferring that the OEM defendants joined in any conspiracy broader in scope and effect than the particular licensing agreements themselves. See 49er Chevrolet, Inc., 803 F.2d at 1467 (refusing to infer an unlawful agreement "merely on the basis of" contract between alleged co-conspirators where contract did not contain agreement to participate in co-defendant's alleged price-fixing scheme); Adaptive Power Solutions, LLC v. Hughes Missile Sys. Co., 141 F.3d 947, 949, 952-53 (9th Cir.) (refusing to infer from an explicit agreement to

drive one subcontractor out of the market a conspiracy to achieve the broader goal of disciplining

other subcontractors), <u>cert. denied</u>, 525 U.S. 875 (1998); <u>TV Communications Network</u>, 964

F.2d at 1026 (refusing to infer concerted action despite allegation that co-conspirators entered

into exclusive dealing contracts that furthered goals of alleged conspiracy); <u>Parkway Gallery</u>

<u>Furniture, Inc. v. Kittinger/Pennsylvania House Group</u>, 818 F.2d 801, 804-06 & n.5 (4th Cir.

1989) (refusing to infer conspiracy where plaintiffs only demonstrated that defendants knew

other manufacturers had similar policies but did not show agreement among manufacturers);

<u>Coastal Transfer</u>, 833 F.3d at 211 (refusing to infer from narrow agreement a broader purpose to

curtail competition, especially when broader goal could only be harmful to one of the alleged co-

conspirators); <u>Contractor Util. Sales</u>, 638 F.2d at 1075-76 (refusing to infer concerted action

---

[5/] Two of the cited provisions — the allegations regarding "per-processor" licensing arrangements and long-term contracts — are irrelevant because they terminated before the beginning of the actionable period.  <u>Infra</u> p. 29.

from contract containing terms that benefitted alleged co-conspirator); <u>Beutler Sheetmetal Works</u>

<u>v. McMorgan & Co.</u>, 616 F. Supp. 453, 456 (N.D. Cal. 1985) (despite parties' "agree[ment] to

sell . . . mortgages" subject to the challenged restriction, no conspiracy may be inferred in the

absence of evidence that the alleged co-conspirators "participated in any way in the formulation

or implementation" of the challenged restrictions); <u>see also</u> <u>Matsushita Elec. Indus., Co.</u>, 475

U.S. at 588, 596 (plaintiffs "must show that the inference of conspiracy is reasonable in light of

the competing inferences of independent action or collusive action that could not have harmed

[plaintiffs]" and declining to find concerted action despite existence of agreements among the

parties); <u>Consolidated Metal Prods., Inc. v. American Petroleum Inst.</u>, 846 F.2d 284, 294 n.30

(5th Cir. 1988) (refusing to infer conspiracy without evidence "that there was a single plan, the

essential nature and general scope of which was known to those responsible for its

implementation"); <u>Association of Retail Travel Agents, Ltd.</u>, 635 F. Supp. at 536 (mere

participation in trade association cannot establish "knowing, intentional participation in the

illegal activities of the association").

 For example, plaintiffs complain about contractual provisions involving Microsoft's sales

of word processing and spreadsheet software, arguing that the company achieved a dominant

share in these markets by offering a discount on packages bundling this software with its

operating system software.  Plaintiffs seem to be suggesting that Microsoft's pricing was so low

as to be "predatory" — <u>i.e.</u>, priced below cost to put competitors out of business.  Even if

plaintiffs' allegations sufficed to establish such a claim against Microsoft — and they do not, for

the reasons articulated <u>infra</u> pp. 32-34 — plaintiffs certainly cannot allege that the OEM

defendants "conspired" in Microsoft's alleged predatory pricing scheme merely because they

purchased its products at low prices.  To the contrary, it would be absurd to suggest that the buyer — which has no knowledge of the seller's cost structure or long-term aims — specifically intended to promote the seller's alleged monopoly merely because it purchased needed inputs at the best available price.

Plaintiffs' claims regarding license agreements allegedly favoring the emergence of Microsoft's Internet Browser similarly fail to offer any basis for inferring the existence of a broad conspiracy to which the OEMs were a party.  Indeed, even if these license agreements were objectionable because of their effect on the browser market[6/] — the only market these restrictions could directly affect — plaintiffs do not challenge them on that basis.[7/]  Instead, plaintiffs insist that Microsoft believed that restrictions on the browser market would indirectly preserve its alleged monopolies in the markets for operating system software.  But even assuming plaintiffs have offered a fair description of Microsoft's intent in adopting these contractual terms, they provide no evidence that the OEMs understood, let alone shared, that intent.[8/]  To the contrary, provisions affecting one market cannot establish the existence of an agreement to join an allegedly far-ranging conspiracy to monopolize in an entirely different market.  As the Supreme Court ruled in Matsushita, even proof of "collateral conspiracies" in one market "says little, if anything, about the existence of a conspiracy" in a different market.  475 U.S. at 596.  "[A] plaintiff cannot avoid the pleading requirements for a claim for conspiracy to monopolize by

---

[6/]  Plaintiffs do not allege that they were denied the opportunity to install and use whatever browser they preferred.  The reason, of course, is that the primary competing browser — Netscape Navigator — has been available free on the Web for years and can be immediately installed on any computer using a Microsoft operating system, regardless of the "boot-up" sequence and desktop provided by the computer manufacturer and regardless of whether Microsoft's Internet Explorer is also installed.

[7/]  Nor could they, for plaintiffs have alleged injury only in the markets for operating system, word processing, and spreadsheet software.

[8/]  Remarkably, the only party plaintiffs allege to have recognized the connection between these two different alleged markets is Microsoft.  ¶¶ 64-66.

constructing a theory or evidence of conspiracies in <u>related</u> markets" and thus must establish the requisite knowledge and intent "with respect to the market in which it has standing." <u>Genetic Sys.</u>, 691 F. Supp. at 421 (emphasis added); <u>cf.</u> <u>SAS of Puerto Rico, Inc. v. Puerto Rico Tel. Co.</u>, 48 F.3d 39, 46 (1st Cir. 1995) (declining to grant standing to a party that was not the "purchaser in the very market <u>directly</u> distorted by the antitrust violation") (emphasis added); <u>Legal Econ. Evaluations, Inc. v. Metropolitan Life Ins. Co.</u>, 39 F.3d 951, 954 (9th Cir. 1994) (declining to find antitrust injury where "the injury does not match either the mischief about which it complains or the markets in which it occurred"); <u>Sullivan v. Tagliabue</u>, 828 F. Supp. 114, 117-18 (D. Mass. 1993) (declining to recognize antitrust injury when plaintiff is not the "'<u>direct</u> victim of the defendants' . . . practices'" and the alleged violation had an "indirect and incidental effect" on the market at issue) (internal citations omitted), <u>aff'd</u>, 25 F.3d 43 (1st Cir. 1994); <u>Weatherby v. RCA Corp.</u>, 1988-1 Tr. Cas. (CCH) ¶ 68,078, at 6-7 (N.D.N.Y. 1986) (concluding that a plaintiff that competes in one market cannot bring an antitrust claim based on restrictions imposed in a different market despite allegations regarding the "indirect relationship" between the two markets).  Thus, far from being supported by specific factual allegations, plaintiffs' conspiracy theory requires them to pile conclusory allegation upon conclusory allegation about the intentions of the OEM defendants.

For these reasons, the Court should squarely reject plaintiffs' effort to cobble together a broad, far-ranging conspiracy based on conclusory allegations and allegedly restrictive contractual terms.  Plaintiffs are "unable to allege or show that [the alleged co-conspirator] had a specific intent to monopolize a market in which it does not participate." <u>Genetic Sys.</u>, 691 F. Supp. at 421.  Instead, plaintiffs have concocted an elaborate conspiracy theory "transferr[ing] and combin[ing]" the intent of the party that stood to benefit from the alleged scheme with a

party that could only be harmed by such a scheme.  Id. at 421, 422.  Notwithstanding the

existence of specific contractual agreements between the defendants that plaintiffs alleged to

have an anticompetitive effect, id. at 410, 413, a plaintiff "cannot create a whole conspiracy . . .

that is greater than the sum of its parts."  Id.   That common-sense conclusion requires dismissal

of plaintiffs' Section 2 claim here.

## II.    PLAINTIFFS' SECTION 1 CONSPIRACY CLAIM IS EQUALLY DEFICIENT.

Although their claims are focused entirely on Microsoft's alleged monopolization of the

markets for operating system, word processing, and spreadsheet software, plaintiffs implicitly

acknowledge the weakness of their claims regarding intentional conspiracy to monopolize under

Section 2 by alleging that the same conduct constitutes a "contract, combination . . . or

conspiracy, in restraint of trade" in violation of Section 1.  But even assuming that it is proper, in

principle, to pursue a "conspiracy to monopolize" claim under Section 1, plaintiffs' evasion will

not work.  Indeed, plaintiffs' Section 1 conspiracy claim should be dismissed for essentially the

same reasons that their Section 2 claim fails.

As with their Section 2 claim, plaintiffs attempt to establish a conspiracy under Section 1

by going beyond the specific contractual provisions cited and alleging that the OEMs joined with

Microsoft in a broader conspiracy to create and preserve Microsoft's alleged status as a

monopolist.  Under Section 1, plaintiffs must present allegations demonstrating that defendants

made a conscious commitment to an illegal conspiracy.  See Laurel Sand & Gravel, Inc. v. CSX

Transp., Inc., 924 F.2d 539, 543 (4th Cir. 1991).  Specifically, plaintiffs must allege: 1) concerted

action by defendants; 2) that the conspiracy caused adverse and anti-competitive effects within

the relevant market; 3) that defendants engaged in illegal conduct pursuant to the conspiracy; 4)

that the conspiracy proximately caused antitrust injury to the plaintiff.  See Terry's Floor

Fashions, Inc. v. Burlington Indus., Inc., 763 F.2d 604, 610 & n.10 (4th Cir. 1985). "Concerted action is the essence of a § 1 claim," id. at 610, and "[t]he essence of concerted activity is agreement. . . ." Mylan Labs., 770 F. Supp. at 1066.

Thus plaintiffs' allegations must suggest that they can show that the OEM defendants shared with Microsoft "'a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement.'" Monsanto Co. v. Spray-Rite Serv. Corp., 465 U.S. 752, 764 (1984) (internal citation omitted); see Mylan Labs., 770 F. Supp. at 1066-67 ("[Plaintiff] must show that each alleged conspirator participated in the conspiracy with knowledge of the essential nature of the plan.") (quotation and citation omitted).  To survive a motion to dismiss, plaintiffs' allegations must support the inference of such an agreement.

The Complaint does not come close to offering these kinds of allegations. Here again, the basic problem is that plaintiffs' claims make no sense.  As the Supreme Court explained in a Section 1 case, if the defendants have no rational economic motive to conspire, ambiguous "conduct does not give rise to an inference of conspiracy." Matsushita Indus. Elec., Co., 475 U.S. at 597.

Other cases illustrate this principle in the Section 1 context.  In Car Carriers, Inc., for example, Car Carriers, a car transport company, brought an antitrust action under Section 1 against Ford Motor Company, which had terminated plaintiff's contract in favor of a Nu-Car, a second car transport company.  Recognizing that in considering a motion to dismiss, a court is not required to "don blinders and ignore commercial reality," 745 F.2d at 1110, the Seventh Circuit ruled that plaintiff's boilerplate recitation of a conspiracy was insufficient to withstand a motion to dismiss in part because the plaintiff had alleged an economically implausible conspiracy theory.  Id.  As the Seventh Circuit explained in dismissing one of plaintiffs'

predatory bidding claims, a complaint should be dismissed when the concerted activity alleged is implausible: "it is preposterous to assume that Ford would conspire with Nu-Car to eliminate Car Carriers by accepting Nu-Car's 'predatory' bid so that [Nu-Car] could later charge noncompetitive monopoly prices." Id.

Similarly, the First Circuit recently affirmed the dismissal of a Section 1 conspiracy claim under Rule 12(b)(6) in DM Research, Inc., 170 F.3d at 55. The plaintiff, a producer of reagents, had alleged that the College of American Pathologists and the National Committee for Clinical Laboratory Standards had conspired to restrain trade in the provision of high grade reagent water products. The First Circuit agreed that dismissal of the complaint was appropriate because "it is highly implausible to suppose that the College or its members have any reason to 'agree' with National to adopt a [reagent] standard whose main effect would be to raise costs for laboratories that found it cheaper to buy bottled reagent water than to make it on site." Id. at 56. The First Circuit found not only that "the case law on this point is ample," but that it would be improper to allow the case to go forward and thus incur "the costs of highly unpromising litigation." Id.; see also Adaptive Power Solutions, 141 F.3d at 952-53 (dismissing Section 1 conspiracy that makes no economic sense); Coastal Transfer Co., 833 F.2d at 211 (rejecting Section 1 conspiracy claim based in part on the fact that plaintiff's conspiracy theory was "illogical").

Moreover, plaintiffs fail to present sufficient allegations of an agreement among the OEM defendants. Like the plaintiffs in Mylan Laboratories, whose case was dismissed pursuant to Fed. R. Civ. P. 12(b)(6), plaintiffs here have focused on "each corporation's tie to the [Microsoft] hub." 770 F. Supp. at 1066. However, as this Court has held:

> Mere identity of purpose, interconnected events and shared participants, on which plaintiffs base their claim, do not link separate conspiracies into one overall, single conspiracy. For separate activities to result in a single conspiracy, the allegations and proof must reflect a wheel and spoke

> arrangement in which a single person at the hub implements the
> conspiracy by a series of arrangements with others to carry out the purpose
> of their conspiracy.  But such separate activities, even if for a common
> purpose, do not constitute a conspiracy 'without the rim of the wheel to
> enclose the spokes.'  There must be a connection among all of the alleged
> participants sufficient to support a finding that they had entered into the
> alleged conspiracy.

Id. at 1066 (quoting In re Ins. Antitrust Litig., 723 F. Supp. at 483-84).  Plaintiffs here have

presented nothing more than allegations of "a hub and spokes without a rim."  Id.  For the

reasons stated above, supra pp. 18-24, the narrow, contractual terms allegedly embodied in the

parties' agreements do not establish that the defendants made a "conscious commitment to a

common scheme designed to achieve an unlawful objective." Monsanto, 465 U.S. at 768.  This

warrants dismissal of their claim, particularly in light of the economic implausibility of their

conspiracy theory.  See Mylan Labs., 770 F. Supp. at 1068; see also Johnson, 903 F. Supp. at

150.

## III. THE SPECIFIC CONTRACTUAL PROVISIONS CITED DO NOT CONSTITUTE RESTRAINTS OF TRADE ACTIONABLE AS TO THE OEM DEFENDANTS UNDER SECTION 1.

As noted, the crux of the Complaint is the claim that the OEMs entered into a broad

conspiracy with Microsoft designed to create and preserve that company's alleged monopolies.

See, e.g., ¶ 125 (describing "overt acts" taken by Microsoft in furtherance of "the conspiracy");

id. ¶ 147 (referring to a single "unlawful conspiracy in restraint of trade" under Section 1).

Nevertheless, in an abundance of caution, we will assume arguendo that plaintiffs also intend to

challenge the individual contracts entered into between Microsoft and each OEM as illegal

"contracts . . . to restrain trade" under Section 1.

To the extent that plaintiffs rely solely on provisions in those contracts in asserting a

Section 1 claim, they must provide a basis for concluding that these contractual provisions in fact

"restrained" trade unlawfully.  "[C]ourts have construed section 1 of the Sherman Act to prohibit

only those contracts and combinations that <u>unreasonably</u> restrain trade."  <u>Montgomery County</u>

<u>Ass'n Of Realtors, Inc. v. Realty Photo Master Corp.</u>, 783 F. Supp. 952, 959 n.21 (D. Md. 1992)

(emphasis added), <u>aff'd</u>, 993 F.2d 1538 (4th Cir. 1993); <u>see also</u> <u>Estate Constr.</u>, 14 F.3d at 220.

The unreasonableness of an alleged restraint is not measured by economic detriment to the

plaintiff, but instead is evaluated "based on its impact on competition as a whole within the

relevant market." <u>Oksanen v.  Page Mem'l  Hosp.</u>, 945 F.2d 696, 708 (4th Cir. 1991).

Accordingly, plaintiffs are required to show at a minimum that the contractual provisions at issue

are comparable in their anticompetitive effects to the select categories of vertical agreements that

have in the past been recognized as being potentially unlawful — <u>i.e.</u>, exclusive dealing

arrangements, resale price maintenance, tying arrangements, and the like.

The provisions at issue here fail to meet this test.  Two of the cited provisions terminated

before the beginning of the actionable period.  As for the remaining three — those supposedly

providing for package pricing of software, restrictions on modification of the initial boot-up

sequence and desktop, and bundling of Windows with the Internet Browser — the Complaint

provides no basis for concluding that the OEMs either expressly or impliedly agreed to any

provision that has been held to constitute a restraint of trade actionable in a private damages suit

under Section 1.  Indeed, Judge Jackson already rejected the government's Section 1 exclusive

dealing claims on the ground that such agreements did not sufficiently foreclose competitors

from the operating system market.  Conclusions of Law at 38.

A.     **Plaintiffs' Allegations Regarding Per-Processor Royalties and Long-Term Agreements Are Time-Barred.**

There is no need to analyze whether two of the alleged categories of contractual

provisions — the "per-processor" provisions allegedly requiring royalties to Microsoft on every

PC shipped with a particular processor type (i.e., regardless of whether Microsoft software was installed) and the provisions allegedly stating that the agreements would be "long-term," see, e.g., ¶¶ 10(a)-(b), 62, 63 — could be viewed as restraints of trade actionable under Section 1. These claims are time-barred.

Plaintiffs concede that on July 15, 1994, the Justice Department sued Microsoft, challenging those contractual provisions, and that the district court approved a consent decree barring them on August 21, 1995.  See ¶¶ 10, 12, 63, 153.  They omit only the fact that a Consent Decree prohibiting Microsoft from imposing per-processor licensing arrangements and long-term contracts on OEMs was filed along with the complaint on July 15, 1994.  See 59 Fed. Reg. 42845, 42855-56 (1994).  That agreement required Microsoft to cease immediately all conduct prohibited by the Consent Decree.  Id. at 42849.  Plaintiffs, significantly, do not allege that Microsoft has violated these provisions of the Consent Decree.  Because plaintiffs filed suit more than four years after this decree was signed and filed with the court, plaintiffs are barred from seeking damages for conduct that preceded that decree.[9]

---

[9]  Antitrust actions for damages "shall be forever barred unless commenced within four years after the cause of action accrued."  15 U.S.C. § 15b (1998).  Under certain circumstances, the four-year limitations period is tolled as to private actions during the pendency of "any civil or criminal proceeding . . . instituted by the United States to prevent, restrain, or punish violations of any of the antitrust laws . . . and for one year thereafter," provided that the private action is "based in whole or in part on any matter complained of in said [government] proceeding," and that it is "commenced either within the period of suspension or within four years after the cause of action accrued."  15 U.S.C. § 16(i) (1998).  But even when the conditions for such tolling are satisfied, the private suit must be initiated within one year of the termination of the government action or within the original four-year statutory period, whichever is later.  15 U.S.C. § 16(i).  Where, as here, the government action is concluded with a consent decree, the action ceases to "pend" on the date the consent decree is approved and entered by the court.  See, e.g., Yoder Bros., Inc. v. California-Florida Plant Corp., 537 F.2d 1347, 1363 (5th Cir. 1976).  Thus, plaintiffs' cause of action regarding Microsoft's per-processor licensing agreements and long-term contracts had to be raised within four years of Microsoft's ceasing the conduct (by July 15, 1998) or within one year after the period of suspension (by August 21, 1996).

**B.**     **Plaintiffs Do Not Allege That the OEMs Entered Into Any License Term That Has Been Found to Be Anticompetitive Under the "Rule of Reason."**

As for the remaining contractual provisions cited, it is important to recognize that plaintiffs fail to allege (1) that the OEMs ever promised to carry only Microsoft products, or (2) that any of the contracts entered into during the period at issue here lasted longer than a year.  For example, plaintiffs fail to allege that, by purchasing "packages" of Microsoft software, the OEMs bound themselves not to purchase or install competing word processing and spreadsheet software.  Nor do the alleged provisions governing the initial "boot up" and the "desktop" or the bundling of the browser with Windows require that the OEMs prevent end-users from using a competing browser.  At most, those provisions could point the customer in the direction of the Microsoft browser product.  Thus, all of the challenged contractual provisions are far <u>less</u> restrictive than a traditional "exclusive dealing" agreement between a supplier and a buyer, which denies the end-user purchaser a meaningful choice.

That by itself should be enough to preclude a claim that those contractual provisions, by themselves, violate the Sherman Act.  It is well established that "[i]f the [ultimate] buyer has the freedom to deal with traders of his choice, an [exclusive] agreement will not be found."  <u>White & White, Inc. v. American Hosp. Supply Corp.</u>, 540 F. Supp. 951, 1028 (W.D. Mich. 1982), <u>rev'd on other grounds</u>, 723 F.2d 495 (6th Cir. 1983); <u>see</u> <u>A.J. Buck & Son, Inc. v. Merck & Co.</u>, 1995-1 Trade Cases. ¶ 70,965, at 74,400 (D. Md. 1995) (holding evidence that buyer purchased and distributed products from seller's competitors "destroy[ed] its claim of exclusive dealing").  It is not enough to show that an agreement significantly reduces the amount of goods the distributor can purchase from another supplier or makes it much more difficult for the distributor to carry another product line.  <u>See, e.g.</u>, <u>Barry Wright Corp. v. ITT Grinnell Corp.</u>, 724 F.2d 227, 237 (1st Cir. 1983) (Breyer, J.) (upholding contractual commitment to buy large quantity of goods from

single supplier because it left the distributor "the legal power to buy small . . . amounts from [a

competitor]"); <u>Barr Lab., Inc. v. Abbott Lab.</u>, 978 F.2d 98, 110 n.24 (3d Cir. 1992) (no exclusive

dealing when restrictions "affect less than all purchases"); <u>Empire Volkswagen, Inc. v. World-

wide Volkswagen Corp.</u>, 814 F.2d 90, 97 (2d Cir. 1987) (concluding that proof of a

manufacturer's requirement that a dealer sell other manufacturers' products in a separate facility

"failed entirely to demonstrate the existence of an exclusive dealing arrangement").  In such

circumstances, the case law deems that competition has not been unduly restrained because the

ultimate consumers still have choice.

Moreover, even had the OEMs entered into true exclusive dealing arrangements, their

short duration would generally preclude a finding of a violation.  <u>See</u> <u>Paddock Publ'ns v.

Chicago Tribune Co.</u>, 103 F.3d 42, 47 (7th Cir. 1996) (affirming dismissal of complaint)

(exclusive dealing contracts are "lawful if limited to a year's duration" because "with year-long

contracts, the entire market if up for grabs" every year); <u>Omega Envtl., Inc. v. Gilbarco, Inc.</u>, 127

F.3d 1157, 1164 (9th Cir. 1997) (rejecting challenge to exclusive dealing arrangements

"[b]ecause all of Gilbarco's distributors are available within one year"), <u>cert. denied</u>, 525 U.S.

812 (1998).  Plaintiffs do not allege that any of the contractual provisions at issue here extended

more than one year.[10/]

## C.  Even Setting Aside Their Non-Exclusive Nature and Short Term, the Challenged Provisions Do Not Establish a Claim As to the OEMs.

Even if plaintiffs had alleged an actionable exclusive dealing arrangement, their claim

must fail.  To begin, Section 1 claims based on exclusive dealing arrangements should be

brought only against the seller that imposed them, not against the <u>buyer</u>.  <u>See</u> <u>Genetic Sys.</u>, 691

---

[10/]  As noted, the 1994 Microsoft consent decree barred Windows operating system software license agreements extending more than one year.  <u>See</u> 59 Fed. Reg. at 42855-56.

F. Supp. at 415 (citing <u>McGuire v. Columbia Broad. Sys., Inc.</u>, 399 F.2d 902, 908 (9th Cir. 1968)).  Thus, such a claim could be brought, if at all, only against Microsoft.  Plaintiffs ignore this rule because, as noted above, they need to sue the OEMs in order to bypass <u>Illinois Brick</u>.  But even assuming that buyers could ever be held liable for exclusive dealing arrangements, it would be particularly indefensible to adopt such an approach here.

1.      <u>The Alleged Package Pricing Provisions.</u>

Perhaps plaintiffs' most remarkable claim is that the OEM defendants conspired to restrain trade by agreeing to purchase the cheapest package of software offered by Microsoft.  That allegation, without more, cannot conceivably establish an unreasonable restraint of trade as to the OEMs.

As to the Microsoft operating system software, plaintiffs themselves allege that "because there is no viable competitive alternative to the [Microsoft] operating software for Intel-based computers, sellers of personal computers consider it a commercial necessity to install [Microsoft software] on nearly all of their personal computers."  ¶ 23.  Given that reality, the best outcome for consumers occurs when each OEM, operating in a highly competitive market, independently negotiates the best prices it can for this software, thus enabling it to pass on those savings to consumers.  As the Supreme Court has explained, "[l]ow prices benefit consumers regardless how those prices are set, and so long as they are above predatory levels, they do not threaten competition."  <u>Atlantic Richfield Co. v. USA Petroleum Co.</u>, 495 U.S. 328, 340 (1990).  The Court accordingly has warned against drawing inferences of a conspiracy from activities that reduce prices because "they chill the very conduct the antitrust laws are designed to protect." <u>Matsushita Indus. Elec., Co.</u>, 475 U.S. at 594; <u>see</u> <u>Zinser v. Rose</u>, 868 F.2d 938, 942 (7th Cir.

1989) ("The antitrust laws do not prohibit a buyer from bargaining for the best deal possible.") (internal citations omitted).

Moreover, as noted above, it is well established that a distributor does not become an alleged monopolist's co-conspirator merely by doing business with that monopolist. See In re Beef Indus. Antitrust Litig., 600 F.2d at 1161.  The reason, as this case illustrates, is that buyers of a needed input, almost by definition, have no choice but to purchase from a monopolist, and it is surely better for consumers to have access to an alleged monopolist's products on the best terms that can be negotiated than to have no product at all.  As Professor Areeda notes, while some courts have treated transaction terms imposed by monopolists as actionable conspiracies against the alleged monopolist, "[w]e must . . . be wary of extending the same proclamation to cases in which the coerced party is the defendant."   6 Phillip E. Areeda, Antitrust Law ¶ 1408b, at 45 (1986).  That caution is directly applicable to plaintiffs' allegations against the OEMs in this case.

Plaintiffs also complain about Microsoft's sales of word processing and spreadsheet software, arguing that the company did not initially have a large market share in these areas but achieved a dominant share by packaging this software with its operating system software.   But this allegation is no more successful.  To begin with, giving the OEMs a better price for a package of operating system and word processing/spreadsheet software certainly does not constitute potentially illegal "tying," because plaintiffs do not, and could not,[11/] allege that Microsoft conditioned purchase of its operating system software on the purchase of Microsoft Word and Excel.  See Jefferson Parish Hosp. Dist. No. 2 v. Hyde, 466 U.S. 2, 12 (1984) (an "essential characteristic of an invalid tying arrangement" is the seller's "forc[ing] the buyer into

the purchase of a tied product that the buyer either did not want at all, or might have preferred to

purchase elsewhere on different terms"); see Stephen Jay Photography, 903 F.2d at 991 (rejecting

tying claim in absence of showing of coercion); Association for Intercollegiate Athletics for

Women, 735 F.2d at 590 (same).  "[O]ffering a package discount does not amount to coercion."

1 ABA Section of Antitrust Law, Antitrust L. Dev., at 189 & n.1027 (4th ed. 1997) (listing

cases); see Jefferson Parish, 466 U.S. at 11 n.17.[12]/

     Plaintiffs seem to be claiming instead that Microsoft's prices were too low.  Plaintiffs do

not, however, make the necessary allegation that its prices were predatory — i.e., below cost.

See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 222 (1993).

Moreover, an allegation that a seller's price was too low cannot provide a basis for suing a buyer

under Section 1 merely because it purchased need inputs at the best available price and passed

---

[11]/  Microsoft has been prohibited since the 1994 consent decree from tying sale of one of its products to sale of another.  See 59 Fed. Reg. at 42855.

[12]/  In any case, "indirect purchasers generally do not have antitrust standing to raise federal tying claims."  See 1 ABA Antitrust Law Section, Annual Rev. 1997 Antitrust L. Dev. 55 (1998).

those savings along to consumers.  Predatory pricing aimed at creating a monopoly down the

road is conduct actionable, if at all, only as a conspiracy claim under Section 2 because it is the

overarching conspiracy to monopolize — not the individual agreement to purchase at a low

price — that establishes liability.  Cf. United States v. Columbia Steel Co., 334 U.S. 495, 532

(1948) (conduct that is lawful under Section 1 may be actionable under Section 2 when it

constitutes "an attempt to monopolize" as long as "specific intent [is] shown").  As noted above,

specific intent to join such an overarching conspiracy cannot be inferred here.

        2.      Provisions Allegedly Designed to Promote the Microsoft Browser.

Plaintiffs' allegations are equally deficient to the extent plaintiffs contend that it

constituted an illegal restraint of trade for the OEMs to have allegedly agreed to restrictions on

modification of the computer boot-up sequence and desktop (allegedly resulting in advantages to

Microsoft's Internet Browser) and to have agreed to buy operating system software with the

browser bundled into it.  The remarkably indirect nature of these claims forecloses a challenge

under Section 1 in this action.

Plaintiffs' browser-related claim is one that, like the predatory pricing claim discussed

above, must be pursued, if at all, under Section 2 of the Act.  As noted, the claim is that

provisions promoting Microsoft's browser served to protect the alleged Microsoft monopoly in

the market for operating systems.  Like a price term, a provision in a vertical agreement under

which the buyer agrees to favor the seller's product cannot become illegal under Section 1

because the seller perceives some long-term advantage in terms of protecting its alleged

monopoly in a separate market for a different product.  With a sufficient showing of specific

intent, the provision might constitute an act of "monopolization" by the seller, but it is not by

itself a direct restraint on trade creating liability for the <u>buyer</u>.  <u>Cf.</u> <u>Matsushita Indus. Elec., Co.</u>,

475 U.S. at 596 ("collateral conspiracies" in different markets do not establish existence of

conspiracy alleged).  For these reasons, the OEM defendants cannot be held liable for the indirect

effects of browser-related terms in the operating system market without showing that the OEMs

made a "conscious commitment" to that broader scheme.

In addition, at least as to the OEMs, plaintiffs' browser claim is so speculative that it fails

to meet the requirement that plaintiffs allege the fact of injury.  It is well established that in

damage actions under the antitrust laws, while the <u>amount</u> of damages may be estimated, the <u>fact</u>

of damage "must be 'certainly proved.'"  <u>Federal Prescription Serv., Inc. v. American Pharm.</u>

<u>Ass'n</u>, 663 F.2d 253, 268-69 (D.C. Cir. 1981) (quoting <u>Poster Exch., Inc. v. National Screen</u>

<u>Serv. Corp.</u>, 401 U.S. 912 (1971)); <u>see</u> <u>Broussard v. Meineke Discount Muffler Shops, Inc.</u>, 155

F.3d 331, 342-43 (4th Cir. 1998) (describing "proof of actual, individual damages" as a "critical

element" of an antitrust claim).  Where plaintiffs' theory of actual injury is speculative or the

relationship between the alleged violation and plaintiffs' injury is indirect, a motion to dismiss

will be granted.  <u>See</u> <u>Seafarers Welfare Plan v.  Philip Morris</u>, 27 F. Supp. 2d 623, 632-33 (D.

Md. 1998) (dismissing antitrust claim against tobacco companies because plaintiff's allegation of

"increased cost of doing business" from funding smoking-related health services was too remote

and indirect); <u>Genetic Sys.</u>, 691 F. Supp. at 420 (dismissing allegations of harm to plaintiff by

the Red Cross's alleged monopolization of the blood market, in which plaintiff did not compete,

on the ground that such allegations were so "vague and speculative" that plaintiff had failed to

allege actual injury and lacked standing to sue); <u>Ficker v. Chesapeake & Potomac Tel. Co.</u>, 596

F. Supp. 900, 905 (D. Md. 1984) (dismissing challenge to advertising restrictions in yellow pages

because, <u>inter alia</u>, "plaintiff's alleged injury is too indirect and the damages too highly

speculative"); <u>Weatherby</u>, 1988-1 Tr. Cas. (CCH) ¶ 68,078, at 7 (granting motion to dismiss antitrust claims on the ground, <u>inter alia</u>, that plaintiffs lacked standing because of "the indirect relationship between the alleged injuries and the antitrust violations" and "the speculative nature of the damages"); <u>cf.</u> <u>Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.</u>, 828 F.2d 211, 219-20 (4th Cir. 1987) (affirming Rule 12(b) summary judgment where asserted damages were indirect and speculative).

As in <u>Genetic Systems</u> and <u>Weatherby</u>, plaintiffs here sue neither as competitors nor consumers in the browser market where they allege the violation took place.  Rather, plaintiffs allege that <u>if</u> the OEMs had not entered into browser-related license provisions, browsers <u>might</u> one day have evolved into the functional equivalents of (or partial substitutes for) operating systems, and this in turn <u>might</u> have caused Microsoft to reduce the price of its operating system software.[13/]  In short, this claim is at least as speculative as those dismissed in those cases.

The Complaint is notably silent as to <u>when</u> browsers might have evolved into competitors for Windows, presumably because this evolution, if it were to occur at all, would occur well in the future.  It is implausible to suggest (and plaintiffs do not allege) that browsers could <u>already</u> have emerged as competitors for Windows, even if Microsoft had never produced its own browser.  Thus, plaintiffs cannot allege, as they must to avoid dismissal of this claim, that there is a reasonably probable, non-speculative connection between the browser provisions in the OEMs' license agreements and economic injury actually and presently sustained by plaintiffs in the

---

[13/] We note that Judge Jackson made clear that any restrictions Microsoft imposed on the OEMs were designed to head off a potential competitive threat that might emerge years down the road.  <u>See</u> ¶¶  32, 43, 56, 60, 77; <u>see also</u> ¶ 411 ("There is insufficient evidence to find that, absent Microsoft's actions, Navigator and Java already would have ignited genuine competition in the market for Intel-compatible PC operating systems.").  It follows that the conduct discussed by Judge Jackson has not yet affected Microsoft's market share or raised prices to consumers above the level that would have existed absent that conduct.  It further follows that there is no point in litigating about that conduct in this lawsuit: injunctive relief will be addressed in <u>United States v. Microsoft</u>, and consumers have not yet incurred any damages.

operating system market.  See, e.g., Adams, 828 F.2d at 30 (affirming grant of motion to dismiss antitrust claims where plaintiffs' theory respecting fact of damage speculative); SAS of Puerto Rico, Inc., 48 F.3d at 45 (affirming grant of motion to dismiss antitrust claims because of speculative nature of injury and connection between violation and injury); cf. Sullivan, 828 F. Supp. at 118-19 (refusing to grant standing when "an extended chain of independent events would have to have occurred to give credence to the plaintiff's damages claim," thus rendering the claim "highly speculative"); Pocahontas Supreme Coal, 828 F.2d at 220-21 (rejecting plaintiff's asserted loss of future royalties as unduly speculative).

* * * *

In sum, the Gravity plaintiffs' quarrel should be with Microsoft alone.  Plaintiffs' transparent attempt to avoid the dictates of Illinois Brick by involving the OEM defendants should be denied because plaintiffs have offered only conclusory allegations of an illogical conspiracy to maintain an alleged monopoly that could only harm the OEMs.  The consolidated actions squarely raise the Illinois Brick issue.  If those plaintiffs can survive an Illinois Brick motion, there clearly is no need for the Gravity action.  But even if the claim for monetary relief in the consolidated case is dismissed, there is no justification for allowing a far-fetched conspiracy case to proceed.

## CONCLUSION

For the reasons set forth above, and because further amendment to the pleadings would be futile, the OEMs respectfully request that the First Amended Complaint be dismissed in its entirety and with prejudice.

Respectfully submitted,


 s/  William D. Coston                    
William D. Coston
Melissa Landau Steinman
Martin L. Saad
VENABLE, BAETJER, HOWARD
 & CIVILETTI, L.L.P.
1201 New York Avenue, NW, Suite 1000
Washington, DC  20005-3917
(202) 962-4800
*Counsel for Defendant*
*Compaq Computer Corporation*


W. Stephen Smith
MORRISON & FOERSTER
2000 Pennsylvania Avenue, NW
Washington, DC  20006
(202) 887-1500


Penelope A. Preovolos
MORRISON & FOERSTER
425 Market Street
San Francisco, CA  94105
(415) 268-7000
*Counsel for Defendant Packard*
*Bell NEC, Inc.*


August 2, 2000

 s/  Paul M. Smith                    
Paul M. Smith
JENNER & BLOCK
601 13th Street, N.W.
Washington, DC 20005
(202) 639-6000


Jerold S. Solovy
Barbara S. Steiner
JENNER & BLOCK
One IBM Plaza
Chicago, Illinois 60611
(312) 222-9350


Samuel R. Miller
FOLGER LEVIN & KAHN LLP
Embarcadero Center West
275 Battery Street, 23rd Floor
San Francisco, CA 94111
(415) 986-2800
*Counsel for Defendant*
*Dell Computer Corporation*

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing motion to dismiss and memorandum in support of the motion were today served, by first-class mail, postage prepaid, on counsel for the "coordinated" and "consolidated" plaintiffs at the following addresses:

Stephen Berry
BERRY & LEFTWICH
2000 K Street, N.W.
Suite 350
Washington, D.C.  20006

Michael Kellogg
KELLOGG, HUBER, HANSEN, TODD & EVANS
1301 K Street, N.W.
Suite 1000 West
Washington, D.C.  20005

Stanley Chesley
WAITE, SCHNEIDER, BAYLESS & CHESLEY CO., L.P.A.
1513 Fourth & Vine Street
Cincinnati, OH  45202

Michael Hausfeld
COHEN, MILSTEIN, HAUSFELD & TOLL, PLLC
1100 New York Avenue, N.W.
Suite 500
Washington, D.C.  20005

               s/  Melissa Landau Steinman
              Melissa Landau Steinman
              VENABLE, BAETJER, HOWARD
               & CIVILETTI
              1201 New York Avenue, NW, Suite 1000
              Washington, DC  20005-3917
              (202) 962-4800

Dated: August 2, 2000