## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

-----------------------------------------------------------------x

**IN RE MICROSOFT CORPORATION**
**WINDOWS OPERATING SYSTEMS**          :          **MDL DOCKET NO. 1332**
**ANTITRUST LITIGATION**

                                    :          **Hon. J. Frederick Motz**

**This Document Relates To:**
**All Actions**                         :

-----------------------------------------------------------------x

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO MICROSOFT'S MOTION TO DISMISS THE MONEY DAMAGES CLAIMS UNDER THE FEDERAL ANTITRUST LAWS

**PUBLIC/REDACTED VERSION**

## TABLE OF CONTENTS

Page

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

A.   Microsoft Engaged in Pervasive Violations Designed to Deprive
Consumers of Readily Available Products and Products of Readily
Available Consumers . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

B.   The License Is The "Product", And The Product End Users Received Was
Wholly Separate From The Product the OEMs Received . . . . . . . . . . . . . . . . . .  7

1.   Microsoft Allegedly Provided The OEM With The Right To Copy
The Software But Is Not Alleged To Have Provided The OEM
With The Right To End Use Nor With Title To The EULA  . . . . . . . . .  7

2.   Microsoft Provided The End-User With A License For Use Of The
Software; Microsoft's Offer Of This Product Was Conveyed By Its
Agents, Namely, OEMs Or Retailers . . . . . . . . . . . . . . . . . . . . . . . . . . .  8

3.   The OEMs And Retailers Act As Microsoft's Agents To Convey
To Consumers Microsoft's Offer To Enter An End-User License  . . . . .  8

4.   End Users Claim Damages For What They Alleged To Be
"Unique" Injuries To Their End Use Rights And Do Not Purport
To Claim For Damages To The Rights Of OEMs Or Retailers . . . . . . . .  9

C.   Microsoft's Pervasive Violations Included Wrongdoing "Intentionally"
Aimed At End-Users And Caused Specified "Unique" Injuries To And
Only To The End Use Rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

1.   DR-DOS and Mirrors . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

2.   Micrographx and OWL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11

3.      Licenses For Dated or Used Microsoft Software, and Other
        Restrictions Imposed Directly On End Users And The EULA
        Market . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   12

4.      Intel's Native Signal Processing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

5.      Sun Microsystem's Java Programming  . . . . . . . . . . . . . . . . . . . . . . . . .   14

6.      The Netscape Navigator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

7.      Applications Programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   15

8.      As A Result of Microsoft's Pervasive Ongoing Violations,
        Microsoft Has The Same Monopoly It Had In the Mid-1980s Plus
        Three New Monopolies  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

POINT I.        GOVERNING PROCEDURAL STANDARDS . . . . . . . . . . . . . . . . . . . . . . . .   16

        A.      Pre-Discovery Dismissals Of Sherman Act Claims Should Be Granted
                "Sparingly" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   16

        B.      Under the Governing Rule 12(b)(6) Standards, Microsoft's Motion Must
                Be Denied Because It Is Improperly Premised On Contradictions of the
                Fact Allegations of the Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   17

POINT II.       PLAINTIFFS HAVE ALLEGED A CLASSIC CLAIM FOR MONEY
                DAMAGES UNDER THE SHERMAN ACT  . . . . . . . . . . . . . . . . . . . . . . . .   19

        A.      The Plain Language of The Money Damages Provision Supports Plaintiffs'
                Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   19

        B.      The Legislative History To The Sherman Act Shows That The Plaintiff-
                Consumers' Claims Against The "Giant" Monopolist Are Congress' Raison
                D'Etre For The Sherman Act Money Damages Remedy . . . . . . . . . . . . . . . . .   20

        C.      Illinois Brick Does Not Require That Monies Be Paid Directly To The
                Violator And, Because Of The Stark Differences Between This Case And
                Illinois Brick, The Real Purpose Of The Illinois Brick Ruling Would Be
                Defeated By A Dismissal Of Plaintiffs' Claims  . . . . . . . . . . . . . . . . . . . . . .   20

                1.      This Case Is Procedurally and Substantively Different From Illinois Brick
                        And In Some Ways It IS The Exact Opposite . . . . . . . . . . . . . . . . . . . .   21

2. Plaintiffs Claim For "Unique" Injury To End Users And Do Not Purport To Claim For Damages To OEMs Or Retailers . . . . . . . . . . . . 22

3. Therefore, Far From Preventing A Double Recovery, Granting Microsoft's Motion Would Immunize It From Money Damages For The Allegedly "Unique" Injuries Which Its Violations Of The Sherman Act Are Alleged To Have "Intentionally and Directly Caused" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

D. Controlling Case Law Upholds Money Damages Claims Of Persons Who Did Not Pay Money Directly To The Violator In Circumstances Where Far Less Wrongdoing And Direct Restrictions Caused Far Less Direct And Unique Injury Than Are Alleged Here . . . . . . . . . . . . . . . . . . . . . . . . . . 25

1. Correctly Anticipating Later Precedent, Numerous Pre-McCready Decisions Limited Illinois Brick And Upheld Money Damages Claims Of Persons Who Did Not Pay Money Directly To The Violator . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

2. The U.S. Supreme Court And Various Circuit Courts Have Upheld Money Damage Claims Of Persons Who Did Not Pay Monies Directly To The Violators . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

a. Even More Than The Defendants In McCready, Microsoft Intentionally Deprived Plaintiffs Of Market Choice And Alternative Product As The Means Of Accomplishing Its Violations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

b. Even More Than The Defendants In Lower Lake Erie, Microsoft Intentionally Deprived The Plaintiffs Of Alternative Lower Cost Products And New Technologies . . . . 29

c. Even More Than The Defendants In Sanner, Microsoft Interdicted Competitive Conditions In The Market In Which Plaintiffs Transacted And Intended To Cause Injury To Plaintiffs, And Imposed Its Restrictions Directly On Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

d. Even More Than The Wrong Doers In Virginia Vermiculite, Microsoft Anticompetitively Restricted End Users In Connection With Their Direct Relationship . . . . . . . . 34

3. Thus, Plaintiffs Easily Satisfy The Five Factor Associated General Contractors Test That Has Been Followed In This Circuit . . . . . . . . . . 34

iv

4. Plaintiffs' Tying Claims Are Not Subject To <u>Illinois Brick</u> . . . . . . . . . .  37

5. If Any Plaintiffs Were Found, After Full Discovery, To Be Indirect Purchasers, They Nonetheless Qualify For Exceptions To <u>Illinois Brick</u> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  39

6. The Decisions By Inferior Courts Under State Law Involved Different Allegations, Different Arguments And Are Otherwise Inapplicable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  42

7. The Blockbuster Analogy Does Not Help Microsoft For Many Reasons Including The Fact That Its Anticompetitive Restrictions In The EULA Go Far Beyond The Copyright Laws . . . . . . . . . . . . . . .  43

POINT III. THE RULE 56 PART OF MICROSOFT'S MOTION FOR PRE-DISCOVERY SUMMARY JUDGMENT MUST BE DENIED AS PREMATURE AND DUE TO GENUINE ISSUES OF FACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  46

A. Governing Rule 56 Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  46

B. Certain Plaintiffs Have Attested That They Are Direct Purchasers Even Under Microsoft's Overly Restrictive Definition Of The Term . . . . . . . . . . . .  46

C. Plaintiffs' Counsel Have Attested To The Absence Of Discovery Regarding Microsoft's Assertions About Its Relations With OEMs, Retailers And Its Other Contradictions Of The Complaint . . . . . . . . . . . . . . . .  47

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  50

Appendix Relating To Estoppel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  53

## **INTRODUCTION**

This Memorandum is submitted on behalf of plaintiffs who have made claims for money damages under the federal antitrust laws in opposition to the motion by Microsoft Corporation ("Microsoft") to dismiss such damages claims.

In its motion for partial dismissal, Microsoft does not contest that plaintiffs have properly pleaded

> that Microsoft committed pervasive, widespread violations of the Sherman Antitrust Act, 15 U.S.C. § 1 et seq. ("Sherman Act"); and

> that, in engaging in such violations, Microsoft "intentionally" caused end users "unique injury" including but "not limited to" depriving them of lower cost products and forcing them to purchase licenses for Microsoft products. Consolidated Class Action Complaint ("C") ¶ 164.

Compare C ¶¶ 122, 164, 176, and passim with Microsoft's Memorandum of Law in Opposition to Motion to Dismiss dated August 5, 2000 ("Microsoft Mem."), passim.  These unique injuries to end users include injuries separate and apart from the overcharge they paid for the license to use Microsoft's software.  Indeed, the absence of consumer choice imposed by Microsoft is an important mechanism which entitled Microsoft to also impose an overcharge.  Moreover, Microsoft expressly concedes that plaintiffs have pleaded a proper claim for injunctive relief against Microsoft's ongoing violations of the Sherman Act.  Microsoft Mem. p. 8 fn. 6.

However, Microsoft requests a summary finding that its pervasive  violations which "intentionally" caused "unique injury" to its end-user licensees, supposedly caused such end-users no money damages under the Sherman Act.  Microsoft Mem. pp. 1-2, 8-13 and accompanying affidavits.  Relying primarily on summary judgment rulings made after full

discovery,[1] Microsoft argues that there supposedly "is one principle of federal antitrust law that has long been crystal clear and uniformly applied: indirect purchasers ... may not bring a [money damages] claim"  (Microsoft Mem. p. 1) supposedly because only "persons who pay monies directly" to the violator may bring money damages claims.  Microsoft Mem. pp. 1, 2, 7-13.

Microsoft is wrong on the law.  Numerous decisions[2] have upheld money damages claims by persons who did not pay monies directly to the violator, and "[t]he Supreme Court's cumulative pronouncements concerning directness of injury in antitrust cases mandate a more complex and differently focused inquiry" than simple minded focus on whether the purchase is direct.  In re Lower Lake Erie Iron Ore Antitrust Litigation, 998 F.2d 1144, 1165, 1167 n.21 (3rd Cir. 1993), cert. denied, 510 U.S. 1091 (1994) "Lower Lake Erie" ("[w]e do not, however, interpret... the 'indirect purchaser' rule of Illinois Brick as announcing a strict prohibition against recovery by indirect purchasers"), citing to Associated General Contractors v. California State Council of Carpenters, 459 U.S. 519 (1982).  See Argument Point II D infra.

---

[1]    Illinois Brick Co. v. Illinois, et al., 431 U.S. 720 (1977) ("Illinois Brick"); Kansas v. Utilicorp United, Inc., 497 U.S. 199 (1990) ("Utilicorp").  See also, California, et al., v. Arc America Corporation et al., 490 U.S. 93, 109 S. Ct. 1661 (1989) ("California"). Microsoft Mem. pp. 1-3, 813.

[2]    E.g., Blue Shield of Virginia v. McCready, 457 U.S. 465 (1982) ("McCready"); Virginia Vermiculite, Ltd.  v. W.R. Grace & Co.- Connecticut, 156 F.3d 535, 540 n.1 (4th Cir. 1998), cert. denied sub nom Historic Green Springs, Inc. v. Virginia Vermiculite, Ltd., 526 U.S. 1066 (1999); Sanner v. Board of Trade, 62 F.3d 918 (7th Cir. 1995); Lower Lake Erie supra; Strobl v. New York Mercantile Exchange, 768 F.2d 22 (2d Cir.), cert. denied sub nom. Simplot v. Strobl, 474 U.S. 1006 (1985); Three Crown Ltd. Partnership v. Salomon Bros., Inc., 1995 WL 422467 (S.D.N.Y. July 14, 1995); Amarel v. Connel, 1986 WL 10613 (N.D. Cal. Aug. 8, 1986); Chatham Brass Co., Inc. v. Honeywell Inc., 512 F. Supp. 108 (S.D.N.Y. 1981); Strax v. Commodity Exchange, Inc., 524 F. Supp. 936 (S.D.N.Y. 1981); Pollock v. Citrus Assocs. of the N.Y. Cotton Exchange, Inc., 512 F. Supp. 711 (S.D.N.Y. 1981); Fairdale Farms, Inc. v. Yankee Milk, Inc., 1979 WL 1723 (D. Vt. Dec. 9, 1980).

Microsoft is also wrong on the facts.  Plaintiffs do not allege that they are indirect purchasers.  C ¶¶ passim; see affidavits (Appendix 1) of certain plaintiffs documenting their acquisitions of copies of software in transactions with Microsoft over its website, which constitute "direct purchases" even within Microsoft's excessively narrow definition of the term. Rather, plaintiffs allege that the product in this case is the license agreement, and that end-users entered their end-user license agreement ("EULA") directly with and acquired it directly from Microsoft.  C ¶¶, e.g., 20-52.  Contradicting the complaint and Microsoft's own consistent legal position for years (see Appendix 2 hereto Relating to Estoppel), Microsoft argues that original equipment manufacturers ("OEMs") and retailers supposedly purchase Microsoft software directly from Microsoft and supposedly re-sell it to end users.  Microsoft Mem. pp. 1-3, 7-13. Asserting that the software, not the license, is the product here, Microsoft argues that OEMs and retailers supposedly are the only persons who can obtain money damages under the Sherman Act for Microsoft's pervasive violations. Id.

However, under FRCP Rule 12(b)(6) and McCready, 457 U.S. at 479-480, plaintiffs' fact allegations as to the relevant product, the relevant market and the resulting injuries must be accepted as true and cannot be purposely misconstrued or contradicted at this pre-discovery stage.  See Argument Point I infra.  Because the fact premises for Microsoft's argument contradict the complaint, Microsoft's motion for dismissal violates the governing standards under Rule 12(b)(6) and must be denied.  See Argument Point I.[3/]

---

3    Because Microsoft contradicts the allegations of the complaint prematurely, and prior to any meaningful opportunity for discovery, its motion also violates the governing standards of Rule 56.  See Argument Point III infra; Advanced Health-Care Services, Inc. v. Radford Community Hospital, 910 F.2d 139, 143-144 (4th Cir. 1990) ("in antitrust cases, in particular ... dismissals prior to giving the

Further, very conveniently for Microsoft, leading OEMs and retailers have said they will

not sue Microsoft for the violations at issue.[4] C ¶ 165.  More important, OEMs and retailers are

**not** alleged to have purchased the EULA product nor suffered the "unique" (C ¶ 164) end-user

injuries.  C passim.  Thus, as compared to the OEMs and retailers, end-users allegedly

• received a product (namely, the EULA) that was different from the copying rights which

   OEMs received (C ¶¶ 84 and 86; see Statement of Facts B infra);

• were subject to additional wrongdoing (C, e.g., ¶ 90; see Statement of Facts C infra); and

• suffered "unique" and separate injuries which the OEMs and retailers are not alleged to

   have suffered, and for which only the end users can recover.  C ¶ 164; see also C ¶¶ 122

   and 164.

Therefore, under controlling law (see cases collected at fn. 2 and Argument Point II A-D infra),

Microsoft's motion must be denied based upon the "unique injury" allegations (C ¶ 164) of the

complaint regardless of whether end-users paid monies directly to Microsoft or are characterized

as direct or indirect purchasers.[5]

---

plaintiff ample opportunity for discovery should be granted very
sparingly") quoting from Hospital Bldg. Co. v. Trustees of Rex Hosp.,
425 U.S. 738, 745 (1976).


4    This is despite ten months of extensive publicity about certain
of Microsoft's violations which were alleged by the Department of
Justice ("DOJ") and found to exist by the United States District Court
for the District of Columbia in an order dated November 5, 1999.  C ¶¶
11-18.


5    Without overstating or misstating the law as Microsoft did,
plaintiffs believe that it is a fair reading of Sherman Act money
damages jurisprudence to say two things.
      First, there is nothing talismanic about whether one pays money
directly to the violator or is a direct or indirect purchaser; a
plaintiff may sue under the Sherman Act for money damages resulting
from violations thereof which are alleged to directly restrict the

Similarly, the summary judgment holdings (see fn. 1) on which Microsoft relies and the reasoning for such holdings turn **not** on whether the victim paid monies directly to the violator but on the policies of (a) promoting the vigorous undiluted enforcement of the Sherman Act damages remedy for each injury, and (b) secondarily, preventing a double recovery of the damages incurred in such injury.  See Microsoft Mem. pp. 8-13.  Far from preventing a double recovery for the same injury which is superfluous to or dilutes the effective enforcement of the money damages remedy, the object of Microsoft's present motion is to immunize Microsoft from any recovery for the unique injuries which its extensive violations are alleged to have "intentionally and directly" caused.  See C ¶ 164; Argument Point II C <u>infra</u>.[6/]

## STATEMENT OF FACTS

**A.     Microsoft Engaged in Pervasive Violations Designed to Deprive Consumers of Readily Available Products and Products of Readily Available Consumers**

During the mid-1980s, consumers could not perform word processing, spread sheet or other applications on their personal computer ("PC") unless the word processing or other

---

plaintiff or to have intentionally caused the plaintiff other direct injury.  See Argument Point II A-D <u>infra</u>.
      Second, the end-user plaintiffs here have alleged substantially more pervasive wrongdoing, significantly more direct restrictions on themselves, and substantially more types of injuries unique to them than have been present in any of the previous cases which upheld money damages claims by persons who did not pay monies directly to the violator.  <u>Id</u>.

6     To any extent that, after full discovery and a ripe summary judgment or trial record, end-users may be found to be indirect purchasers, plaintiffs clearly qualify for one of the exceptions to <u>Illinois Brick</u>.  Argument Point II D(5) <u>infra</u>.

application's software was compatible and could work with the operating system software of the PC.  See C ¶¶ 91-107.  The license to use the operating system of the PC was, thus, an essential facility both for the consumer to be able to perform applications and for the application software writers to be able to offer a marketable product for consumers.  C ¶¶ 143-147.

During the mid-1980s, Microsoft had a monopoly over licensing operating systems for Intel-compatible PCs (C ¶ 1) and many scores of software applications would work only with the Microsoft operating system.  However, the demand of the consumer (or "end user") for Microsoft's operating system for a PC derives primarily from the operating system's ability to enable the consumer to enjoy software applications which the consumer could not enjoy without the operating system.  C, e.g., ¶ 92; see ¶ 133 (providing applications to end users through means other than the operating system would "commoditize" the operating system).  C ¶¶ 92, 95.

Thus, demand for Microsoft's operating system would decline (and Microsoft's revenues would decline) if a sufficient number[7/] of consumers could choose to perform the applications

_____

7    Gaining the loyalty of a sufficient number of consumers to a new product will make it financially worthwhile for software applications program writers to write word processing and other programs for that product.  C ¶¶ 90-95.  Once it becomes financially worthwhile, software program writers will write more and more programs for that product.  Id.

     The availability of new programs will then attract more and more consumers to the product which, in turn, will then positively reinforce the writing of still more applications programs.  C ¶ 95 (so-called "positive feedback loop").

     While Microsoft's unlawful conduct did not have to "nip in the bud" the lower cost competitive products, it did have to eliminate such products before they could obtain sufficient critical mass to develop a "positive feedback loop".  Id.

     This phenomenon constitutes a barrier to entry into the operating system licensing market for competitors of Microsoft, and is known as the applications barrier to entry.  Id.

they desire on their PC with a non-Microsoft operating system or a new technology other than an operating system.

For eleven years, Microsoft has continuously abused its operating system licensing monopoly power so as to anticompetitively deprive consumers of a sufficiently available non-Microsoft operating system or any new technology that would permit consumers to perform their applications without the Microsoft operating system.  C ¶¶ 1, 2, 99-139.  To achieve its unlawful mission, Microsoft's logic has been simple:  anticompetitively deprive consumers of readily-available products, and products of readily-available consumers.  See C ¶¶ 88, 122, 164.

Microsoft has succeeded.  C _passim_; see sub-point C below.  Before recounting the eight specified (and scores more unspecified) products of which Microsoft has deprived consumers (and detailing Microsoft's other anticompetitive conduct which directly restricted and uniquely injured end users and end users only), plaintiffs first explain what Microsoft's "products" were.

**B.    The License _Is_ The "Product", And The Product End Users Received Was Wholly Separate From The Product the OEMs Received**

Microsoft does not sell its software to anyone.  C ¶ 84; see Appendix Relating To Estoppel.  Instead, it carefully parcels out different bundles of rights in respect of its software.  _Id_.  These rights, bundled together as a so-called "license", are the only "products" that Microsoft conveys.  C ¶¶ 81-88.  Microsoft retained the title and all rights to its software except for those rights which Microsoft expressly conveyed through one of these licenses.  _Id_.

**1.    Microsoft Allegedly Provided The OEM With The Right To Copy The Software But Is Not Alleged To Have Provided The OEM With The Right To End Use Nor With Title To The EULA**

Microsoft enters one type of license with the OEMs.  C¶ 84.  The "specified purposes" of the license with OEMs permit "them to pre-install [the software] on PCs sold to end users".  Id. The Complaint does not allege that Microsoft conveyed title to end use rights to OEMs.  C passim; see sub-point 3 below. Nor does the complaint allege that OEMs conveyed end use rights to consumers.  Id.

> **2.      Microsoft Provided The End-User With A License For Use Of The Software; Microsoft's Offer Of This Product Was Conveyed By Its Agents, Namely, OEMs Or Retailers**

Microsoft provides a wholly "different" license to the end users than to the OEMs.  C ¶ 84.  Specifically, Microsoft grants the right to "use the software on the PCs" to and only to end-users.  Id.  Microsoft's end user license is a "take it or leave it" proposition and not a product of negotiation.  C ¶¶ 84-88.  The EULA states:  "By installing, copying, downloading, accessing or otherwise using the software product, you agree to be bound by the terms of this [Agreement]."

Thus, the end user accepts the EULA by "clicking" agreement on the computer or taking other action to indicate acceptance of Microsoft's offer of license rights.  The end-user "chooses" to enter the EULA license with Microsoft only when the end-user first begins to use the operating system and not at the times of purchase, payment, or other incidents of the transaction.  See Argument Point III C infra specifying various portions of Microsoft's OEM EULA which expressly provides various rights and remedies in favor of Microsoft.  C ¶88.

> **3.      The OEMs And Retailers Act As Microsoft's Agents To Convey To Consumers Microsoft's Offer To Enter An End-User License**

Between 1995 and the present, OEMs have had no

> other viable choice [and Microsoft has] ... effectively forced OEMs
> to pre-install Microsoft operating systems on their PCs and to act

> as Microsoft's agents in offering end-user licenses for acceptance
> or rejection by customers under terms strictly and exclusively
> dictated by Microsoft.

C ¶86.  Accordingly, the Complaint alleges that, far from selling to the consumers the end use rights (which OEMs never owned in the first place), the OEMs merely act as Microsoft's agents to convey to end users Microsoft's take-it-or-leave-it offer to enter the EULA.  Id.

Like OEMs, retailers and others also acted as agents to convey Microsoft's offer to enter the EULA.  C ¶¶ 85, 89.  The retailers also are not alleged to have purchased or received title to the end use rights or other aspects of the product, namely, the EULA.  Id.  In fact, the EULA conveyed by retailers expressly provides that it is between Microsoft and the end user, and that Microsoft would provide refunds to prospective end users who did not agree to the "take-it-or-leave-it" terms of Microsoft's EULA.  C ¶ 88-89; see Vellone Affidavit par. 10 (all EULAs conveyed through the retailer channel are between Microsoft and end user).

In sum, neither OEMs nor retailers are alleged to be buyers and resellers of end-use rights and end-use licenses.  Both are alleged to be Microsoft's agents who convey to consumers Microsoft's take-it-or-leave-it offer to enter the EULA.  The consumer manifests assent to this offer and acquires the product (namely, the license) only by clicking, loading, or other affirmative conduct.

    **4.**       **End Users Claim Damages For What They Alleged To Be "Unique" Injuries To Their End Use Rights And Do Not Purport To Claim For Damages To The Rights Of OEMs Or Retailers**

Plaintiffs allege:

> ... Microsoft intentionally caused end-users to suffer unique injury as a direct
> result of Microsoft's restrictive and exclusionary practices.  End-users were

> deprived of the benefits of competition including, but not limited to, technological
> innovation, market choice, product variety, and substitutable supply, and were
> also forced to purchase multiple copies of Microsoft's operating systems.

C ¶ 164.  Obviously, the plaintiffs who are end users are claiming money damages only for

injuries unique to end users.  They are not purporting to claim the damages which Microsoft

caused through its separate and distinct injuries to the non-end use rights which were conveyed

by Microsoft to OEMs or distributors.  Id.

### C.  Microsoft's Pervasive Violations Included Wrongdoing "Intentionally" Aimed At End-Users And Caused Specified "Unique" Injuries To And Only To The End Use Rights

## 1. DR-DOS and Mirrors

Microsoft engaged in approximately fifteen types of exclusionary, predatory or

anticompetitive acts (C¶ 116a-116o) in order to deprive consumers of Digital Research's

technologically superior and lower cost (C ¶ 115) DR-DOS[8] operating system and IBM's

technologically superior (C ¶ 125) OS/2 operating system.  Such anticompetitive acts  deprived

consumers of readily available products (namely, DR-DOS and OS/2) and products of readily

available consumers.  Id.  But such

anticompetitive conduct also led to a complaint in 1994 by the Department of Justice ("DOJ").  C

¶¶ 11-12.

---

8    DR-DOS went through various generations of technological leap
frog with Microsoft's products.  C ¶ 111-115.  The DR-DOS innovations
and improvements (C ¶ 115) excelled those of Microsoft.  Id.  But from
at least 1994 forward, end users were largely deprived of the lower
costs or superior performance of DR-DOS and OS/2 as well as the
technological innovation and other benefits of dynamic competition
which their presence fostered.

The DOJ accused Microsoft of abusing its monopoly power in violation of the Sherman Act. Id. ¶¶ 11-19.  The DOJ and Microsoft entered a sweeping settlement agreement in which Microsoft agreed not to engage in at least eight separate types of the anticompetitive, exclusionary or predatory abuses which it had used effectively to eliminate the foregoing competitive products.  Compare C ¶ 12 with C¶¶ 116a-116o and 118-120.

By the time the judgment on that settlement was entered in 1995, the lower cost, technologically superior DR-DOS, the technologically superior OS/2 and numerous other prospective competitive products had all been denied to consumers and effectively eliminated as competitors of Microsoft.  See C ¶¶ 12-14, 111-125.

## 2. **Micrographx and OWL**

Two of the other products which Microsoft's violations denied consumers during the early 1990s were the Mirrors product by Micrographx and Borland's C++ programming language Object Windows Library ("OWL").  C ¶¶ 123-128.  Mirrors permitted applications programs written for Windows to be ported to or used on IBM's OS/2 (C ¶ 123) and OWL went further:  it permitted porting not just to OS/2 but to the Windows, Macintosh and Unix systems "with virtually no conversion effort".  C ¶ 123.

The OWL and Mirrors innovations could have created market conditions in which Microsoft's "application barrier to entry" could have been lessened.  C ¶¶ 91-101; see fn. [6] supra.  This would have greatly benefitted consumers by, among other things, permitting them to enjoy the thousands of applications available for Microsoft's operating system on PCs with a non-Microsoft operating system.  Id. Consumers have been deprived since the early 1990s of

these technological (and the other competitive and innovative) benefits which OWL and Mirrors

promised.

3.      **Licenses For Dated or Used Microsoft Software, and Other Restrictions**
        **Imposed Directly On End Users And The EULA Market**

During 1995 and continuing with the November 10, 1995 start of the Class Period[9],

Microsoft expanded its antitrust violations.  For example, in connection with Microsoft's end

user licenses prior to the Class Period and in the software markets generally, end users had

numerous rights.  End-users had the right to re-use the license on another PC.  C ¶¶ 90.  End-

users had the right to re-sell the license.  Id.  And end-users enjoyed the right to return the license

and obtain a refund if the end-user did not want to accept the giant monopolist's license.  Id.

However, with the lower cost or superior technology DR-DOS and OS/2 operating systems and

numerous other products no longer being marketed in the margins of the market, Microsoft was

"freed up" during the Class Period to fearlessly charge a higher profit-maximizing price and

impose far more anticompetitive restrictions on end-users.

Microsoft did so.  C ¶¶ 90, 160-164.  It tripled its prices and, contrary to software industry

practice and what had been Microsoft's practices prior to the Class Period, it effected a series of

new restrictions on its licensee end-users who acquired PCs through the OEMs channel.  For

example, Microsoft prevented end-users from effectively returning the Microsoft operating

system for a refund (notwithstanding the terms of Microsoft's end-user license).  C ¶ 90.  Also,

Microsoft prohibited end-users from using on newly purchased PCs the Windows 95 or 98

installed on their old PCs.  Id.  Similarly, Microsoft prohibited end-users from re-selling on a

---

9       The Class Period runs from November 10, 1995 until the present.
All end users who entered their licenses with Microsoft during that
period already had the direct injuries resulting from the elimination
of the lower cost DR-DOS and other products specified in the text by
1994, as well as additional direct injuries described in the text
infra.

stand-alone basis the Windows operating system licenses acquired when they had purchased their PCs.  <u>Id</u>.

Microsoft's new EULA restrictions were intended to force the consumer to acquire a new EULA with each new PC and, thereby, deprive consumers of other products and other products of consumers.  See C ¶¶ 88, 122, 164.  Over time, Microsoft slyly coupled these restrictions with other anticompetitive steps.  These included Microsoft's nearly two-fold increase during 1998 of its prices for licenses of its old and dated (but not obsolete) operating system to the same level of prices charged for licenses of its new operating systems, namely, from $49.00 to $89.00.  C ¶¶ 161-163.

By a combination of its abuses of monopoly power, Microsoft successfully maximized its revenues by directly depriving end-users of lower-priced competing products (like the license for DR-DOS) (C ¶¶ 101-159) and restricting the availability of lower priced licenses for Microsoft's own dated (C ¶ 161) or used operating systems (C ¶ 90).  <u>Id</u>.

Thereby, Microsoft "intentionally" caused end-users "unique injury".  C ¶ 164.  This included, but was "not limited to", depriving consumers of "technological innovation, market choice ... and substitutable supply".  <u>Id</u>.  Indeed, "Microsoft engaged in continuing violations ... which it specifically intended to create market conditions in which end-users were forced to purchase ... Microsoft products [<u>e.g.</u>, C ¶ 90] and were deprived of competitive ... substitutes therefor".  C ¶ 122.

**4.  <u>Intel's Native Signal Processing</u>**

Also during 1995, Microsoft abused its monopoly power to engage in numerous new exclusionary, predatory and anticompetitive acts so as to eliminate the potential competitive

threat of Intel's Native Signal Processing ("NSP").  C ¶ 130, DOJ Findings ¶¶ 94-103.  NSP

could have served "as a platform on which applications could be developed" independent of any

specific operating system.  This so-called "middleware" would have greatly benefitted consumers

by, among other things, enabling them to enjoy applications without a Microsoft operating

system.  Id.  It would have presented real choice and touched off real price and technological

competition.  Reciprocal to these benefits to consumers, however, were the serious threats to

Microsoft's applications barrier to entry that NSP posed.  See fn.[6] supra; C ¶¶ 89-96, 130.

Accordingly, Microsoft intentionally abused its power to deprive consumers of this product as

well.  Id.

**5.  Sun Microsystem's Java Programming**

Another product which had the virtue of benefitting consumers but the reciprocal vice of

threatening Microsoft, was Sun Microsystem's Java programming language.  C ¶¶ 134a-h, 136-

139.  Java would have enabled applications to run on different operating systems with minimal

porting. C ¶136.  The Java technology promised the same (and many additional benefits) to

consumers (and, correspondingly, the same and greater threats to Microsoft) as did OWL and

Mirrors.  See supra.  Once again, Microsoft intentionally acted, this time through a profusion of

abuses of its monopoly power (C ¶¶ 134 a-h, 136-139) to deprive consumers of those benefits.

**6.  The Netscape Navigator**

The Netscape Navigator was the "new competitor born on the Internet" which committed

a grave offense:  it could eventually permit the consumer to use and enjoy applications programs

without using Microsoft's operating system.  C ¶¶ 133, 131-135 generally.  In its abusive rush to

deprive consumers of the Navigator and the new world which Navigator potentially could open

up, Microsoft intentionally hurt all end users by degrading their PCs' functionality and causing them increased vulnerability to security breaches, bugs and viruses.  C ¶ 163.[10]

## 7. **Applications Programs**

Not content with unlawfully forcing consumers to purchase licenses for Microsoft operating systems in order to enjoy applications programs, Microsoft leveraged and further abused its monopoly power over operating system licensing so as to unlawfully develop monopolies over the licensing of the three most widely-used applications.  C ¶¶ 1, 140-159 (word processing, spread sheets, and office suites).

Here again, Microsoft's logic was to anticompetitively deprive consumers of readily available products, and products of readily available consumers.  Thus, Microsoft energetically orchestrated its anticompetitive conduct so as to directly deprive consumers of any readily available supply of superior or lower cost competing applications programs.  C ¶¶ 154a-f, 155-7. At the same time, Microsoft effectively forced consumers to have to demand new Microsoft applications. C ¶¶ 154g-l.[11]

---

10    Microsoft has also engaged in deceptive practices (or been found to have been engaged in deceptive practices) in order to conceal its efforts which are designed to prevent applications which are compatible with Microsoft products from being used with other operating system products.  See Bristol Technology, Inc. v. Microsoft, Civ. Action No. 3:98-CV-1657 (D.Ct. August 31, 2000).

    In Bristol, the Court recently awarded punitive damages and injunctive relief to plaintiff against Microsoft because, as alleged in this case, Microsoft took deceptive and anticompetitive steps to limit cross-platform applications from being developed for porting to other operating systems.

    [11]    Microsoft's EULA for these applications programs was the same as its EULA for its operating system.  Therefore, Microsoft also expanded during the Class Period its anticompetitive conduct regarding applications so that one part of same was aimed exclusively at consumers.  C ¶¶ 89-90.

**8.      As A Result of Microsoft's Pervasive Ongoing Violations, Microsoft Has The Same Monopoly It Had In the Mid-1980s Plus <u>Three New Monopolies</u>**

As a result of Microsoft's pervasive wrongdoing, end-users in the year 2000 (as in the mid-1980s), still have to obtain a license for a Microsoft operating system to enjoy most applications on their PC.  But consumers now must pay ten times as much for the operating system licenses as they did during the 1980s and now also must obtain Microsoft licenses for the top three applications.  C ¶¶ <u>passim</u>.

<u>ARGUMENT</u>

**POINT I.      GOVERNING PROCEDURAL STANDARDS**

**A.      Pre-Discovery Dismissals Of Sherman Act Claims Should Be Granted "Sparingly"**

In antitrust cases

...in particular, the Supreme Court has stated that "dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." <u>Hospital Bldg. Co. v. Trustees of Rex Hosp.</u>, 425 U.S. 738, 747 48 L. Ed. 2d 338, 96 S. Ct. 1848 (1976).  See generally <u>Faulkner Advertising Assoc. v. Nissan Motor Corp.</u>, 905 F. 2d 769, (4th Cir. 1990) (reversing district court's 12(b)(6) dismissal in a Sherman Act tying case).

As this Court has stated, a complaint should not be dismissed "merely because the court doubts that the plaintiff will ultimately prevail; so long as a plaintiff colorably states facts which, if proven, would entitle him to relief, the motion to dismiss should not be granted.  <u>Adams v. Batin</u>, 697 F.2d 1213, 1216 (4th Cir. 1982).

<u>Advanced Health Care Services v. Radford Community Hospital</u>, 910 F.2d 139, *143 at 144.

(4th Cir. 1990).

17

**B.    Under the Governing Rule 12(b)(6) Standards, Microsoft's Motion Must Be Denied Because It Is Improperly Premised On Contradictions of the Fact Allegations of the Complaint**

A court should not dismiss the complaint on a motion pursuant to Rule 12(b)(6) "unless it appears beyond all doubt that the plaintiff can prove no set of facts in support of his claim which entitle him to relief."[12]  In considering a motion pursuant to Rule 12(b)(6), the Court must accept the well-pled allegations in a complaint as true[13], engage in a "liberal construction,[14] and "view the allegations in a light **most favorable to plaintiff**." Chisolm v. TranSouth Financial Corp., 95 F.3d 331, 334 (4th Cir. 1996). [Emphasis supplied].

Plaintiffs allege that the product they acquired is the EULA and that, in reality, plaintiffs acquired that EULA directly from Microsoft.  C ¶¶ 1, 20-58, 84-88.  Although Microsoft admits that this "may be true" (Microsoft Mem. p. 13), the necessary premises for Microsoft's motion under Rule 12(b)(6) are to contradict the foregoing well-pleaded fact allegations.  For example, Microsoft asserts:

> (a) that the **"product"** plaintiffs acquired is the software rather than the EULA (Microsoft Mem. pp. 1-3 and p. 7), but see Appendix Relating to Estoppel

---

[12]   Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  Labram v. Havel, 43 F.3d 918, 920 (4th Cir. 1995); Coakley & Williams, Inc. v. Shatterproof Glass Corp., 706 F.2d 456, 457 (4th Cir. 1983); see Wright & Miller, Federal Practice and Procedure, Civil 2d 1349, at 192-193 (1990)(motions to dismiss for failure to state a claim are "granted sparingly and with caution in order to make certain that plaintiff is not improperly denied a right to have his claim adjudicated on the merits.").

[13]   Scheuer v. Rhodes, 416 U.S. 232 (1974).

[14]   Coakley, 706 F.2d at 457.

recounting Microsoft's successful assertions in other litigations that it never sells the "software" to OEMs or anyone else)[15];

(b) that plaintiff did not acquire such **"product"** directly from Microsoft (Microsoft Mem. passim);

(c) that Microsoft's EULA is provided through OEMs is not between Microsoft and the end users but, rather, between the OEM and the end users; and

---

15    Microsoft wants its software licensing transactions to be different from "goods" for purposes of the U.C.C. and intellectual property laws, but the same as goods for the purposes of Illinois Brick.  See Appendix Relating To Estoppel.  Based upon Microsoft's arguments in other cases, however, the proper focus is on the license agreement between Microsoft and plaintiffs.  Id.  Appendix Relating To Estoppel.

In this regard, in 1999, the National Conference of Commissioners on Uniform State Laws recognized that software transactions are different from sales of goods, such as bricks, and therefore require a different commercial code for software, the Uniform Computer Information Transactions Act ("UCITA").  As  Professor Raymond T. Nimmer, the Reporter to the UCITA Drafting Committee, stated:

> [T]he purpose of UCITA. . . is to develop contract law sensitive to computer information as subject matter. . . . Sales of goods are different from transactions in computer information.  A sale of a chair or toaster (the grist of Article 2) is different from a license of a computer database or software (the focus of UCITA).

Raymond T. Nimmer, UCITA: A Commercial Contract Code, p. 4, Computer Lawyer (May 2000) (emphasis added). Professor Nimmer explained:

> [U.C.C.] Article 2 rules flow from a number of presumptions consistent with the view that the focus of the transaction centers on delivery of a tangible product, title to which passes on delivery along with unrestricted rights to use the product and acceptance (or rejection) of the tangible product.  These are not the relevant points for most computer information transactions, many of which are licenses. . .  The deal does not begin and end with delivery and acceptance of a diskette.

Raymond T. Nimmer & Carlyle C. Ring, Jr., "UCITA:  A Commercial Code for the New Commerce," p. 14, Practicing Law Inst.  (Apr. B May 2000)(emphasis added).

(d) that OEMs and retailers are not influenced or controlled by Microsoft in their pricing decisions.  Microsoft Mem. p. 13 fn. 10; Vellone Affidavit par. 10 [16].

Thus, Microsoft wrongly asserts that plaintiffs make claims for damages for

> ... a variety of Microsoft software **products**, including certain Microsoft **operating systems**.  Plaintiffs do not allege that they purchased any of these **products** from Microsoft. And, indeed, with rare exception, Microsoft has never sold any of these **products** directly to end users.

Microsoft Mem. pp. 1-2 [emphasis supplied], Microsoft proceeds to make the fact assertion, throughout its motion, that the "product" is the software and that plaintiffs did not acquire the "product" directly from Microsoft.  Microsoft Mem. <u>passim</u>.  This is contrary to the complaint (as well as Microsoft's own consistent legal position in other litigations for years, see Appendix Relating To Estoppel).  Microsoft may not misconstrue plaintiffs' allegations of the product, market and injury on a motion to dismiss.  <u>McCready</u>, 457 U.S. at 479-480.  The Court must disregard all of the foregoing assertions by Microsoft that contradict the well-pleaded fact allegations of the complaint.  <u>A.S. Abell Co. v. Chell</u>, 412 F.2d 712, 715 (4th Cir. 1969).

Because such assertions may not form the basis for a motion to dismiss pursuant to Rule 12(b)(6), the Rule 12(b)(6) part of Microsoft's motion lacks any proper premise and must be denied. (Apparently recognizing as much, Microsoft alternatively premises its motion prematurely on Rule 56.  See Point III <u>infra</u>.)

## POINT II.    PLAINTIFFS HAVE ALLEGED A CLASSIC CLAIM FOR MONEY DAMAGES UNDER THE SHERMAN ACT

---

[16]    Microsoft apparently also implies that the anticompetitive acts which plaintiffs allege that Microsoft aimed at end users (C ¶ 90) supposedly did not occur because refunds and returns supposedly are available (or are the sole responsibility of OEMs). Kurt Kolb Affidavit at ¶ 9.

A.    **The Plain Language of The Money Damages Provision Supports Plaintiffs' Claim**

The plain language of the private damages remedy for violations of the Sherman Act (15 U.S.C. §15) provides:

> any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue ... and shall recover threefold the damages by him sustained, and the cost of suit, including a reasonable attorney's fee...

This broad language clearly encompasses end-users' claims for money damages against Microsoft. Courts should be careful in "engrafting limitations on" this language. <u>McCready</u>, 457 U.S. 472.

B.    **The Legislative History To The Sherman Act Shows That The Plaintiff-Consumers' Claims Against The "Giant" Monopolist Are Congress' <u>Raison D'Etre</u> For The Sherman Act Money Damages Remedy**

> The legislative history of the [remedy for Sherman Act violations] ... shows that Congress was primarily interested in creating an effective remedy for **consumers** who **were forced to pay excessive prices by [not "to"] the giant** trusts and combinations that dominated certain interstate markets. [emphasis supplied].

<u>Associated General Contractors, Inc. v. California State Council of Carpenters</u>, 459 U.S. 519, 530 (1982) [emphasis supplied].

In fact, Congress changed the single damages provision of the first version of the section on damages to a treble damage provision precisely in order to give small consumers an incentive to sue the "giants" that injured them. <u>Id</u>. at fn. 20. Microsoft is just such a "giant", having monopolized no less than **four** relevant product markets. C ¶¶ 1, 60-69.

C.    **<u>Illinois Brick</u> Does Not Require That Monies Be Paid Directly To The Violator And, Because Of The Stark Differences Between This Case And**

### <u>Illinois Brick</u>, The Real Purpose Of The <u>Illinois Brick</u> Ruling Would Be Defeated By A Dismissal Of Plaintiffs' Claims

Although Microsoft repeatedly implies that the summary judgment holdings on which it relies, turn on whether the victim paid monies directly to the violator, Microsoft conspicuously fails to provide any jump cite to the cases in fn 1 for this proposition.  Microsoft Mem. <u>passim</u>. In fact, the decisions on which Microsoft relies (cited at fn. 1 <u>supra</u>) do not express that only persons who pay monies directly to the violator may sue under the federal antitrust laws.  See cases cited in Microsoft Mem. <u>passim</u>.  Instead, as is developed below, all of the decisions on which Microsoft relies are intended to promote the undiluted and vigorous enforcement of the federal antitrust laws for any distinct injury which an alleged violator perpetrates upon an alleged victim.

### 1.  This Case Is Procedurally and Substantively Different From <u>Illinois Brick</u> And In Some Ways It IS The Exact Opposite

In summary judgment rulings made after full discovery, the Supreme Court in <u>Illinois Brick</u> and <u>Utilicorp</u> (cited at fn. 1 <u>supra</u>) was confronted with competing sets of claimants for damages arising from the same limited violation (price fixing) and the same limited injury (a price overcharge for a commodity to which title and all rights passed and re-passed along the consecutive links of a chain of distribution).  <u>Illinois Brick</u> at 726; <u>Utilicorp</u> at 199, 208.

The set of persons who sued first were the persons who had purchased and taken title to the price fixed article directly from the alleged price fixers.  <u>Id</u>.  These so-called direct purchasers then sold and passed on the title to the article (and allegedly also passed on some of the same overcharge injury) to other sets of persons.  <u>Illinois Brick</u> at f.n. 6; <u>Utilicorp</u> at 205.

22

In contrast, this motion is presented at the pre-discovery stage.  Microsoft is alleged to have engaged in widespread wrongdoing causing multiple injuries.  C ¶¶ 1-5, 99-165.  The OEMs and retailers did not take title to, re-sell, and pass on the end use rights.  C ¶ 84.  Leading OEMs and retailers have said they will not sue Microsoft for any antitrust injury (let alone the distinct one that only end users suffered).  C ¶ 165.  Plaintiffs' claims are the only ones enforcing the Sherman Act money damages remedy.  The end-users here allege "unique" injury for which only they can recover.  See Statement of Facts <u>supra</u>.

### 2. Plaintiffs Claim For "Unique" Injury To End Users And Do Not Purport To Claim For Damages To OEMs Or Retailers

Moreover, in <u>Illinois Brick</u>, the indirect purchasers admitted, by answer to interrogatory or otherwise, that they had no direct relationship with the violators. <u>Illinois Brick</u> fn. 6; <u>Utilicorp</u> at 205. Title to the product had passed to the masons from the violators in an outright purchase. The masons sold the bricks and their services to the building contractors who then entered a relationship with the State of Illinois. There was no "click" required by the State of Illinois to create rights and obligations with the manufacturers and accept the bricks. There was no right of the State of Illinois to return the bricks (nor were the bricks separable and legally or supposedly returnable, if the State did not want to "click" acceptance).

Thus, the plaintiffs in <u>Illinois Brick</u> did not allege that they were in a direct relationship with the violator let alone that they had been directly injured in that relationship. <u>Contrast</u>, C ¶¶ 90, 99-159. For example, the indirect plaintiffs did not allege that the violators had intentionally deprived them of lower cost products or new technologies. <u>Illinois Brick</u> <u>passim</u>. There were no restrictions placed directly on the State of Illinois with regard to the bricks. <u>Id</u>.

To the contrary, the plaintiffs here all allege that they actually had a direct contractual relationship with the violator in the relevant markets, the markets for licensing various software. C ¶¶ 21-58. They allege that the violator anticompetitively restricted them in that relationship, prevented them from obtaining lower cost products, caused them unique injuries for which only they can recover, and directly interdicted competitive conditions in the market in which they transacted. See Statement of Facts <u>supra</u>. Further, the end-users here expressly claim for injuries "unique" to them and do not purport to claim for the damages of someone else, namely, OEMs or retailers.

Thus, in contrast to Illinois Brick, Utilicorp, and California, the plaintiffs here

(1) sued first;

(2) are not competing claimants;

(3) were directly (and, as to certain anticompetitive acts, exclusively) impacted by Microsoft's anticompetitive acts;

(4) do **not** admit that they stand in an indirect relationship to Microsoft, but, on the contrary, allege a direct relationship;

(5) have suffered direct injuries for which only they can      recover;

(6) transacted in the competently pleaded relevant market in which the violator's unlawful acts directly caused a breakdown in competitive conditions;

(7) are not superfluous but, rather, indispensable to the effective enforcement of the Sherman Act and the damages remedy thereunder because their injuries are unique, and others have said they will not sue Microsoft (C ¶165);[17] and

(8) have had no meaningful opportunity for discovery.

And, importantly, only after complete discovery and on a fully ripe summary judgment record, were the claims in Illinois Brick and Utilicorp dismissed.

_____

17    In Illinois Brick and California, the first set of direct purchaser claimants had already settled before the second, "Johnnie-come-lately" set of claimants even brought suit or claimed.  Illinois Brick at f.n. 5, f.n. 11; California at 97.

     The direct purchasers in Illinois Brick, thus, had adequately enforced the Sherman Act insofar as the limited price-fixing overcharge at issue there was concerned.  The claims of the second set of claimants were, in effect, superfluous to the effective enforcement of the antitrust laws and, unlike here, presented a direct threat of a double recovery of the same overcharge for precisely the same limited injury.  Illinois Brick at 201-202.

**3.      Therefore, Far From Preventing A Double Recovery, Granting Microsoft's Motion Would Immunize It From Money Damages For The Allegedly "Unique" Injuries Which Its Violations Of The Sherman Act Are Alleged To Have "Intentionally and Directly Caused"**

In <u>Illinois Brick</u>, the Supreme Court gave three reasons for dismissing the claim of the indirect purchaser plaintiffs:

(1)      enforcement of the Sherman Act would be best accomplished by the direct purchasers;

(2)      the indirect purchasers presented the threat of double recovery for the same injury;[18]

(3)      any attempt to apportion damages would strain the then-very crowded court system[19].  <u>Illinois Brick</u> 200-202.

---

18   In *Utilicorp*, the Supreme Court somewhat downplayed the double recovery rationale by stating: "We have maintained, throughout our cases, that our interpretations of § 4 *must* promote the vigorous enforcement of the antitrust laws."  497 U.S. at 217 (emphasis added). The Court ruled that such enforcement would be promoted rather than undermined by **not** creating an exception for an entire market C consumers in the public utilities market.  *Id*. at 216.

     It premised this ruling on numerous findings that are entirely inapplicable here.  For example, the consumers' injury in <u>Utilicorp</u> was payment of higher prices for natural gas.  The Supreme Court found that this injury would not go unredressed because the utility companies, which directly paid the overcharge to defendants gas producers, would be required by state law to pass on to the consumers the benefit of any monetary recovery under §4 that they obtained against defendants.  *Id*. at 216.  Similarly, the Supreme Court found that utilities had "an established record of diligent antitrust enforcement" and were already parties to that lawsuit. *Id*. at 205, 213, 216.

19   The Supreme Court expressly demoted this reason to "subordinate" status in the <u>McCready</u> decision.  457 U.S. at 475.

26

Based upon the stark differences in the circumstances here and in  Illinois Brick, none of the foregoing reasons applies here.  See supra.  On the contrary, dismissing the claims of the only plaintiffs suing to recover damages for the unique injuries which they suffered,  would clearly defeat the most important policy of Illinois Brick, namely ensuring enforcement of the Sherman Act and its money damages remedy.  C ¶ 165 (leading OEMs have stated that they will not sue Microsoft for injuries and damages they sustained to their non-end use rights).

> **D.     Controlling Case Law Upholds Money Damages Claims Of Persons Who Did Not Pay Money Directly To The Violator In Circumstances Where Far Less Wrongdoing And Direct Restrictions Caused Far Less Direct And Unique Injury Than Are Alleged Here**
>
> **1.     Correctly Anticipating Later Precedent, Numerous Pre-McCready Decisions Limited Illinois Brick And Upheld Money Damages Claims Of Persons Who Did Not Pay Money Directly To The Violator**

In the immediate wake of Illinois Brick, numerous decisions upheld indirect purchasers' Sherman Act money damages claims where a monopolization of a given market interdicted the competitive conditions in the market in which the indirect purchaser transacted. E.g., Chatham Brass Co., Inc. v. Honeywell Inc., 512 F. Supp. 108 (S.D.N.Y. 1981) ("Chatham Brass"), Fairdale Farms, Inc. v. Yankee Milk, Inc., 1979 WL 1723 (D. Vt. Dec. 9, 1980); *vacated on other grounds and remanded for clarification,* 635 F.2d 1037 (2d Cir. 1980). Amarel v. Connel, 1986 WL 10613 (N.D. Cal. Aug. 8, 1986).  This was particularly true in commodity futures cases. Strax v. Commodity Exchange, Inc., 524 F. Supp. 936 (S.D.N.Y. 1981); Pollock v. Citrus

Assocs. of the N.Y. Cotton Exchange, Inc., 512 F. Supp. 711 (S.D.N.Y. 1981); see Three Crown

Ltd. Partnership v. Salomon Bros., Inc., 1995 WL 422467 (S.D.N.Y. July 14, 1995).[20]

In Chatham Brass, the alleged violation was to directly impose anticompetitive

restrictions, including discriminatory prices, on plaintiff itself as well to impose restrictions on

the market in which the plaintiff transacted.  Chatham Brass Co. at 113.  The Court found that

this violation allegedly increased the prices in the markets in which plaintiff transacted and

distinguished Illinois Brick as follows:

> Illinois Brick does not bar a damages claim based on such facts, since Chatham is
> complaining, not of injury resulting from the passing on of a price-fixing
> overcharge by a middleman, but rather of direct injury from Honeywell's alleged
> success in creating sufficient monopoly power to raise prices ... [in the relevant
> market]

Id. at 115.  Another reason why Illinois Brick was not viewed in Chatham as being an

impediment is clear and very persuasive:

---

20  Two pre-Associated General Contractors cases from the District of
Maryland which Microsoft relies upon are Dart Drug Corporation v.
Corning Glass Works, 480 F. Supp. 1091, 1095 (D. Md. 1979) ("Dart
Drug") and Technical Learning Collective, Inc. v. Daimler-Benz
Aktiegesellschaft, 1980-1 Trade Cas. ¶ 63,612 (D. Md. 1980).  See
Microsoft Mem. pp. 16, 18-20.  In Dart Drug, the defendants argued
that Illinois Brick precluded an "indirect purchaser" from bringing a
suit for any claim under Section 4 of the Clayton Act.  The Court
disagreed.  Id.  It held, even before the Supreme Court's holdings in
Associated Contractors and McCready, that indirect purchasers could
bring monopoly claims against the violator.  Id. 1096.
    Similarly, in another case relied upon by Microsoft, Technical
Learning, supra, the Court denied defendants' summary judgment motion
against indirect purchasers' monopoly claims.  The rationale of Dart
Drug and Technical Learning is dated and clearly incorrect due to the
subsequent McCready and Associated General Contractors decisions.
However, Dart Drug and Technical Learning further show that even the
immediate wake of Illinois Brick did not capsize indirect purchasers'
monopoly and elimination of competition claims.

...the proof required [on Chatham's indirect purchases] does not raise the difficulties foreseen in Illinois Brick of separating out passed-on overcharges from legitimate price increases imposed by a middleman, but rather is limited to a comparison of the prices Chatham actually paid for goods to the prices it would have paid if Honeywell had not attempted to monopolize this market....

Id.

**2.      The U.S. Supreme Court And Various Circuit Courts Have Upheld Money Damage Claims Of Persons Who Did Not Pay Monies Directly To The Violators**

After the foregoing district court cases, the U.S. Supreme Court, the Fourth Circuit Court of Appeals (see discussions of McCready and Virginia Vermiculite decisions, infra), and other circuit courts similarly upheld money damages claims brought under the federal antitrust laws by persons who did not pay monies to the violator.

**a.      Even More Than The Defendants In McCready, Microsoft Intentionally Deprived Plaintiffs Of Market Choice And Alternative Product As The Means Of Accomplishing Its Violations**

In Blue Shield of Virginia v. McCready, 457 U.S. 465 (1982) ("McCready"), very limited wrongdoing (a conspiracy of health insurers and psychiatrists to boycott psychologists) was alleged to have caused money damages to a class of consumers of psychological services.  457 U.S. 473-4.  Although the plaintiff class in McCready  paid a psychologist and apparently did not pay any money to the alleged violators, the U.S. Supreme Court upheld the Fourth Circuit's determination that the plaintiff class stated a valid claim for money damages under the Sherman Act.[21/]   Id.

_____

21   Just as Microsoft argues that supposedly only the OEMs paid monies to Microsoft, so the defendants in McCready argued that only McCready's employer paid monies to the defendants:

> Petitioners next argue that even if the § 4 remedy might be available to persons other than the competitors of the conspirators, it is not available to McCready because she was not an economic actor in the market that had been restrained.... Here, petitioners contend that that market, for purposes of the alleged conspiracy, is the market in

The Court reasoned that the violators' alleged conspiracy directly and "foreseeably" restricted the class from having the choice of a competing product (psychological services) available for their use.  Id. 457 U.S. at 478-79.  Moreover, such denial of choice was the very means of effecting the conspiracy and "inextricably intertwined" with the violation.  Id.  Further, the Supreme Court held that the risk of duplicative recovery "engendered by allowing both direct and indirect purchasers to claim damages resulting from a single overcharge by the antitrust defendant" was inapplicable because the plaintiff class was seeking recovery of damages for injuries unique to it.  Id. at 474-75.

Microsoft's repeated allegedly unlawful acts here similarly denied plaintiffs the choice of having a competing product (scores of competing products, actually).  Moreover, as in McCready, many anticompetitive acts used to implement the violations here intentionally deprived consumers of the choice of alternative product, i.e., the deprivation of choice is "inextricably intertwined" with the violation.  C ¶¶ 99-159.  Further, as with the class in McCready, the end-user plaintiffs here are not seeking to recover any damages incurred by the persons who had licenses to copy and, on the contrary, specifically allege damages for the

---

group health care plans.  Thus, in petitioners' view, standing to redress [*480] the violation alleged in this case is limited to participants in that market -- that is, to entities, such as McCready's employer, who were **purchasers** of group health care plans, but not to [**2549] McCready as a beneficiary of the Blue Shield plan.[emphasis supplied].

McCready at 479-480.  But the Supreme Court held that such arguments misconstrued and could not "trump", at the pleading stage, the plaintiffs' allegations of what the product, the relevant market, and the class' distinct injuries were.  Id.  The Supreme Court has also held that in Section 2 monopolization cases, the relevant market is an issue of fact.  See also Syufy Enterprises v. American Multicinema, Inc., 793 F.2d 990, 994 (9th Cir. 1986), cert. denied, 479 U.S. 1034 (1987).

"unique" injury to end-users.  C ¶¶ 164, 122.  This includes the deprivation of the end use of

licenses for numerous lower cost products which Microsoft anticompetitively eliminated and the

forced end use of Microsoft licenses <u>via</u> restrictions which Microsoft imposed directly on

plaintiffs.  C ¶ 90.

> **b.      Even More Than The Defendants In <u>Lower Lake Erie</u>,
>          Microsoft Intentionally Deprived The Plaintiffs Of Alternative
>          Lower Cost Products And New Technologies**

In <u>In re Lower Lake Erie Iron Ore Antitrust Litig.</u>, 998 F.2d 1144, 1165, 1167 n. 21 (3d

Cir. 1993) <u>cert. denied</u> 570 U.S. 1091 (1994) ("<u>Lower Lake Erie</u>"), the Court held that the

contention that the "indirect purchaser status is the death knell of plaintiffs' claim," "is not

supported by the current law.  We are, instead, instructed by [the Supreme Court's ruling in

<u>Associated General Contractors</u>], to ascertain ***the nature of the relationship between the parties.***

***This directness*** factor thus sets the tone for our standing analysis."  *Id.* (emphasis supplied).


In <u>Lower Lake Erie</u>, as here, the defendants, in order "to eliminate competition and

monopolize the transportation and handling of iron ore," had intentionally prevented the plaintiff

steel companies from using a competitive technology.  998 F.2d at 1152.  Specifically, when a

new technological development providing an alternative way for unloading the ore from the ships

was developed, the railroads "plotted *to halt the progress of [that technology]* to maintain the

railroads' dominance in the iron ore transport market."  *Id.* at 1153 (italics supplied).  The jury

found that the competing product would have cost less and awarded as money damages the

difference between that lower cost and what plaintiffs actually paid.  <u>Id</u>. at 1167-69.

Because the steel companies made some of their actual payments to shipping companies [who were also suing] the defendants contended that the steel companies were indirect purchasers in a chain of distribution under <u>Illinois Brick</u>, 998 F.2d at 1166-1168.  However, the Court of Appeals held that "[w]e do not . . . interpret . . . the `indirect purchaser rule' of *Illinois Brick* as announcing *a strict prohibition against recovery by indirect purchasers*."  *Id.* at 1167 n. 21 (emphasis supplied).  The Court distinguished <u>Utilicorp</u> as follows:

> "Despite the Court's remark in *Utilicorp* that permitting parties with indirect purchaser status to proceed with a § 4 claim would require it to `create an exception to the direct purchaser rule established in *Hanover Shoe* and *Illinois Brick* . . . .' [w]e discount the import of this language because the *Utilicorp* decision was addressing the peculiarities of applying the pass-on theory of standing in the public utility arena."  *Id.* (ellipses in the original; citations omitted).

The Third Circuit held that the mere fact that monies paid to third parties (the shipping companies) represent a component by which the steel companies measure their damages "does not foreclose further inquiry as to whether standing existed."  *Id.* at 1168. Rather, the Third Circuit ruled:

> The relevant question is whether B & LE's antitrust activity directly impacted the steel companies.  Undeniably it did.

<u>Id</u>.  The Court reasoned:

> The direct nature of the injury absorbs the question of causal connection.  There are no missing links in the causation chain here.  The correlation between the steel companies' inability to utilize the lower cost method to carry its ore and the railroad's attempt to close the ore transport market is obvious.

*Id.*      There are no "missing links" here either.  The "correlation between" end users' inability to use eight specified (and many more unspecified) technologies and Microsoft's elimination of such products and technologies in order to "close" the relevant market here is also "obvious".

33

> The goal of the railroads in preventing the [new, technologically advanced and lower cost system] ... coming into existence left four victims in its wake, the three component industries, and the steel companies.  However, the steel companies suffered the greatest harm in connection with the delay of the use of the self-loader technology.  This all-important, directness factor thus weighs greatly in the steel companies favor.

Id.  While the alleged wrongdoing here also may be shown to have left different "victims in its wake" (OEMs and retailers), only end-users were deprived of the end use of alternative products and technologies; only end-users have been anticompetitively restricted in their end-use, deprived of refunds, and otherwise deprived of end use rights in respect of their licenses of Microsoft software (C ¶ 90); only end-users have alleged "unique" money damages therefor (C ¶ 164); and end-users have not claimed for damages to others.

Thus, this is a far easier and more clear case than was Lower Lake Erie.  Indeed, the dock and trucking companies were also "direct victims" in Lower Lake Erie (Id. at 1168-69) and the Third Circuit found that the risk of duplicative recovery and apportionment of damages were "real," "weigh[ed] against the steel companies," but that, on balance, these considerations were not sufficiently compelling to deny the steel companies Sherman Act money damages.  Id. at 1169.  The Court reasoned that the "presence [of the dock and truck companies] does not diminish the directness of the steel companies' injury."  Id. at 1168-69.

> [T]he involvement of other parties and their resultant damages here are not the particular kind of double recovery Illinois Brick sought to prevent.  In Illinois Brick the concern was that overlapping parties would compete for the same pool of illegal profits garnered from the antitrust activity.  This type of duplication would be implicated here if B & LE's illegal activity were subject to suit by a "downstream" industry alleging, as was alleged in Illinois Brick, that the steel companies had passed on the transportation increase in the price of steel.  Here, different parties allege different injuries--the steel companies' claim is for the savings which would be realized if the

34

> less expensive method of transport was in place, while the vessel and
> dock companies' claim focuses on lost profits."

*Id.*

The Third Circuit acknowledged that the problems of overlap remained, despite the

"distinctive labeling" of injuries, with the steel companies having to demonstrate "that none of its

lost savings includes any amounts which the vessel companies might potentially claim as lost

profits."  *Id.*  However, the Court refused to find that "litigation must be avoided because it might

be difficult to ascertain damages," reasoning:

> Injured parties cannot be penalized and left without recourse because
> measurement of their damages is difficult.... The damage theories
> here should not be deemed complex simply because that is the way
> in which they were ultimately presented.  Reliability is instead an
> evidentiary question properly decided under evidentiary
> standards—are the figures economically reliable? Was the expert
> witness credible?  At the standing stage we look to the initial
> allegation of damages, and, at that point, the steel companies'
> damages did not appear incapable of accurate calculation.
>
> The facts as found by the jury were that self-unloaders were generally
> less expensive to utilize.  The steel companies' damages were
> measured as the difference between the amounts they actually paid to
> transport their ore and the lower prices they would have paid had the
> conspiracy not excluded a lower cost system. ... Thus, although this
> factor weighs against the steel companies, we do not find it a reason,
> standing alone, sufficiently compelling to support a standing
> challenge.  A balancing of the *AGC* factors, thus, weighs in favor of
> the steel companies' standing; the lake transport damages are
> recoverable.

Id.  Even more than in Lower Lake Erie, the plaintiff end-users here have alleged that they transacted

and suffered "unique" injury; at this pleading stage, those allegations must be accepted as true.  See

Point I supra.

35

      **c.**     **Even More Than The Defendants In <u>Sanner</u>, Microsoft Interdicted Competitive Conditions In The Market In Which Plaintiffs Transacted And Intended To Cause Injury To Plaintiffs, And Imposed Its Restrictions Directly On Plaintiffs**

The money damages claims of persons who did not make payment to the violator were also upheld in <u>Sanner v. Board of Trade</u>, 62 F.3d 918 (7th Cir. 1995) ("Sanner").  Soybean farmers sued the Board of Trade for money damages allegedly caused to the farmers' soybean businesses by the defendant's alleged restraint of trade.  <u>Id</u>. 921-923.  This restraint consisted of an emergency order (a) restricting soybean futures contract traders holding in excess of a specified amount of futures contracts from holding such positions, and (b) directing them to gradually sell such positions.  <u>Id</u>. at 921-923.

Although the farmers did not hold the affected positions, paid no monies to the Board of Trade, and did not claim damages for transacting in the futures markets, dismissal of their claims was denied under the <u>Associated General Contractors</u> test.  <u>Id</u>. at 927-929.  The Court distinguished <u>Illinois Brick</u> on the grounds that the "farmers are not attempting to stand in the shoes of a third party or to complain of secondary consequences arising from an injury to a third party".  <u>Id</u>. at 927.  Instead, soybean cash market prices had fallen as a direct result of the restraint of trade in the futures market and the farmers' injury "allegedly occurred as an intentional result of the" restraint of trade.  <u>Id</u>.  Because the direct injury and interdiction of market conditions were allegedly intentional, the farmers' case was "more like" <u>McCready</u>.  <u>Id</u>.

The facts here present a much more clear and easy case than in <u>Sanner</u>.  Plaintiffs allege that Microsoft engaged in far more anticompetitive conduct than the one emergency order in <u>Sanner</u>.  Unlike the farmer plaintiffs in <u>Sanner</u>, here some of the violator's anticompetitive conduct directly

restricted what the plaintiff end-users could do with their product.  C ¶¶ 90, 122.    As with the

farmers in <u>Sanner</u>, the end-user plaintiffs here directly suffered an interdiction of the competitive

conditions in the market in which they transacted and, over time, were effectively forced to purchase

Microsoft licenses because all market choice and alternative products had been eliminated by

Microsoft's pervasive wrongdoing.  Like the farmers, end-users are suing for injuries "unique" to

them and are not trying to complain of any injury to the OEMs' or distributors' rights or otherwise

stand in the OEM's shoes.

> **d.** **Even More Than The Wrong Doers In <u>Virginia Vermiculite</u>, Microsoft Anticompetitively Restricted End Users In Connection With Their Direct Relationship**

In <u>Virginia Vermiculite, Ltd. v. W.R. Grace & Co.-Connecticut</u>, 156 F.3d 535, 540 n.1 (4th

Cir. 1998), <u>cert</u>. <u>denied</u> <u>sub</u> <u>nom</u> <u>Historic Green Springs, Inc. v. Virginia Vermiculite, Ltd.</u>, 526 U.S.

1066 (1999), parties with a direct relationship with the antitrust violator relating to mining and

royalty rights sued the alleged violator under the federal antitrust laws.  <u>Id</u>. at fn. 1.  Citing to

<u>Associated General Contractors</u>, the Fourth Circuit Court of Appeals held that these persons (who

did not pay any monies to the violator but who had a direct relationship with the violator) had

standing to sue such violator.  <u>Id</u>.  In addition, competitors damaged by the violator's alleged

anticompetitive conduct also had standing to sue for money damages.  <u>Id</u>. at pp. 539-540.

Similarly, in plaintiffs' direct relationship with Microsoft, they have alleged a series of

anticompetitive acts by Microsoft which have deprived end-users of competitive products and other

rights.  C ¶¶ 90, 99-159.

> **3.** **Thus, Plaintiffs Easily Satisfy The Five Factor <u>Associated General Contractors</u> Test That Has Been Followed In This Circuit**

In <u>Associated General Contractors</u>, the Court held that the following factors should govern a court's determination of whether a plaintiff has antitrust standing:  (1) the causal connection between the antitrust violation and the harm to plaintiff and defendant's intent to cause that harm; (2) whether plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; (3) the directness of the injury; (4) the existence of more direct victims of the alleged antitrust violations; and (5) the potential for duplicative recovery or complex apportionment of damages.  459 U.S. 543-46.

Courts in the Fourth Circuit have followed <u>McCready</u>, <u>Associated General Contractors</u> ("AGC"), or the five factor test of AGC in assessing whether Sherman Act money damages injury is properly alleged.  <u>Virginia Vermiculite</u>, <u>suprra</u> 156 F.3d at 540 n.1 (4th Cir. 1998) (upholding money damages claims under the federal antitrust laws of two types of persons who did not pay monies to the violator); <u>Pocahontas Supreme Coal Co. v. Bethlehem Steel Corp.</u>, 828 F.2d 211, 217-220 (4th Cir. 1987).   Applying the five factor test of AGC to the allegations here, further demonstrates that Microsoft's motion should be denied.

     a.   <u>Defendants' Intent to Injure And Causal Connection Between Wrongdoing and Injury</u>. At this pleading stage, plaintiffs clearly satisfy the first AGC factor.  Microsoft intended to injure plaintiffs' (C ¶¶ 88, 122, 164) by, among other things**,** (a) eliminating lower priced and all other competitive substitutes for its product, and (b) anticompetitively forcing plaintiffs to purchase Microsoft products.  C ¶¶ 90, 99-159; 164 (alleging other forms of unique injury).  Further, plaintiffs' injury is "inextricably intertwined" (<u>McCready</u> 457 U.S. at 484) with such anticompetitive conduct because depriving the competitors of plaintiffs' business was one of the means of eliminating the competitors.  The causal connection here could not be stronger and there are no missing links.

39

b.      <u>Plaintiffs' Alleged Injury is The Raison D'Etre For The Damages Remedy</u>.  Plaintiffs

also clearly satisfy and epitomize the second AGC factor, namely, whether the injury is of the type

which the antitrust laws are intended to redress.   459 U.S. at 543-544.   See sub-point B <u>supra</u>

(consumers' claims against "giant" monopolists are the <u>raison d'etre</u> for the Sherman Act money

damages remedy).<u>22/</u>

c.      <u>Directness of Injury</u>.   The third AGC factor also strongly supports plaintiffs' claims.

For example, by unlawfully driving the lower priced and other products out of business, Microsoft

directly injured end-users and directly deprived end-users of such products.   C ¶¶ 99-159.   For

another example, by inserting the restrictive provisions in the EULA and engaging in its associated

restrictive acts, Microsoft imposed its anticompetitive restraints directly on plaintiffs and directly

forced them to purchase new Microsoft products.   C ¶¶ 90, 161-163.

As in <u>Lower Lake Erie</u>, 998 F.2d at 1168, the "nature of the relationship between the parties"

also supports directness.   Over and above the facts present in any of the previous cases upholding

money damages claims, plaintiffs here allegedly entered a EULA relationship directly with Microsoft

---

22    In market exclusion or monopolization cases, consumers or
competitors are generally held to be the best plaintiffs.   <u>SAS of
Puerto Rico v. Puerto Rico Tel. Co.</u>, 48 F.3d 39, 44 (1st Cir. 1995).
Indeed, in <u>AGC</u>, where the union plaintiff was denied standing, the
Supreme Court expressed the long-established preference for consumer
standing, holding that "[i]n this case, however, the Union was neither
a consumer nor a competitor in the market in which trade was
restrained."   459 U.S. at 539.   Here, plaintiffs are members of one of
the classes of "best plaintiffs" since they are consumers of the
products in the market monopolized by defendant and from which
competitors have been unlawfully excluded.   The Fourth Circuit
articulated the same preference in <u>White v. Rockingham Radiologs,
Ltd.</u>, 820 F.2d 98, 104 (4th Cir. 1987), holding that plaintiff "cannot
prevail on his claims of monopoly in the product market of medical and
surgical hospital services because he is neither a provider or
consumer of these services."

as the product itself, namely, plaintiffs' direct relationship with Microsoft **is** the product.  Plaintiffs' allegations present a strong case of direct injury.

        d.      <u>The Existence of More Direct Victims</u>.  Microsoft argues that the OEMs and retailers are more direct victims.  Microsoft Mem. pp. 8-13.  However, the leading OEMs have said they will not sue Microsoft for any injury (C ¶ 165) let alone the unique injuries to end users.  OEMs and retailers simply are not victims at all (let alone more direct victims) with respect to the unique injuries to end users.  C, <u>e.g.</u>, ¶¶ 90, 99-159.

        e.      <u>There is no Potential For Duplicative Recovery or Complex Apportionment</u>.  On the allegations of the complaint, the injuries to end-users are "unique" and other victims do not exist as to these injuries.  Further, OEMs and retailers have not claimed damages for these injuries.  C ¶165 (leading OEMs have, moreover, stated they will not sue Microsoft for any injuries).  Therefore, there is no danger of duplicative recovery or any apportionment of damages, let alone a complex one.  See <u>Bigelow v. RKO Radio Pictures</u>, 327 U.S. 251 (1946); <u>J. Truett Payne Co. v. Chrysler</u>, 451 U.S. at 566-67.

### 4.      Plaintiffs' Tying Claims Are Not Subject To <u>Illinois Brick</u>

Plaintiffs allege that the illegal tie of Internet Explorer to the operating system resulted in multiple injuries to all Windows 98 purchasers – those who used Internet Explorer, those who used a competing browser, and those who used no browser. C ¶¶ 163-64.  The injuries include: loss of speed and memory caused by the technological tie; loss of operating system stability and increased susceptibility to viruses or security breaches; and deprivation of consumer choice.  <u>Id</u>.[23/]

---

23    These allegations are supported by findings made by Judge Jackson in <u>United States v. Microsoft Corp.</u>, 84 F. Supp. 2d 9 (D.D.C. 1999) (see paragraphs 172-174).

Plaintiffs' injuries resulting from the illegal tie are the result of acts, directed at plaintiffs, with the intent and effect of harming competition by forcing plaintiffs to use Internet Explorer. The antitrust laws were intended to prevent these injuries, which directly flow from the illegal tie. Brunswick Corp. v. Pueblo Bowl-O-Mat, 429 U.S. 477, 489 (1977). The injuries claimed are not the result of any injury to others and, therefore, Illinois Brick does not apply to them. See argument supra.

Microsoft states that "even Judge Jackson noted that integrating IE into Windows 98 had benefitted consumers, by lowering the costs of Web-browsing software and enhancing Internet accessibility." Microsoft Mem. p. 3. This is a gross misinterpretation of Judge Jackson's Findings of Fact, and does nothing to eliminate or minimize the injuries suffered by plaintiffs as a result of the illegal tie. A fair reading of Judge Jackson's Findings is:

> As an "abstract" and "general proposition," consumers can be said to benefit from Microsoft's provision of Web browsing functionality with its Windows operating system at no additional charge. United States v. Microsoft Corp., 84 F. Supp. 2d 9 (D.D.C. 1999) (paragraph 193).

> Even without an anticompetitive intent, however, the competitive price of an Internet Explorer consumer license may have been zero. Id. at paragraph 140.[24/]

> But Microsoft realized that, even with the price of the Internet Explorer browser set at zero, consumers would still be likely to choose Netscape's Navigator. Id. at paragraph 166.

> So Microsoft took further, anticompetitive action, in part deciding that they would " . . .bind the [operating system] to the Internet Explorer, so that running any other browser is a jolting experience." Id. at 160.

---

[24] Discovery may well show that both Netscape and Microsoft could still make a profit on their browsers despite setting the consumer price at zero, due to other revenue sources derived from the browsers.

42

It was the anticompetitive contractual and technological binding of Internet Explorer to Windows 98 that Judge Jackson found lacked any justification, and caused significant damage to consumers. Id. at 172-198.

As a result of Microsoft's illegal tie of Internet Explorer with Windows 98, the plaintiff-consumers in this case suffered direct antitrust injuries under Section 4 of the Clayton Act. Microsoft Mem. p. 8, n. 6 (noting that Microsoft's motion does not seek dismissal of claims for injunctive relief, nor claims brought under laws of states that have "repealed" Illinois Brick).

**5.      If Any Plaintiffs Were Found, After Full Discovery, To Be Indirect Purchasers, They Nonetheless Qualify For Exceptions To Illinois Brick**

Microsoft argues that exceptions to Illinois Brick should be very limited and, therefore, that plaintiffs do not qualify for any exception. Microsoft Mem. pp. 17-24. However, plaintiffs have alleged that neither the OEMs nor the wholesalers and retailers purchase and take title to the end use rights and EULA. C ¶¶ 82-89; see Statement of Facts supra and Appendix Relating To Estoppel. Rather, at this preliminary stage of the case, plaintiffs have alleged that OEMs and retailers act as Microsoft's controlled agents to convey Microsoft's take-it-or-leave-it offer to enter the EULA. Id. In In re Mid-Atlantic Toyota Antitrust Litigation, 516 F. Supp. 1284, 1287 (D. Md. 1981), the court denied motions to dismiss under Illinois Brick holding:

Analysis of Illinois Brick reveals quite clearly that the exceptions therein announced were not meant to be necessarily exclusive.

.... The fact that the Supreme Court expressly grounded its recognition of the ownership or control exception on the observation that "market forces have been superceded ... plainly indicate other circumstances in which supercession of market forces has occurred could similarly create other exceptions to the Illinois Brick rationale. And when the reasons for the rule do not apply, applications of the rule would be plainly inappropriate.

Numerous decisions have recognized the agency or "market forces have been superceded" exception that In re Mid-Atlantic Toyota recognized.  See Fuchs Sugars & Syrups, Inc. v. Amstar Corp., 602 F. 2d 1025, 1031 n.5 (2d Cir.), cert. denied, 444 U.S. 917 (1979); In re NASDAQ Market-Makers Antitrust Litigation, ("NASDAQ") 169 F.R.D. 500 (S.D.N.Y. 1996); Diskin v. Daily Racing Form, Inc. ("Diskin"), 1994 U.S. Dist. LEXIS 9129, 1994-1 (CCH) Trade Cases ¶ 70,649 (S.D.N.Y. 1994); Illinois Corporate Travel, Inc. v. American Airlines, Inc., 1985 WL 2548 at *5 (N.D. Ill. 1985).

In none of these cases, however, did the plaintiffs maintain a licensor-licensee relationship with the alleged antitrust violator as plaintiffs do with Microsoft nor had the violator engaged in such pervasive wrongdoing including "forced" agency (C ¶¶ 84-89) and directly imposing restrictions on the plaintiffs.  After discovery is completed, one set of facts which plaintiffs may prove is that the OEMs and retailers are, functionally, Microsoft's agents in supplying licenses for Microsoft's operating systems.  Compare Diskin, and NASDAQ, 169 F.R.D. 500, at 505, 506 (S.D.N.Y. 1996) with C ¶¶ 84-89.[25]

---

25   For example, if discovery shows that OEMs or others had the ability to recoup from Microsoft their payments in respect of unsold or returned operating systems, then, functionally, market forces may have been sufficiently suspended or superseded so as to qualify for an exception from Illinois Brick.  See Diskin, supra (ability of race tracks and other distributors to return unsold racing forms at cost to the publisher sufficiently superseded market forces so as to constitute an exception to Illinois Brick).

Similarly, if, contractually (see Complaint ¶¶ 43 and 70) or otherwise, the OEMs or others were acting as Microsoft's agents in supplying the license to plaintiffs, then market forces may likewise have been sufficiently suspended or superseded so as to qualify for an exception from Illinois Brick.  See NASDAQ, supra (if customers purchased from their brokers who purchased from the market-makers who conspired to fix spreads in the market, the customers' relationship with their broker may have sufficiently superseded market forces so as to constitute an exception to Illinois Brick).

Microsoft argues that the Fourth Circuit has never accepted an "ownership or control" exception.  Microsoft Mem. at p. 18.  However, the case to which Microsoft cites, does recognize the exception, but finds it to be inapplicable on the facts presented.  Technical Learning Collective, Inc. v. Daimler-Benz Aktiegesellschaft, 1980-1 Trade Cas. ¶ 63,612 (D. Md. 1980).  Critically, Technical Learning was a motion for summary judgment, not a motion to dismiss.  Id.  Although the court did not want to create a "franchise" exception, it specifically noted that "plaintiffs have not explained why the particular franchise here should fall within the control exception."  Id. at 77,256 (emphasis in original).

In contrast to the plaintiffs in Technical Learning, the plaintiffs in In re Mid-Atlantic Toyota did adequately explain why they should fall within the control exception.  516 F. Supp. at 287. Similarly, the plaintiffs here have alleged that the giant Microsoft monopoly effectively controlled the OEMs through its prodigious market power, its ability to deny the OEMs a license to copy the essential facility of Microsoft's operating system, and other means.  See C ¶¶ 81-124.  Microsoft cites to no case in which the ability to deprive the agent/distributor of an essential facility was held not to satisfy the control exception to Illinois Brick, Microsoft Mem. passim.[26/] Full discovery must go

_____

26    One law review note states:  "courts should invoke the exception only to ensure that sellers do not choose to insulate themselves from suit . . . by strong-arming direct purchasers into choosing not to sue."  Note, "Scaling the Illinois Brick Wall:  The Future of Indirect Purchasers in Antitrust Litigation", 63 Cornell L. Rev. 309, 328-29 (1978).

       Another note reads: "Reliance upon direct purchasers to bring suit is wholly unjustified when they are controlled by the prospective defendants."  "The Supreme Court, 1976", 91 Harv. L. Rev. 70, 230 (1977).  Such reliance is particularly misguided where (1) none of the so-called "direct purchasers" has sued, (b) others claiming to be direct purchasers have sued, and (c) those suing have plainly alleged that the violator controlled the distributor.

forward in all events regarding Microsoft's relationship with the OEMS and distributors.  Plaintiffs

have adequately alleged a "control" relationship in all the circumstances.

In <u>Dee-K Enterprises, Inc. v. Heveafil SDN. BHHD.</u>, 982 F. Supp. 1138 (E.D. Va. 1997),

plaintiff alleged a control relationship and the Court denied a motion to dismiss:

> Of course, at this stage of the proceedings, plaintiffs need not prove
> that such ownership **or control** actually existed **between the
> producers and distributors**; they need only allege facts sufficient to
> defeat the motions to dismiss.  The second amended complaint asserts
> that each of the distributor-defendants who sold rubber thread on
> behalf of the Malaysian producers ... is **controlled** and/or owned by
> one of the manufacturer-defendants. . . [citing complaint].  Because
> plaintiffs have alleged facts that indicate ownership or **control
> relationships** with respect to these defendants, they avoid, at least at
> the pleading stage, the limitations imposed by <u>Illinois Brick</u>'s indirect
> purchaser rule as it relates to those parties. . . . [Emphasis supplied]

Plaintiffs' allegations here should likewise suffice.

### 6. The Decisions By Inferior Courts Under State Law Involved Different Allegations, Different Arguments And Are Otherwise Inapplicable

Microsoft cites to five state court decisions and/or orders dismissing state law claims.

<u>Hindman v. Microsoft Corp.</u>, No. 00-1-0945 (Haw. Dist. Ct. July 21, 2000); <u>Sherwood v. Microsoft

Corp.</u>, No. 99-3562 (Tenn. Cir. Ct. July 5, 2000); <u>Comes v. Microsoft</u>, No. CL 82311 (Iowa Dist.

Ct. July 11, 2000); <u>Arnold v. Microsoft</u>, No. 00-CL-00123 (Ky. Cir. Ct. July 21, 2000); <u>Daraee v.

Microsoft Corp.</u>, No. 0004-0331 (Or. Cir. Ct. June 27, 2000) (attached to Microsoft Mem.).


The focus of these cases was first and foremost on whether <u>Illinois Brick</u> applied in that state,

not whether <u>Illinois Brick</u> applies under federal law.  Indeed, the <u>Hindman</u> court did not dismiss on

the basis of <u>Illinois Brick</u>, but on the basis of Hawaii state law which prevents class actions by indirect purchasers.  No court considered the allegations and arguments raised here.[27]  Indeed, the Oregon, Nevada, and Iowa courts did not even mention the EULA.

>    **7.   The Blockbuster Analogy Does Not Help Microsoft For Many Reasons Including The Fact That Its Anticompetitive Restrictions In The EULA Go Far Beyond The Copyright Laws**

Microsoft analogizes its EULA relationship with plaintiffs to the relationship of the person who rents a video from Blockbuster to the maker of the video, <u>e.g.</u>, Disney.  Microsoft Mem. p. 6 fn. 3.  First, the user of a video need not click or manifest acceptance to a take-it-or-leave-it contract.  Second, Disney does not insert itself into the "sale" or "video rental" so as to demand return of the video (and offer refund of the rental price) if the consumer does not agree to Disney's license.  <u>Contrast</u>, this with the terms of the Microsoft EULA.

In this regard, Microsoft similarly argues that "its software is distributed through multiple channels" (p.6), that "software is 'licensed,' not sold, as a way of protecting the intellectual property rights of the developer," that the "end-user license agreement ('EULA') sets forth the terms and conditions of the consumer's use of the software."

---

27     For example, Microsoft cites the <u>Arnold</u> decision for the proposition that plaintiffs "are the beneficiaries, not the victims" of Microsoft's conduct.  Memorandum at 3.  This is based on the Kentucky court's premature but extensive forays into economic analysis.

However, as Microsoft concedes, plaintiffs here allege that the Navigator is only the tip of an eleven-year iceberg of Microsoft's violations of the Sherman Act.  Thus, on the allegations here, the trade-offs that occurred for consumers between the free product and technological degradation (C ¶¶ 161-165), are a wholly separate issue from the extensive harm to the consumer prior to the Navigator (and since).

Microsoft is not like Disney and Blockbuster who sell and resell copies of movies. Microsoft does not sell copies of its software – not to distributors, not to retailers, not to OEMs, not to end-users, not to anyone. Microsoft has freely chosen not to sell copies, but rather to enter into direct contracts called "licenses," in order to avoid application of the default rules of federal copyright law. If Microsoft sold copies, the copyright rules would apply, including the important First Sale Doctrine, which permits the first purchaser of a copy to dispose of it by sale or any other means.[28/] By selling only "licenses," Microsoft skirts the copyright laws and instead enters into a direct contractual relationship with the end-user that imposes restrictions on use and provides Microsoft with remedies that otherwise would be unavailable.

It is clear that Microsoft does not make a first sale to its OEM distributors. Microsoft's OEM licenses provide,

> All distribution and use of the Product is by license only. MS does not authorize all or any portion of the Product to be "issued to the public", "put into circulation", or subject to a "first sale" as the copyright laws may use those (or similar) terms. [The Joint Affidavit of Stanley Chesley and Michael Hausfeld ("Attorneys' Aff.") Ex. A, Microsoft Licensing Agreement with Micron Electronics, Inc., dated March 1, 1998.]

Indeed, Microsoft successfully argued before another federal district court that "Microsoft only licenses and does not sell its products" and that "a license agreement is not a 'sale' for purposes of the first sale doctrine." See Harmony Computer, supra, at 213 (discussed in Appendix relating to Estoppel).

Microsoft's end user license also clearly abrogates the copyright law First Sale Doctrine by contractually restricting the rights of the user. Id. For example, the end user who acquires the Microsoft license in connection with the purchase of a computer from an OEM cannot use the

---

28   See Microsoft v. Harmony Computers & Electronics, 846 F.Supp. 208, 212 (E.D.N.Y. 1994).

software as he pleases but can only use it on the very same computer with which it came pre-installed. C ¶90.  The end user cannot buy another computer and transfer the original software to it, even if purely for his own personal use.  Id.  Nor can the end-user sell or transfer the software to another except in connection with a sale of the very computer with which it came pre-installed.  Id. Some of Microsoft's reasons for these restrictions are obvious: they dramatically improve sales of licenses if end-users cannot transfer their software to new computers or to other users.  Every time someone buys a new computer they have to buy a new end-user license from Microsoft.  Microsoft's licenses are not a mere exercise of its copyright rights; they are direct contractual limitations on the rights that consumers, who buy Microsoft licenses rather than copies of its software, would otherwise enjoy.

Since Microsoft is not selling copies of software, but rather end-use licenses, the relevant question under Illinois Brick is whether those end-use licenses are sold and resold through a chain of distribution.  The answer is decidedly no.  The OEM never itself obtains the end-use license and cannot possibly be reselling it to the end-user.  All the OEM ever receives is a different kind of license – a license to pre-install.  It follows that the EULA is a direct transfer of rights from Microsoft to the end-user, and the end-user is not merely the direct, but the only purchaser of the EULA.

In this case, the license, not the software or copies of the software, is the very product being sold and it passes directly from the owner of the intellectual property, Microsoft, to the end-user. It must be remembered that Microsoft, like Disney and Blockbuster, could have chosen to sell copies of its software.  It elected not to do so for its own commercial advantage.  It cannot now be heard to claim that the licenses, which Microsoft has elevated to the utmost importance in so many other legal and business contexts, are mere forms and that the substantive commercial transaction is actually the sale of the "software" which Microsoft has so consistently insisted never occurs. See Appendix Relating To Estoppel.

**POINT III.     THE RULE 56 PART OF MICROSOFT'S MOTION FOR PRE-DISCOVERY SUMMARY JUDGMENT MUST BE DENIED AS PREMATURE AND DUE TO GENUINE ISSUES OF FACT**

> **A.     Governing Rule 56 Standards**

Rule 56(f) provides as follows:

> Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Ordinarily, motions for summary judgment at the outset of the case will be denied where facts are in dispute or insufficient opportunity for discovery has been afforded.  See Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Hospital Building Co., 425 U.S. at 746 (1976) (in antitrust cases "plaintiffs should be given ample opportunity to conduct discovery"); Phillips v. General Motors Corp., 911 F.2d 724 (4th Cir. 1990) (summary judgment reversed where court below failed to address nonmoving plaintiffs' contention that they were not in a position to oppose the motion because defendants had not answered plaintiffs' interrogatories).

> **B.     Certain Plaintiffs Have Attested That They Are Direct Purchasers Even Under Microsoft's Overly Restrictive Definition Of The Term**

Eleven named plaintiffs have submitted affidavits attesting based on their personal knowledge that they directly purchased from Microsoft.  See accompanying affidavits.  For this further reason (as well as Microsoft's concession that plaintiffs have adequately pleaded a claim for injunctive relief under the Sherman Act), full discovery is required to go forward in all events in this case, and Microsoft's motion to dismiss the Sherman Act money damage claims of end users should be denied in all respects.

### C. Plaintiffs' Counsel Have Attested To The Absence Of Discovery Regarding Microsoft's Assertions About Its Relations With OEMs, Retailers And Its Other Contradictions Of The Complaint

Plaintiffs have submitted a competent opposing affidavit attesting that full discovery is required in order for plaintiffs to demonstrate numerous genuine issues of fact outside plaintiffs' personal knowledge, e.g.:

- what were the relationships and practices between Microsoft and its distributors;

- did the distributor ever own the EULA and the rights thereunder, and then sell that agreement or those rights to end users;

- what were the relationships and practices between Microsoft and its OEMs;

- did the OEMs ever own the EULA and the rights thereunder, and then sell that EULA or the rights thereunder to end users;

- what factors went into the pricing decisions of OEMs and distributors;

- what influence did Microsoft have over the terms of the EULA and the pricing decisions of the OEMs and retailers; and

- how were OEMs and distributors billed and charged.

See Attorneys' Affidavit ¶¶ 2-8.

Although plaintiffs are far from completing document discovery, it is apparent that [

**REDACTED TEXT**          **REDACTED TEXT**                    **REDACTED TEXT**

   **REDACTED TEXT**            **REDACTED TEXT**            **REDACTED TEXT**

   **REDACTED TEXT**            **REDACTED TEXT**                    **REDACTED**

**TEXT**

        **REDACTED TEXT**                        **REDACTED TEXT**

51

**REDACTED TEXT**          **REDACTED TEXT**          **REDACTED TEXT**

**REDACTED TEXT**                    **REDACTED TEXT**

**REDACTED TEXT**               **REDACTED TEXT**

**REDACTED TEXT**               **REDACTED TEXT**

**REDACTED TEXT**                    **REDACTED TEXT**

**REDACTED TEXT**               **REDACTED TEXT**

**REDACTED TEXT**                    **REDACTED TEXT**

**REDACTED TEXT**                          ]29/

---

29      Although Microsoft concedes that it "may be true" that plaintiffs
acquire their license directly from Microsoft, Microsoft also argues
that one-half the EULAs are between Microsoft and end users but one-
half are between OEMs and end-users.  Microsoft Mem. pp. 7-13; Vellone
Aff. par. 14.  This is contrary to the complaint.  C ¶¶ 81-88.  It is
based on certain portions of the language in an ambiguous EULA for
OEMs which is imposed by Microsoft.

     Microsoft's argument constitutes a sham designed to insulate
Microsoft from a direct relationship with the end-user.  Other
portions of the language of the EULA create express remedies and
rights in favor of Microsoft.  C ¶ 88; see Attorneys' Aff. par. 10-18.
Further, Microsoft itself creates the language of the EULA.  C ¶¶ 84-
88. **[REDACTED TEXT**
**REDACTED TEXT**                         **REDACTED TEXT**
**REDACTED TEXT**
**REDACTED TEXT**          **REDACTED TEXT**                    **REDACTED**
**TEXT]**
Therefore, the OEM could not be the granting or counterparty to the
EULA.  Only Microsoft could.

     Indeed, Microsoft imposed more obligations on end users and in
favor of itself in the EULA that was supposedly from OEMs than in the
retail EULA to which Microsoft admits it is a party.  C ¶ 90.

     Further the EULA provides that Microsoft retains title to the software including the copy
obtained by the end user.  **[REDACTED TEXT**          **REDACTED TEXT**
**REDACTED TEXT**          **REDACTED TEXT**          **REDACTED TEXT**
**REDACTED TEXT**          **REDACTED TEXT**          **REDACTED TEXT**
**REDACTED TEXT**     **REDACTED TEXT]**

Therefore, discovery may establish that the relationship between Microsoft and OEMs is that of consignor and consignee.  In <u>Malone v. Microdyne Corp.</u>, 26 F.3d 471, 476 n.6 (4th Cir. 1994), the Fourth Circuit explained that a "consignment is a transaction in which goods are delivered by a consignor to a dealer or distributor (the consignee) primarily for sale by the consignee, and the consignee has the right to return any unsold commercial units of goods in lieu of payment."  Thus, in <u>Malone</u>, the court held that where a software manufacturer provided software to distributors who had a right to return the merchandise if they could not sell it, the transactions were consignments, not sales.  <u>Id</u>. at 477-78;  <u>see</u> <u>In re Lexington Appliance Co.</u>, 202 F.2d 869, 871 (D. Md. 1962) (consignment is a "bailment for care or sale, where there is no obligation to purchase on the part of the consignee. . . .[I]f the alleged consignee is absolutely bound in all events to pay for the goods unsold. . . the transaction is a sale. . .")

The characterization of the transaction as a consignment is significant, because a consignee is the agent of the consignor, not a purchaser.  In <u>Blank v. Dubin</u>, 267 A.2d 165, 167 (Md. 1970), the court explained:

> In a sale title passes to the buyer, while in a consignment by principal to a factor title remains in the principal but possession passes to the factor.  Where goods are delivered by one party to another, to sell for the party delivering them, it creates the relationship of agency, and the title remains in the principal. . . . .

Thus, the OEMs are Microsoft's agents in presenting Microsoft's offer to enter licenses to end users.

---

Also, Microsoft's upgrade practice shows that Microsoft was the real contracting party in the EULA.  Attorneys' Aff. ¶ 17.  Clearly, discovery is required on who, in reality, the end user is contracting with under Microsoft's EULA.

In view of plaintiffs' competent affidavits, genuine issues of fact exist regarding whether plaintiffs acquired the EULA directly from Microsoft.  Thus, this is a classic antitrust case in which the relevant proof is in the hands of the alleged violator.  Therefore, Microsoft's Rule 56 motion must be denied.  Advanced Health-Care Services, Inc. v. Radford Community Hospital, 910 F.2d 139, 143-144. (4th Cir. 1990) ("in antitrust cases, in particular ... dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly")  quoting Hospital Bldg. Co. v. Trustees of Rex Hosp., 425 U.S. 738, 745 (1976); Virginia Vermiculite, supra, 156 F.2d at 538, 539 (same).

## CONCLUSION

Microsoft's motion to dismiss plaintiffs' money damages claims under the federal antitrust laws should be denied in all respects.

Dated _____                          Respectfully submitted,


_____                    _____
Stanley M. Chesley                                 Michael D. Hausfeld
Waite, Schneider, Bayless                          Cohen, Milstein, Hausfeld & Toll, PLLC
& Chesley Co., L.P.A                               1100 New York Avenue, NW
1513 Fourth & Vine Tower                           Suite 500
One West Fourth Street                             Washington, D.C.  20005
Cincinnati, OH  45202

PLAINTIFFS' CO-CHAIRS



PLAINTIFFS' LEAD COUNSEL COMMITTEE

Ben Barnow                                         Joseph Danis
Barnow & Goldberg                                  Carey & Danis

1 N. LaSalle St., Ste. 4600,
Chicago, IL  60602

8182 Maryland Ave.
Suite 1400
St. Louis, MO  63105

Robert Lieff
Lieff Cabraser Heimann & Bernstein, LLP
275 Battery Street, Suite 3000
San Francisco, CA  94111

Alice McInerney
Kirby McInerney & Squire, L.L.P.
830 Third Avenue
New York, NY  10022

Douglas Thompson
Finkelstein, Thompson & Loughran
1055 Thomas Jefferson St. SW
Suite 6012
Washington, D.C.  20007

Christopher Lovell
Lovell & Stewart, L.L.P.
500 Fifth Avenue, Suite 5800
New York, NY  10110

Leonard B. Simon
Milberg, Weiss, Bershad, Hynes & Lerach
600 West Broadway, Suite 1800
San Diego, CA  92101

## PLAINTIFFS' EXECUTIVE COMMITTEE

Gordon Ball
Law Offices of Gordon Ball
750 Nations Bank Center
550 Main Avenue
Knoxville, TN  37902

John J. Cummings III
Cummings, Cummings & Dudenhefer
416 Gravier Street
New Orleans, LA 70130

Linda P. Nussbaum
Pomerantz, Haudek, Block, Grossman
& Gross LLP
100 Park Avenue, 26th Floor
New York, NY  10017-5516

Howard J. Sedran
Levin, Fishbein, Sedran & Berman
510 Walnut Street, Suite 500
Philadelphia, PA  19106

Nicholas E. Chimicles
Chimicles & Tikellis LLP
361 West Lancaster Avenue
One Haverford Centre
    Haverford, PA  19041-0110

Dianne M. Nast
Roda & Nast, P.C.
801 Estelle Drive
Lancaster, PA 17601

Lynn L. Sarko
Keller Rohrback, LLP
1201 Third Avenue
Suite 3200
Seattle, WA  98101-3052

David D. Shelby
Shelby & Cartee
2956 Rhoades Circle, S.
Birmingham, AL  35205

56

Robert A. Skirnick
Meredith Cohen Greenfogel, & Skirnick, P.C.
63 Wall Street
New York, NY  10005

**Appendix 2**
**Relating to Estoppel**

Microsoft Should Be Estopped By Its Prior Conduct In Obtaining Stays of
Discovery In This Litigation  From Seeking A Summary Judgment Here That It
"Sells The Software" To OEMS Or Others Because It Has Successfully Argued In
Other Litigation That It Makes No Such Sale

Plaintiffs' arguments in the text suffice to defeat Microsoft's motion on substantive legal

as well as controlling procedural grounds.  However, there is another reason to deny Microsoft's

motion which is premised on matters that are going to become a recurring issue in this litigation

as discovery and other proceedings go forward.

Microsoft consistently moved for stays of discovery and otherwise opposed discovery

from 1999 until Summer, 2000.  Attorney's Affidavit, ¶¶ 4-6.  As those stays were expiring,

Microsoft moved for a summary judgment holding that it sells its "software" first to OEMs and

retailers who then supposedly resell it to end users.  Microsoft Mem. pp. 6-7.

However, Microsoft has affirmatively, unambiguously and successfully asserted in

numerous previous cases that Microsoft does not make any "first sale" to OEMs or others

(including distributors) of its "software".  E.g., Microsoft Corp. v. Harmony Computers & Elec.

Inc., 846 F. Supp. 208, 211 (E.D.N.Y. 1994).  A legal doctrine very analogous to the direct

purchaser doctrine under the federal antitrust laws is the "first sale doctrine" under the federal

copyright laws.  In Microsoft Corp. v. Harmony Computer, supra, defendants parried Microsoft's

copyright infringement suit by asserting that they were immune from liability therefor because

Microsoft had made the "first sale" of the software to them.

Microsoft unequivocally and affirmatively asserted that it did not make a "first sale" of its

software to any person nor permit any change in the legal title to its products.  Id. at 213.  On the

contrary, Microsoft asserted that it merely licensed various bundles of rights in respect of the software, and that it (Microsoft) retained full title to software.  Id.  The Court in Microsoft v. Harmony supra accepted Microsoft's assertions.  Id.  Thereby, Microsoft successfully established, when it suited Microsoft's purposes, that Microsoft does not make a "first sale" of its software to OEMs or distributors and, correspondingly, that such OEMs, distributors and all other persons do not make a re-sale of such software.

Further, Microsoft successfully asserted that the standardized mass market licenses and licensor-licensee relationships which Microsoft enjoys with all its end users, should be enforceable to the fullest extent by Microsoft directly against end users.  See the article written by senior in-house attorney for Microsoft, R. Gomulkiewicz, The License is the Product: Comments on the Promise of Article 2B for Software and Information Licensing, 13 Berkeley Tech. L. J. 891 (1998) (successfully asserting that the District Court's refusal to permit such enforcement in ProCD, Inc. v. Zeidenberg, 908 F. Supp. 640 (W.D. Wisc. 1996), should be reversed by the Seventh Circuit Court of Appeals).  That Circuit later did reverse the holding. See ProCD, Inc. v. Zeidenberg, 86 F.3d 1447 (7th Cir. 1996)).[30]

In Microsoft Corporation v. Grey Computer, 910 F. Supp. 1077, 1084 (D.Md. 1995), defendants argued in this District Court that "[s]urely at some point in the distribution chain Microsoft no longer can inhibit sale of computer products."  Therefore, defendants argued that

---

30  In M.A. Mortenson Co., Inc. v. Timberline Software Corp., 140 Wash.2d 568, 998 P.2d 305 (Wash. 2000), the court followed Pro CD and held that the contract for purchase of software is not accepted until the end user began using the software, thereby assenting to the license.  The court observed that Pro CD now represents "the overwhelming majority view."  Id. at 140 Wash.2d at 583, 988 P.2d at 313, n. 10.

they had obtained clear title to the operating system software.  Id.  This Court rejected this position, and accepted Microsoft's arguments:

> This argument also lacks merit.  Unlike contracts, copyrights and the rights flowing therefrom are entirely creatures of statute and "computer programs are proper subjects of copyright".  M. Kramer Mfg. Co., 783 f.2d at 432. By the clear terms of § 106, Microsoft, as owner of the copyrighted works, has the exclusive right to limit the distribution chain of its products.  See Radji v. Khakbaz, 607 F. Supp. 1296 (D.C. Cir. 1985). Limitations on those rights, none of which Defendants raise, are properly contained in the Copyright Act itself under §§ 107-118.  Id.

Judicial estoppel, an equitable doctrine that prevents a party who has successfully taken a position in one proceeding from taking the opposite position in a subsequent proceeding, is recognized to protect the integrity of the judicial system.  See Lowery v. Stovall, 92 F.3d 219, 223 (4th Cir. 1996) (doctrine of judicial estoppel protects the essential integrity of the judicial process); McNemar v. Disney Store, Inc. 91 F.3d 610, 616 (3d Cir. 1996) ("The doctrine ... serves a consistently clear and undisputed jurisprudential purpose: to protect the integrity of the courts"); DeGuiseppe v. Village of Bellwood, 68 F.3d 187, 191 (7th Cir. 1995) ("Courts are under no compulsion to heed the shifting theories of chameleonic litigants'").

Acting on the assumption that there is only one truth about a given set of circumstances, the courts apply judicial estoppel to prevent a party from benefiting itself by maintaining mutually inconsistent positions regarding a particular situation.

> As we have previously observed, the doctrine is invoked to prevent a party from "playing fast and loose with the courts," from "blowing hot and cold as the occasion demands," or from attempting "to mislead the courts to gain unfair advantage."  Lowery 92 F.3d at 223, 225 (citations omitted).  As an equitable doctrine, judicial estoppel is invoked in the discretion of the district court and with the recognition that each application must be decided upon its own specific facts and circumstances.  See e.g., McNemur, 91 F. 3d at 617.

We have recognized the necessity of establishing at least three elements to apply the doctrine: (1) The party to be estopped must be asserting a position that is factually incompatible with a position taken in a prior judicial or administrative proceeding; (2) the prior inconsistent position must have been accepted by the tribunal; and  (3) the party to be estopped must have taken inconsistent positions intentionally for the purpose of gaining unfair advantage.  See <u>Lowery</u>, 92 F.3d at 223; <u>John S. Clark Co. v. Faggers & Frieden, P.C.</u> 65 F.3d 26, 29 (4th Cir. 1995).

<u>King v. Herbert J. Memorial Hospital</u>, 159 F.3d 192, 196 (4th Cir. 1998).

All three conditions are clearly satisfied by Microsoft's conduct in connection with the <u>Harmony</u>, <u>ProCD</u> and <u>Grey Computer</u> cases <u>supra</u>.  Microsoft should be estopped from asserting that OEMs or others are "first purchasers" of anything or that Microsoft's software is the product it sells.