IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

_____

IN RE MICROSOFT CORP.                            )
ANTITRUST LITIGATION                             )
                                                 )       MDL DOCKET NO. 1332
                                                 )       Hon. J. Frederick Motz
This Document Relates To:                         )
Gravity, Inc. v. Microsoft Corp.                  )
                                                 )
_____)

**REPLY BRIEF OF DEFENDANTS DELL COMPUTER CORPORATION,
COMPAQ COMPUTER CORPORATION, AND PB ELECTRONICS, INC.
IN SUPPORT OF MOTION TO DISMISS THE AMENDED COMPLAINT**

William D. Coston
Melissa Landau Steinman
Martin L. Saad
VENABLE, BAETJER, HOWARD
  & CIVILETTI, L.L.P.
1201 New York Avenue, NW, Suite 1000
Washington, DC 20005-3917
(202) 962-4800
*Counsel for Defendant*
*Compaq Computer Corporation*

W. Stephen Smith
MORRISON & FOERSTER
2000 Pennsylvania Ave N.W.
Suite 5500
Washington, DC   20006
(202) 887-1500

Penelope A. Preovolos
MORRISON & FOERSTER
425 Market Street
San Francisco, CA   94105
(415) 268-7000
*Counsel for Defendant*
*PB Electronics, Inc.*

Paul M. Smith
JENNER & BLOCK
601 13th Street, N.W.
Washington, DC 20005
(202) 639-6000

Jerold S. Solovy
Barbara S. Steiner
JENNER & BLOCK
One IBM Plaza
Chicago, Illinois 60611
(312) 222-9350

Samuel R. Miller
FOLGER LEVIN & KAHN LLP
Embarcadero Center West
275 Battery Street, 23rd Floor
San Francisco, CA 94111
(415) 986-2800
*Counsel for Defendant*
*Dell Computer Corporation*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.      TO WITHSTAND A DISMISSAL MOTION, A COMPLAINT MUST
        INCLUDE SUFFICIENT FACTUAL ALLEGATIONS TO MAKE A
        PLAUSIBLE CLAIM OF CONSPIRACY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.     PLAINTIFFS HAVE ABANDONED THE CONSPIRACY CLAIM SET FORTH
        IN THEIR COMPLAINT, BUT THE REVISED VERSION DESCRIBED IN
        THEIR BRIEF IS NO MORE ECONOMICALLY PLAUSIBLE. . . . . . . . . . . . . . . . . . 4

        A.      Plaintiffs' New Conspiracy Theory Is Foreclosed by the Complaint . . . . . . . . . . . 5

        B.      Plaintiffs' New Conspiracy Theory Is Nonsensical . . . . . . . . . . . . . . . . . . . . . . . . 8

III.    PLAINTIFFS' SECTION 2 CLAIM SHOULD BE DISMISSED. . . . . . . . . . . . . . . . . 12

IV.     PLAINTIFFS' SECTION 1 CLAIM ALSO MUST BE DISMISSED. . . . . . . . . . . . . . 12

        A.      Plaintiffs Have Not Even Attempted to Allege That the Defendant
                OEMs Made a "Conscious Commitment" to Any Agreement *with
                Each Other*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        B.      Narrow Contractual Agreements, Even If Allegedly Anti-competitive
                In Their Indirect, Long-term Effects, Do Not Establish a Broad Conspiracy. . . . 15

        C.      Reliance on Narrow Contractual Provisions to Establish a Broad
                Conspiracy under Section 1 Is Especially Unjustified Where, as Here,
                The Particular Agreements at Issue Are Not Themselves Actionable
                Restraints of Trade. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

                1.      Plaintiffs Have Not Come Close to Alleging an Illegal Exclusive
                        Dealing Arrangement. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

                2.      Plaintiffs Have Offered No Other Justification for Concluding
                        That the Challenged Agreements Unlawfully Restrain Trade. . . . . . . . . 20

                3.      Plaintiffs' Arguments for Extending the Statute of Limitations
                        Are Incorrect. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

## TABLE OF AUTHORITIES

### CASES

Airweld, Inc. v. Airco, Inc., 742 F.2d 1184 (9th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Al George, Inc. v. Envirotech Corp., 939 F.2d 1271 (5th Cir. 1991) . . . . . . . . . . . . . . . . . . . . 24

Amey, Inc. v. Gulf Abstract & Title, Inc., 758 F.2d 1486 (11th Cir. 1985) . . . . . . . . . . . . . . . 24

Car Carriers Inc. v. Ford Motor Co., 745 F.2d 1101 (7th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . 4

Charley's Tour and Transportation, Inc. v. Interisland Resorts, Ltd., 618 F. Supp. 84
        (D. Haw. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Contractor Utility Sales Co. v. Certain-teed Products Corp., 638 F.2d 1061
        (7th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

In re Copper Antitrust Litigation, MDL No. 1303, __F.R.D.__, 2000 WL 1225041
        (W.D. Wis. Aug. 24, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

DM Research, Inc. v. College of American Pathologists, 170 F.3d 53 (1st Cir. 1999) . . . . . . . . 3

DXS, Inc. v. Siemens  Medical Systems, Inc., 100 F.3d 462 (6th Cir. 1996) . . . . . . . . . . . . . . 24

Eichman v. Fotomat Corp., 880 F.2d 149 (9th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Elder-Beerman Stores Corp. v. Federated Department Stores, Inc., 459 F.2d 138
        (6th Cir. 1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Genetic Systems Corp. v. Abbott Laboratories, 691 F. Supp. 407 (D.D.C. 1988) . . 15, 17, 19, 20

Hammes v. AAMCO Transmissions, Inc., 33 F.3d 774 (7th Cir. 1994) . . . . . . . . . . . . . . . . . . . 4

Impro Products, Inc. v. Herrick, 715 F.2d 1267 (8th Cir. 1983) . . . . . . . . . . . . . . . . . . . . . 14, 17

International Distribution Centers, Inc. v. Walsh Trucking Co., 812 F.2d 786
        (2d Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Klehr v. A.O. Smith Corp., 521 U.S. 179 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Kramer v. Pollock-Krasner Foundation, 890 F. Supp. 250 (S.D.N.Y. 1995) . . . . . . . . . . . . . . . 3

Leonia Amusement Corp. v. Loew's, Inc., 117 F. Supp. 747 (S.D.N.Y. 1953) . . . . . . . . . . . . . 22

Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc., 824 F.2d 582
    (8th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

MCM Partners, Inc. v. Andrews-Bartlett & Associates, Inc., 62 F.3d 967
    (7th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Matsushita Electric Industries Co. v. Zenith Radio Corp., 475 U.S. 574 (1986) . . . . . . . . . . . 21

Monahan's Marine, Inc. v. Boston Whaler, Inc., 676 F. Supp. 379 (D. Mass. 1987),
    aff'd on other grounds, 866 F.2d 525 (1st Cir. 1989) . . . . . . . . . . . . . . . . . . . 13, 15, 16, 21

Monsanto Co. v. Spray-Rite Service Corp., 465 U.S. 752 (1984) . . . . . . . . . . . . . . . . . . . . . . . 13

Multistate Legal Studies, Inc. v. Harcourt Brace Javonovich Legal and
    Professional Publications, Inc., 63 F.3d 1540 (10th Cir. 1995) . . . . . . . . . . . . . . . . . . . . 15

Mylan Laboratories, Inc. v. Akzo, N.V., 770 F. Supp. 1053 (D. Md. 1991) . . . . . . . . . . . passim

Nobel Scientific Industries, Inc. v. Beckman Instruments Inc., 670 F. Supp. 1313
    (D. Md. 1986), aff'd, 831 F.2d 537 (4th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17

Pace Industries, Inc. v. Three Phoenix Co., 813 F.2d 234 (9th Cir. 1987) . . . . . . . . . . . . . . . . 24

Peck v. General Motors Corp., 894 F.2d 844 (6th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Pepsico, Inc. v. Coca-Cola Co., No. 98 CIV. 3282(LAP), __F. Supp. 2d__,
    2000 WL 1346789 (S.D.N.Y. Sept. 19, 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Peto v. Madison Square Garden Corp., 384 F.2d 682 (2d Cir. 1967) . . . . . . . . . . . . . . . . . . . . 22

Poster Exchange, Inc. v. National Screen Service Corp., 517 F.2d 117 (5th Cir. 1975) . . . . . . . 23

Royal Drug Co. v. Group Life Health Insurance Co., 737 F.2d 1433 (5th Cir. 1984) . . . . . . . . 15

Russ Toggs, Inc. v. Grinnell Corp., 426 F.2d 850 (2d Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . 22

Sun Theatre Corp. v. RKO Radio Pictures, Inc., 213 F.2d 284 (7th Cir. 1954) . . . . . . . . . . . . 22

TV Communications Network, Inc. v. Turner Network Television, Inc., 964 F.2d 1022
    (10th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

T.W. Electric Service, Inc. v. Pacific Electric Contractors Ass'n, 809 F.2d 626
    (9th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 21

United States v. Kissel, 218 U.S. 601 (1910) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

United States v. Microsoft Corp., 84 F. Supp. 2d 9 (D.D.C. 1999) . . . . . . . . . . . . . . . . . . 6, 7, 10

United States v. Microsoft Corp., 87 F. Supp. 2d 30 (D.D.C. 2000) . . . . . . . . . . . . . . . . . . 10, 18

Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321 (1971) . . . . . . . . . . . . . . . . . . . . 24

**STATUTES**

15 U.S.C. § 16(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

**INTRODUCTION**

As the Court knows, of the multitude of antitrust class actions filed against Microsoft based on the Government's case in United States v. Microsoft, only one – this case – included original equipment manufacturers ("OEMs") as co-defendants. The response to the Motions to Dismiss filed by the Gravity plaintiffs ("plaintiffs"), while attempting to defend the validity of their Complaint, only serves to explain its uniqueness: plaintiffs' conspiracy claims are aberrant because they are illogical and contrived. This is a case in search of a theory, filed against three OEMs only because the plaintiffs did not think they could proceed solely against Microsoft. Plaintiffs, by walking away from the actual allegations in the Complaint, effectively concede that they do not state a plausible claim. Moreover, if the new version of the case described in plaintiffs' brief were incorporated into a new complaint, the case would make even less sense.

The OEMs' opening brief pointed to a number of fundamental problems with the Complaint. Among them was the inherent contradiction between their singling out three OEMs as alleged co-conspirators and their own allegations that the entire OEM industry (along with Internet service and content providers) had struck comparable anti-competitive agreements with Microsoft. A second flaw in the Complaint is its fundamental implausibility. It simply makes no sense to claim that OEMs operating in a competitive market would set out to preserve an alleged monopoly possessed by the supplier of an input demanded by their customers, or that Microsoft, in possession of its alleged monopoly over software that consumers needed and wanted, would share its monopoly profits with three, and only three, OEMs.

Plaintiffs have tried but failed to address these and other problems with their case. They now emphasize that they are claiming a conspiracy involving only three OEMs – not the whole industry. But the Complaint still says that the five provisions in license agreements – the only

anti-competitive conduct of OEMs specifically alleged – were accepted by the defendant OEMs and others.  If that is so (and plaintiffs in their brief never actually claim otherwise), then it is nonsense to label the conduct of the defendant OEMs as evidence of a four-party conspiracy.

Conversely, if plaintiffs are now asserting that only the "conspirator" OEMs accepted the allegedly anti-competitive contractual provisions, they face a different, but no less insuperable, problem.  Those provisions, if applied only to three OEMs, could not by their very nature have created or preserved a monopoly for Microsoft, because plaintiffs do not and cannot allege that the three defendant OEMs possessed the requisite market power.  Nor do the conspiracy's alleged "benefits" to the defendant OEMs pass a test of minimum plausibility.  At bottom, it is nonsensical to allege that three participants in a highly competitive and diversified market set out to preserve the market share of a monopolist supplier by restricting the way they sold their products.  They would not have done so, and it would not have worked if they had tried.

Thus, although shifting course in their description of the conspiracy, plaintiffs have not improved its plausibility.  As a result, they all but abandon their Section 2 claim, offering only a cursory argument that their allegations, even if proved, would allow an inference that the defendant OEMs had a specific intent to promote and preserve Microsoft's alleged monopoly.

As for Section 1, which requires a showing that each alleged co-conspirator made a "conscious commitment" to an unlawful scheme, plaintiffs have not alleged a single fact to support the allegation that the OEMs conspired with each other.  But this Court has held that such an effort to construct a "global conspiracy" by alleging a "hub and spokes without a rim" is barred as a matter of law.  Mylan Labs., Inc. v. Akzo, N.V., 770 F. Supp. 1053, 1066 (D. Md. 1991).  Mylan and numerous cases from other jurisdictions preclude plaintiffs from cobbling together a four-party conspiracy based solely on provisions in confidential license agreements

-2-

independently negotiated between Microsoft and each of the defendant OEMs. That is not enough to create a single conspiracy actionable under Section 1, particularly where, as here, none of the specific agreement provisions is itself an actionable violation of the Act.

**I.      TO WITHSTAND A DISMISSAL MOTION, A COMPLAINT MUST INCLUDE SUFFICIENT FACTUAL ALLEGATIONS TO MAKE A PLAUSIBLE CLAIM OF CONSPIRACY.**

The legal standard applicable here should not be controversial.  Although the federal rules allow "notice pleading," that does not mean that a plaintiff can defeat a motion to dismiss with conclusory allegations of a conspiracy that is economically nonsensical.  Numerous decisions cited in the OEMs' first brief establish that, where a conspiracy claim defies common sense, the plaintiff must include sufficient specific allegations to justify a conclusion that their case has a plausible basis in fact.  Plaintiffs attempt to confine this principle to the summary judgment context, Plaintiffs' Consolidated Opposition to Motions to Dismiss ("Resp. Br.") at 12, but the cases require a comparable screening process at the pleading stage.  Remarkably, while attempting to distinguish some of those cases, plaintiffs do not even address DM Research, Inc. v. College of American Pathologists, 170 F.3d 53, 55 (1st Cir. 1999), which recently discussed the prevailing rule at length, or Mylan Laboratories, Inc. v. Akzo, N.V., where this Court dismissed implausible conspiracy allegations, see 770 F. Supp. at 1065-68 (relying on principles derived from Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986), and Monsanto v. Spray-Rite Serv. Corp., 465 U.S. 752 (1984), in assessing sufficiency of a complaint); see also Kramer v. Pollock-Krasner Found., 890 F. Supp. 250, 256 (S.D.N.Y. 1995).

Far from arguing for a "heightened pleading" requirement, Resp. Br. at 11, the OEMs simply invoke the principle that a complaint must contain allegations adequately addressing all material elements of a claim.  Absent such allegations, a suit may not proceed, for "the costs of

modern federal antitrust litigation and the increasing caseload of the federal courts counsel against sending the parties into discovery when there is no reasonable likelihood that the plaintiffs can construct a claim from the events related in the complaint. <u>A contrary view would be tantamount to providing antitrust litigation with an exemption from Rule 12(b)(6)</u>." <u>Car Carriers Inc. v. Ford Motor Co.</u>, 745 F.2d 1101, 1106-07 (7th Cir. 1984) (emphasis added).[1]

## II.   PLAINTIFFS HAVE ABANDONED THE CONSPIRACY CLAIM SET FORTH IN THEIR COMPLAINT, BUT THE REVISED VERSION DESCRIBED IN THEIR BRIEF IS NO MORE ECONOMICALLY PLAUSIBLE.

Plaintiffs fail in their efforts to show that the Complaint contains sufficiently plausible conspiracy allegations to justify allowing them to move forward with litigation of their claim. Recognizing the inherent problems with a complaint that singles out three OEMs as co-conspirators but then accuses them of doing nothing that was not also done by all of their competitors, plaintiffs in their brief seek to <u>suggest</u> that the defendant OEMs did take some actions that were both distinctive and anti-competitive.  But that suggestion not only flatly contradicts the Complaint but also is not supported by <u>any</u> statement, <u>anywhere</u> in plaintiffs' brief, describing even a single anti-competitive action that was taken only by the defendant OEMs.  The reason, as plaintiffs well know and as Judge Jackson's findings confirm, is that all of the supposedly anti-competitive features of license agreements cited by the plaintiffs were features that Microsoft successfully demanded in its negotiations with all of the OEMs.

Moreover, even assuming, hypothetically, that the license agreement provisions cited by plaintiffs were limited to the Compaq, Dell and Packard Bell NEC license agreements, that still

---

1/     Plaintiffs cite another Seventh Circuit case for the proposition that a "'plaintiff is not required to plead the particulars of his claim.'" Resp. Br. at 12 (citing <u>Hammes v. AAMCO Transmissions, Inc.</u>, 33 F.3d 774, 782 (7th Cir. 1994)).  But <u>Hammes</u> did not involve a facially implausible conspiracy allegation, and that case also carefully emphasized that the "complaint's description of the defendants' practice" must be "consistent with an antitrust conspiracy." 33 F.3d at 782.

would not render plaintiffs' conspiracy claims plausible.  To the contrary, those claims would be rendered even more implausible, because the anti-competitive benefits supposedly enjoyed by Microsoft and its three co-conspirators <u>depend</u> on the assumption that the same restrictions had been imposed on the remaining OEMs.

**A.     Plaintiffs' New Conspiracy Theory Is Foreclosed by the Complaint.**

The first problem with plaintiffs' revisionist claim of a four-party conspiracy is that it is utterly inconsistent with the facts they themselves have alleged.  While plaintiffs now insist that "the Complaint nowhere alleges that these [licensing] agreements are . . . the same as those entered into by all other computer manufacturers," Resp. Br. at 17, the Complaint is filled with allegations that the challenged license terms were adopted industry-wide, and plaintiffs identify not one allegedly anti-competitive feature unique to the Compaq, Dell and Packard Bell NEC license agreements.   Thus, the Complaint alleges that "sellers of personal computers," not just the named defendants, entered into per-processor agreements and long-term contracts in the early 1990s, Complaint ¶ 10, and that "the named co-conspirators, <u>as well as other sellers of personal computers</u>," later agreed to limitations on the desktop and boot-up sequences, <u>id.</u> ¶ 90 (emphasis added); <u>see also</u> <u>id.</u> ¶ 96 (alleging that Microsoft imposed these limitations on other computer sellers, including "Micron, Hewlett Packard, and Gateway").   Similarly, plaintiffs allege that Microsoft bundled browser software with Windows "in licensing agreements with the named co-conspirators <u>and other sellers of personal computers</u>."   <u>Id.</u> ¶ 105 (emphasis added); <u>see also</u> <u>id.</u> ¶ 113 (same); <u>id.</u> ¶¶ 119-120 (alleging that Microsoft's package pricing of word processing, spreadsheet, and operating software made "it difficult . . . [for] competitors to sell their products <u>to personal computer sellers</u>") (emphasis added).

This is no accident.   Any suggestion that anti-competitive provisions in license agreements were limited to three OEMs would be utterly inconsistent with the Government's theory in <u>United States v. Microsoft</u> and with Judge Jackson's findings of fact.[2]   Moreover, as we explain <u>infra</u>, plaintiffs' explanations of the benefits supposedly reaped by Microsoft and the defendant OEMs as a result of these license agreement provisions become even less plausible if one assumes that the other OEMs were not similarly restricted.   For these reasons, plaintiffs' allegations of <u>industry-wide</u> anti-competitive conduct cannot just be disregarded.[3]

In a last-ditch effort to square their four-party-conspiracy theory with their own Complaint, plaintiffs point to allegations that the defendant OEMs received discounts or other benefits as a result of their willingness to accept the license agreement restrictions favored by Microsoft.   Resp. Br. at 14-15.   But here again, plaintiffs are hampered by the fact that, according to their own allegations, all the OEMs – those that received the alleged "discounts" and those that did not – acquiesced in the same allegedly anti-competitive restrictions sought by Microsoft.[4]

---

2/      Plaintiffs, although citing Judge Jackson throughout, ignore his clear findings that the license agreement provisions that are among those cited here by plaintiffs were <u>universally</u> imposed by Microsoft on all OEMs.   <u>See</u> <u>United States v. Microsoft Corp.</u>, 84 F. Supp. 2d 9, 58-59, ¶ 202 (D.D.C. 1999) (Internet Explorer browser was bundled with operating system in sales to all OEMs); <u>id.</u> at 59, ¶ 204 ("[W]hen OEMs began . . . to request permission to remove the Internet Explorer icon from the Windows desktop prior to shipping their PCs, Microsoft consistently and steadfastly refused."); <u>id.</u> at 61, ¶ 213 (Microsoft imposed on all OEMs limitations on their ability to modify desktop and boot sequence).   These findings argue strongly against allowing plaintiffs to amend their Complaint to allege specific anti-competitive conduct unique to the defendant OEMs.   <u>Cf.</u> <u>In re Copper Antitrust Litigation</u>, MDL No. 1303, __ F.R.D. __, 2000 WL 1225041 at, *14 (W.D. Wis. Aug. 24, 2000) (granting motion to dismiss complaint, even though allegations may have been sufficient on their face, where evidence submitted with class certification motion made clear that the Complaint did not reflect reality).

3/      Plaintiffs themselves state that when they "meant to state that Microsoft entered into agreements with computer makers generally . . . the Complaint said so explicitly."   Resp. Br. at 22. In fact, the Complaint says so throughout.

4/      <u>See</u> <u>Microsoft</u>, 84 F. Supp. 2d at 62, ¶ 215 ("Even in the face of strident opposition from its OEM customers, Microsoft refused to relent on the bulk of its restrictions. . . . Despite the high costs

Unable to claim otherwise here, plaintiffs point to findings by Judge Jackson that OEMs that more quickly accepted the restrictions received lower prices.  Resp. Br. at 18, 26.  But even if true, such findings only suggest that Microsoft used a "carrot and stick" approach with the OEMs and that, in response, various OEMs adopted different negotiation strategies – with some more quickly accepting restrictions that Judge Jackson found were costly and harmful[5] but demanding price concessions, while others initially resisted the restrictions before agreeing to them.  Such a variation in negotiation strategies – adopted by independent companies operating in a competitive market and negotiating confidential license agreements with an alleged monopolist – cannot make one group of OEMs "co-conspirators" when they ultimately did nothing different than their competitors.

Finally, plaintiffs seek to have it both ways, arguing that even if all of the OEMs accepted the same allegedly anti-competitive licensing agreement provisions because they had no choice, the Complaint would still be valid.  They argue that, under that assumption, (1) the entire OEM industry would properly be viewed as coerced co-conspirators with Microsoft and (2) plaintiffs have a right to sue just a subset of the co-conspirators.  Resp. Br. at 18-22.  But for the reasons stated in our opening brief, that is not and cannot be the law.  Indeed, even plaintiffs do not claim that an entire coerced industry could be said to be co-conspirators with an alleged monopolist supplier under Section 2 of the Act, with its requirement that each member of the conspiracy have "specific intent to monopolize."  See Resp. Br. at 20 (citing only Section 1 cases).  As for

_____

that Microsoft's demands imposed on them, the OEMs obeyed the restrictions because they perceived no alternative to licensing Windows for pre-installation on their PCs.")

5/      See Microsoft, 84 F. Supp. 2d at 61, ¶ 214 ("[The OEMs] believed that the new restrictions would make their PC systems more difficult and more confusing to use, and thus less acceptable to consumers.  They also anticipated that the restrictions would increase product returns and support costs and generally lower the value of their machines.").

Section 1, even assuming that a party's coerced acceptance of a specific, illegal restraint of trade can constitute an actionable conspiracy, that is not the situation here.  Where, as here, the alleged conspiracy involves a series of specific agreements, none of which is individually an actionable restraint of trade (see pp. 17-19, infra), an entire industry's acquiescence in coercion to accept those agreements cannot constitute "conspiracy in restraint of trade."  Plaintiffs have cited no case upholding a conspiracy theory remotely resembling that claim.

      **B.**        **Plaintiffs' New Conspiracy Theory Is Nonsensical**.

Even taken on its own terms, plaintiffs' latest conspiracy theory is no more plausible than the one alleged in the Complaint.  Thus, even assuming – as plaintiffs now suggest without ever quite saying so – that the only OEMs to enter into the purportedly anti-competitive agreements with Microsoft were the named OEM defendants, then the conspiracy would have been irrational.

First, for Microsoft, it would have been useless, as a means of preserving its alleged monopoly, to impose restrictions solely on three OEMs operating in a highly competitive market with no alleged market power.[6]  For example, if the alleged per-processor royalties and long-term agreements were designed to assure that OEMs did not install other companies' operating systems, they would have done little good if many other companies selling Windows-based PCs were not so constrained.  And if the bundling of Internet Explorer with Windows, along with restrictions on modification of boot-up sequences and desk tops, was intended to suppress the use of Netscape Navigator (because of a perceived threat that this browser would ultimately evolve in

---

6/      Although plaintiffs allege that the defendant OEMs are the three largest sellers of Windows-based PCs, the fact is that market shares have varied dramatically during the period 1993-2000. More importantly, plaintiffs never allege that the defendant OEMs had the kind of "lock" on the market that would have allowed them to prevent software competition by acting in concert with Microsoft.  They cannot do so because, as Judge Jackson found, the market for sales of PCs is a highly competitive one.  See Brief of the Defendant OEMs in Support of Motion to Dismiss ("OEM Br.") at 17 n.4.

such a way that it would undercut the alleged Windows monopoly), that strategy again would have made sense only if Microsoft was insisting that all OEMs act in the same way.

Similarly, the supposed benefits received by the three OEMs would have been illusory if (hypothetically) they were the only ones accepting the supposedly anti-competitive restrictions. To begin with, even assuming that the three OEMs stood to gain in some way from Microsoft's alleged possession of monopoly power (a proposition that is itself utterly implausible), a four-party conspiracy would have done no good.  As just explained, such a narrow conspiracy would not, by its very nature, have served the alleged purpose of protecting Microsoft's monopoly.

In any event, even assuming that the defendant OEMs were the only ones to accept the allegedly anti-competitive license agreement provisions cited in the Complaint, and even assuming that such conduct could plausibly have served to protect Microsoft's alleged monopolies, plaintiffs still have no plausible explanation of how that would have benefitted the defendant OEMs.  The first supposed benefit is discounts in the price of Windows.  Complaint ¶ 153; see Resp. Br. at 9, 24-26.  But those discounts would have been worthless if other competitors, although paying more, remained free to avoid the higher costs and consumer confusion that were associated with the restrictions.  See p. 7 n.5 supra (citing Judge Jackson's findings).  Certainly there is no suggestion by plaintiffs of a reason why Microsoft would have gone beyond discounts designed to compensate for the costly restrictions it was demanding, and shared its alleged monopoly profits with three customers "out of the goodness of its heart."

Second, plaintiffs allege that the three OEMs benefitted because they could earn profits on their computers loaded with Windows  secure in the knowledge they would "not be substantially undercut by rivals offering hardware competitive with the Microsoft software, or without software."   Complaint ¶ 154; see Resp. Br. at 9, 26-27.  But this is utter nonsense.

Plaintiffs do not and cannot explain how the defendant OEMs make a dime of extra profit in a world where Microsoft has an alleged  monopoly over PC operating systems and applications software (and thus all customers insist on computers loaded with Windows and Microsoft applications) – as compared to a world where options exist.   Because the OEM market is extremely competitive,[7] under either scenario, no OEM could hope to earn more than a competitive return on its hardware and whatever software comes with it.  Thus, in the current environment where Microsoft maintains an alleged monopoly, the three OEMs cannot attempt to charge more than the "going" (competitive) rate for their computers with their Windows operating systems because they <u>would</u> be instantly "undercut by rivals," such as Gateway, Hewlett-Packard and IBM, offering comparable hardware and Microsoft software at a lower price.  Put differently, plaintiffs can attempt to label three OEMs as Microsoft co-conspirators if they want to, but they cannot defy the basic economic principle that those OEMs, lacking market power, cannot earn supracompetitive profits even if Microsoft has a monopoly over operating systems.

Third, plaintiffs claim that the alleged Microsoft monopoly on operating systems allowed the defendant OEMs to force consumers to buy the more expensive computers supposedly required to run that software – as compared to potential competitive software.  But here again, plaintiffs suggest no basis for the claim that such an outcome increases the profits of the three named OEMs.  In a world where cheaper computers were able to run some of the available operating system software, the price of computers would be lower because <u>costs</u> would be lower.

---

[7]/     See, e.g., <u>Microsoft</u>, 84 F. Supp. 2d at 65, ¶ 225 ("the market for intel-compatible PCs is, by all accounts, a competitive one"); <u>id.</u> at 56, ¶ 193 ("OEMs operate in a competitive market"); <u>United States v. Microsoft Corp.</u>, 87 F. Supp. 2d 30, 41 (D.D.C. 2000) (OEMs operate in a "very competitive PC market").

Sales of PCs, in turn, would be higher.  If so, then the OEMs might well stand to <u>gain</u> by earning the same (or even lower) margins on a higher volume.  In sum, it is pure speculation to assert that the latter world would be less profitable than the world the OEMs currently occupy.[8]

Finally, even if plaintiffs' listing of supposed benefits to the defendant OEMs from preserving Microsoft's monopoly were even superficially plausible, they do not meaningfully address the inevitable <u>harm</u> caused to those OEMs by the existence of such a monopoly.  Elementary microeconomics teaches that if the cost of an essential input goes up because the supplier has market power, either the price of the resulting product must go up (resulting in fewer sales at no additional profit per sale) or the profit on each sale must be reduced.  <u>See</u> Brief of the Defendant OEMs in Support of Motion to Dismiss ("OEM Br.") at 12 (citing cases).  That is why it is inherently irrational to say that OEMs conspired to suppress competition in the software market.  Plaintiffs never suggest a plausible reason why this truism would not apply here.

It should not be surprising that plaintiffs' case makes no sense.  Their Complaint is engrafted on a Government case in which the OEMs were seen as <u>victims</u> of Microsoft's unilaterally exercised monopoly power.  And the class action complaint filed by Gravity's counsel in California state court, where they are unencumbered by <u>Illinois Brick</u>, follows the Government's lead.[9]  Nothing but a perceived need to overcome the <u>Illinois Brick</u> barrier has led

---

8/     Even more absurd is the related allegation that the defendant OEMs benefit because they can bundle applications software in their computers and make people buy it even if they do not want it. Complaint ¶ 156.  Assuming that competing OEMs are free not to bundle such software, if the market demands such an option, consumers will have it.

9/     The consolidated class plaintiffs also cast OEMs as victims of Microsoft's alleged monopoly abuses rather than willing co-conspirators.  <u>See, e.g.,</u> Amended Consolidated Complaint ¶ 52 ("Microsoft has used its monopoly in the operating system market to dictate the terms and conditions under which OEMs are engaged . . . . OEMs have no choice but to accede to Microsoft's demands.").

plaintiffs in this case to include in their federal case conspiracy allegations that they cannot coherently and plausibly defend.  Their case should be dismissed.

## III.   PLAINTIFFS' SECTION 2 CLAIM SHOULD BE DISMISSED.

Reflecting the weakness of their explication of their conspiracy allegations, plaintiffs mount only a half-hearted defense of their Section 2 claim.  Resp. Br. at 40-42.  As they concede, that section requires a showing that each member of the conspiracy has a specific intent to promote or preserve a monopoly.  Plaintiffs point to places in the Complaint where they allege such an intent in conclusory fashion, id. at 41, but they do not really argue that the allegations of the Complaint are sufficient to justify allowing them to proceed with their case under Section 2. To the contrary, as we have seen, their description of the supposed conspiracy in their brief departs dramatically from their actual allegations, and neither version plausibly explains why the defendant OEMs would have "intentionally" worked to promote Microsoft's alleged monopolies.

The clearest indication of the weakness of plaintiffs' Section 2 claim is the fact that they "take[] no position on whether the Defendant computer makers were coerced into participating in the conspiracy."  Resp. Br. at 21.  Even assuming coerced conduct can sometimes violate Section 1, no one would contend that actions taken in response to an alleged monopolist's coercion can support a claim that the victims acted with the specific intent required under Section 2.   When plaintiffs "take no position" on whether the defendant OEMs were willing and intentional participants in a conspiracy to monopolize, they should be taken at their word.

## IV.   PLAINTIFFS' SECTION 1 CLAIM ALSO MUST BE DISMISSED.

Plaintiffs argue that they can plead a monopolization case under Section 1, but that claim is also fatally flawed in multiple ways.  Under Section 1, plaintiffs must show a basis for inferring that the alleged conspirators made a "conscious commitment" to an illegal scheme.

Monsanto Co. v. Spray-Rite Serv. Corp, 465 U.S. 752, 764 (1984).[10]  Given the implausibility of the conspiracy claim at issue here, that showing cannot be based simply on allegations that the three OEMs agreed, at Microsoft's insistence, to license agreement provisions that plaintiffs label anti-competitive – combined with unpersuasive explanations why the OEMs would have benefitted from preserving Microsoft's monopoly.  That is true for three basic reasons.  First, plaintiffs have never alleged that the defendant OEMs entered into an express or tacit agreement with each other.  Second, abundant case law warns against extrapolating from a narrow agreement to a broad conspiracy without additional evidence to support that claim.  Third, such an extrapolation is particularly problematic where, as here, none of the specific alleged agreements is itself an actionable restraint of trade.

     **A.**     **Plaintiffs Have Not Even Attempted to Allege That the Defendant Oems Made a "Conscious Commitment" to Any Agreement *with Each Other*.**

As we noted in our opening brief, OEM Br. at 26-27, Section 1 law does not authorize a plaintiff to construct an alleged conspiracy based solely on individual agreements between competitors and a single supplier, without some showing of concerted action among the competitors – i.e., "'without [alleging] the rim of the wheel to enclose the spokes.'" Mylan Labs.,

---

10/     To satisfy this standard, at a minimum plaintiffs would have to show a "'meeting of the minds'" with respect to the unlawful scheme itself.  Monsanto, 465 U.S. at 764 n.9.  That standard is not met merely by pointing to an allegedly anti-competitive contract.  For example, the Seventh Circuit declined to find concerted action under Section 1 in a case where the alleged perpetrator, based on an improper motive, entered into a contract conferring preferential terms on the company alleged to be its co-conspirator.  Instead, it insisted upon evidence that the latter "encouraged or participated in [the challenged] decision."  Contractor Util. Sales Co. v. Certain-teed Prods. Corp., 638 F.2d 1061, 1075 (7th Cir. 1981).  Similarly, the federal district court for the District of Massachusetts refused to find the existence of a Section 1 price-fixing conspiracy between a manufacturer and a supplier in a case in which the supplier signed contracts that included terms the manufacturer intended to fix prices, because the contracts were "merely memorializations" of the manufacturer's "unilateral price discrimination."  Monahan's Marine, Inc. v. Boston Whaler, Inc., 676 F. Supp. 379, 381 (D. Mass. 1987), aff'd on other grounds, 866 F.2d 525 (1st Cir. 1989).

Inc., 770 F. Supp. at 1066 (quoting In re Insurance Antitrust Litigation, 723 F. Supp. 464, 483-84 (N.D. Cal. 1989)).  Plaintiffs' response is twofold.  First, they argue that a single conspiracy can exist when the only agreements are between a "hub" and various "spokes."  Resp. Br. at 19 n.8. But as this Court recognized in Mylan, that is simply wrong.  There must be at least a tacit understanding among the conspirators as a group.  See Pepsico, Inc. v. Coca-Cola Co., No. 98 Civ. 3282 (LAP), __ F. Supp. 2d __, 2000 WL 1346789, at *15 (S.D.N.Y. Sept. 19, 2000). Some of the cases cited by plaintiffs do state that a "rimless wheel" conspiracy can be a valid theory, but they also emphasize that "to satisfy the concerted action requirement, the plaintiff must demonstrate that the defendants shared a 'unity of purpose or a common design and understanding, or a meeting of the minds' to engage in the conduct prohibited by the Sherman Act."  Impro Prods., Inc. v. Herrick, 715 F.2d 1267, 1273 (8th Cir. 1983) (quoting American Tobacco Co. v. United States, 328 U.S. 781, 810 (1946)).  See also Elder-Beerman Stores Corp. v. Federated Dep't Stores, Inc., 459 F.2d 138, 146 (6th Cir. 1972) (permitting rimless wheel claim only where there was an "overall-unlawful plan or 'common design' in existence" and each participant had knowledge of the overall plan and its "unlawful nature" and the fact that others were involved).  No case supports the proposition that independently negotiated agreements between a supplier and multiple competitors can constitute an actionable conspiracy.

Second, plaintiffs rely on the claim that the OEMs were generally aware that Microsoft was demanding similar license agreement provisions in negotiations with their competitors. Resp. Br. at 19 n.8.  But that hardly suffices to establish a conscious commitment to a four-party conspiracy.  Plaintiffs do not begin to suggest that the defendant OEMs would have had awareness of some (hypothetical) special set of arrangements they had with Microsoft differentiating them from the rest of the OEMs.  See id. (citing facts that would have been

equally applicable to all OEMs).  Nor do they offer anything other than conclusory assertions to support the proposition that there was a single understanding reached among the OEMs to pursue a common illegal scheme.  Especially in view of how economically implausible the alleged conspiracy is, that is far from enough.  Mylan, 770 F. Supp. at 1068.

**B.     Narrow Contractual Agreements, Even If Allegedly Anti-competitive in Their Indirect, Long-term Effects, Do Not Establish a Broad Conspiracy.**

Even after 64 pages of briefing, it remains true that the only specific concerted activities alleged by plaintiffs are a handful of provisions in the parties' licensing agreements.  But it is well established that conspiratorial conduct cannot be inferred from a contract that does not contain the broader agreement alleged.  See Multistate Legal Studies, Inc. v. Harcourt Brace Javonovich Legal and Prof'l Publ'ns, Inc., 63 F.3d 1540, 1556-57 (10th Cir. 1995) (declining to infer agreement broader than contract itself); Royal Drug Co. v. Group Life Health Ins. Co., 737 F.2d 1433, 1437 (5th Cir. 1984) (evidence of "actual agreements" does not "negate[] any need to establish a combination" when those contracts do not contain broader agreement); Monahan's Marine, Inc. v. Boston Whaler, Inc., 676 F. Supp. 379, 381 (D. Mass. 1987) (nothing in the law "suggests . . . that the requirement of concerted action is met by the mere circumstance of there being a contract"), aff'd on other grounds, 866 F.2d 525 (1st Cir. 1989);  see also OEM Br. at 20-24.[11]     Something beyond a "limited provision" in a contract is necessary to establish "the

---

[11]/     Tellingly, plaintiffs do not seriously dispute this principle.  Indeed, they do not even discuss the many cases cited by the OEMs in their opening brief, save to distinguish a few on the ground that they involved summary judgments or trial verdicts. Resp. Br. at 30 n.13.  This principle, however, applies equally on a motion to dismiss.  See, e.g., TV Communications Network Inc. v. Turner Network Television, Inc., 964 F.2d 1022, 1026 (10th Cir. 1992) (refusing to infer concerted action on a motion to dismiss despite allegation that co-conspirators entered into exclusive dealing contracts that furthered goals of alleged conspiracy); Genetic Systems Corp. v. Abbott Labs, 591 F. Supp. 407, 410, 413, 421 (D.D.C. 1988) (refusing to infer broad conspiracy on a motion to dismiss despite existence of allegedly anti-competitive contract).

existence of a broader conspiracy." T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809

F.2d 626, 634 (9th Cir. 1987); cf. United States v. Kissel, 218 U.S. 601, 608 (1910) ("[a]

conspiracy in restraint of trade is different from and more than a contract in restraint of trade")

(emphasis added).  Indeed, even where one party has negotiated a contractual provision for illicit

reasons, that fact cannot establish that the other party to the contract shared that intent or

"participated in such a conspiracy."  T.W. Electrical, 809 F.2d at 634-35.   Thus, even if

Microsoft allegedly desired to monopolize the market for operating system and word processing

software by manipulating the browser market, plaintiffs may not impute that intent to the OEMs.

See Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc., 824 F.2d 582, 590 (8th Cir.

1987); International Distribution Ctrs., Inc. v. Walsh Trucking Co., Inc., 812 F.2d 786, 795-96

(2d Cir. 1987); Monahan's Marine, Inc., 676 F. Supp. at 381.

Plaintiffs accuse the defendants of "dismembering" the conspiracy, Resp. Br. at 30, but

defendants can hardly be faulted for focusing on the only specific conduct alleged in the

Complaint.   Nowhere in their Complaint or their response have plaintiffs identified any

additional actions undertaken by the named OEM defendants to aid Microsoft, or specifically

described the contents of any broader agreement purportedly reached among them.

Indeed, the sole factual allegations plaintiffs argue have been "dismembered" by

defendants are two sentence fragments stating that the defendants employed "restrictive licensing

provisions and other practices to exclude horizontal competition."  Resp. Br. at 17 (emphasis in

original) (quoting Complaint ¶¶ 61, 115) .   But such conclusory allegations cannot suffice to

establish "the content of the . . . conspiracy" challenged or remedy the inadequacies of plaintiffs'

other factual allegations.  T.W. Electrical Serv, 809 F.2d at 633; see Nobel Scientific Indus., Inc.

v. Beckman Instruments, Inc., 670 F. Supp. 1313, 1324 (D. Md. 1986) (rejecting broad

conspiracy claim despite "conclusory assertions of concerted action"), aff'd, 831 F.2d 537 (4th

Cir. 1987).  Thus, this is a case crying out for application of the principle that a plaintiff "cannot

create a whole conspiracy . . . greater than the sum of its parts."  Genetic Systems Corp. v. Abbott

Labs., 591 F. Supp.  407, 410, 413 (D.D.C. 1988).

> **C.      Reliance on Narrow Contractual Provisions to Establish a Broad Conspiracy under Section 1 Is Especially Unjustified Where, as Here, the Particular Agreements at Issue Are Not Themselves Actionable Restraints of Trade.**

Plaintiffs' reliance on provisions in the license agreements as evidence of a broad

conspiracy might be more plausible if any of those provisions were themselves blatantly illegal

restraints of trade under Section 1.  But plaintiffs err in making that claim.  It follows, as

suggested in our opening brief, that plaintiffs have no basis for proceeding with a Section 1

claim.  The office of Section 1 is to address agreements that, by their very nature, restrain trade in

some concrete and unlawful way.  See Impro Prods., Inc., 715 F.2d at 1273 ("Although both

sections prohibit conspiracies, they apply to different conduct: section 1 proscribes conspiracies

in restraint of trade; section 2 proscribes conspiracies to monopolize.").  If the rule were

otherwise, a claim of conspiracy to monopolize under Section 2, with its heightened scienter

requirement, would be utterly superfluous, because any plaintiff could follow the lead of the

Gravity plaintiffs and evade the specific intent standard by pleading the same conspiracy under

Section 1.  In any event, the fact that none of the subsidiary agreements cited by plaintiffs is

independently actionable further undermines the plausibility of plaintiffs' broad conspiracy

claims.

### 1.    Plaintiffs Have Not Come Close to Alleging an Illegal Exclusive Dealing Arrangement.

We explained in our opening brief that none of the challenged licensing restrictions is sufficiently restrictive to constitute a traditional exclusive dealing arrangement because all of them allow the defendant OEMs to carry non-Microsoft products.  OEM Br. at 30-32.  That fact is confirmed by Judge Jackson's express conclusion of law that there was no exclusive dealing arrangement shown by the Government with respect to the OEM license agreements.  United States v. Microsoft Corp., 87 F. Supp. 2d 30, 35 (D.D.C. 2000).[12]

In their response, plaintiffs do not discuss the many cases cited by the OEMs in support of this argument.   Nor do they assert that any of the licensing terms they specifically describe in their Complaint actually requires the named defendants to license Microsoft products exclusively.  Plaintiffs nevertheless go to great lengths to establish that they properly alleged a truly exclusive dealing arrangement and even accuse the defendants of "misrepresent[ing] the Complaint."  Resp. Br. at 33.  But none of the paragraphs they cite justifies that accusation.  For example, plaintiffs are certainly correct that, in listing the "restrictive licensing provisions and other practices" challenged, Complaint ¶ 61, the Complaint mentions "exclusive dealing distribution arrangements" in passing.  Resp. Br. at 33 (quoting Complaint ¶ 62).  But the only exclusive arrangements plaintiffs specifically allege are Microsoft's agreements with Internet Service and Content Providers, Complaint ¶¶ 75-89 – agreements to which the defendant OEMs were not a party.

---

12/     Judge Jackson held that "Microsoft's multiple agreements with distributors did not ultimately deprive Netscape of the ability to have access to every PC user worldwide to offer an opportunity to install Navigator.  Navigator can be downloaded from the Internet.  It is available through myriad retail channels.  It can (and has been) mailed directly to an unlimited number of households."  87 F. Supp. 2d at 53.

Plaintiffs next point to a paragraph that they assert establishes "that the Defendant computer makers buy only Microsoft operating software to sell with their computers and that they do not offer customers a choice" of competing software.  Resp. Br. at 33 (quoting Complaint ¶¶ 121-122).  But it is irrelevant whether, as plaintiffs assert, an OEM has chosen to offer certain consumers only Microsoft products.  A distributor may always decide unilaterally to carry a single product.  See MCM Partners, Inc. v. Andrews-Bartlett & Assocs., Inc., 62 F.3d 967, 972 (7th Cir. 1995) ("A party may independently decide with whom it will deal, and it may, without running afoul of Section 1, decide to direct all of its business to a single supplier.").  An exclusive dealing arrangement, in contrast, requires a contractual promise that the distributor will never change its mind and offer a competitor's product.  Nowhere do plaintiffs allege such a promise (nor could they in light of Judge Jackson's conclusions of law).

In any event, even assuming plaintiffs had properly alleged a truly exclusive distribution arrangement, that Section 1 claim still would not be actionable.  Such a claim may only be brought against the seller that imposed the exclusive arrangement, not against the buyer.  Genetic Systems, 691 F. Supp. at 415.[13]  Moreover, none of the contracts entered into within the relevant statute of limitations period are alleged to have exceeded a year's duration.  Nowhere do plaintiffs even suggest that any of the contracts entered into after 1994 lasted longer than a year.  That means that any exclusive arrangement was presumptively lawful.  OEM Br. at 31-32.[14]

---

13/      Plaintiffs try to distinguish this case on the ground that Genetic Systems "addressed Section 3 of the Clayton Act."  Resp. Br. at 21 n.9.  But that court explicitly stated that its analysis of the Clayton Act applied equally to Section 1 of the Sherman Act and thus "mandates the dismissal of Count II against [the buyer] brought under the broader proscription of Section 1."  691 F. Supp. at 415.

14/      Plaintiffs, to be sure, have argued that consumers who purchased computers within the last four years may bring a claim today if they can trace their injury to the alleged existence of long-term contracts prior to 1994.  Resp. Br. at 29-32.  That argument is incorrect for the reasons set forth infra

**2.      Plaintiffs Have Offered No Other Justification for Concluding That the Challenged Agreements Unlawfully Restrain Trade.**

Plaintiffs' further efforts to conjure an illegal restraint of trade from the innocuous terms allegedly contained in the parties' licensing agreements bear little discussion.  Plaintiffs argue that it does not matter whether they have failed to allege an actionable exclusive dealing, tying, or predatory pricing claim, because they need only establish that defendants' practices "unreasonably restrict competition."  Resp. Br. at 32.  But where, as here, the challenged provisions are considerably <u>less</u> restrictive than other short-term agreements or package discounts courts have upheld, plaintiffs must offer something more than conclusory allegations of an anti-competitive effect to survive a motion to dismiss.  The Complaint offers nothing more than plaintiffs' own say-so.  <u>See</u> <u>Id.</u> (relying on bare allegations of anti-competitive effect).

Indeed, even when given another opportunity to articulate why the licensing terms challenged are anti-competitive, plaintiffs have failed to do so.  For example, plaintiffs do not even hint that, by offering attractive package deals on its software, Microsoft has engaged in "tying" or "predatory pricing."   Instead, they insist that these package deals are anti-competitive "because the Defendant computer makers have already paid for Microsoft word processing and spreadsheet software when they purchase the essential Microsoft operating software," thereby creating "a strong disincentive to pay more money to purchase additional, competing word processing and spreadsheet software."  Resp. Br. at 38.  In other words, plaintiffs are saying that <u>if</u> the defendant OEMs allegedly paid a single package price for two kinds of software, they would be less likely to buy competing software.  That cannot be actionable.

---

pp. 29-31.  But even if plaintiffs were correct, that argument cannot magically transform agreements reached <u>after</u> 1994 into "long-term" exclusive dealing arrangements.  Thus, any allegations regarding contractual terms adopted after 1994 should be dismissed.

Similarly, plaintiffs fail to acknowledge, let alone discuss, the many cases foreclosing their efforts, as buyers in the operating system and word processing software markets, to hold the defendant OEMs accountable for licensing restrictions that would directly affect only the browser market.  Resp. Br. at 38-39.   As this Court has held, a plaintiff cannot premise a conspiracy claim on "evidence of conspiracies in related markets," but must establish the requisite knowledge and intent "with respect to the market in which it has standing."  691 F. Supp. at 421 (emphasis added); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 596 (1986) (even proof of "collateral conspiracies" in one market "says little, if anything, about the existence of a conspiracy" in a different market).  Instead, plaintiffs only repeat their allegations that Microsoft intended to use such provisions to affect the operating systems market.  Resp. Br. at 38-39.  But courts will not infer that one party "participated in . . . a conspiracy" in violation of Section 1 simply because it agreed to a contractual provision that the other party to the contract intended to restrain trade.  See T.W. Electrical Serv., 809 F.2d at 634-35; Monahan, 676 F. Supp. at 381; supra p. 13 n.10.

### 3. Plaintiffs' Arguments for Extending the Statute of Limitations Are Incorrect.

In the opening brief, the OEMs relied on a 1994 consent decree, which forbade  Microsoft from imposing long-term contracts and per-processor agreements, to show that these claims are time-barred.  OEM Br. at 29.  In response, plaintiffs make a variety of arguments for allowing them to premise their suit on this long-discontinued conduct.  None is correct.

Nowhere in their Complaint or response do plaintiffs suggest that Microsoft signed any contracts after 1994 that either were long-term or required per-processor royalties.[15]  Instead, they

_____

15/    Plaintiffs, to be sure, make a half-hearted attempt to establish that per-processor agreements existed after 1994.  But the extra-record evidence they cite establishes at most that certain OEMs

assert that the statute of limitations was tolled by three Department of Justice ("DOJ") proceedings. Resp. Br. at 34-35. The 1994 DOJ suit, however, was terminated on August 21, 1995, when the parties' consent decree was filed by the Court. Complaint ¶ 12. The tolling effect of that proceeding therefore ended one year later, on August 21, 1996. See 15 U.S.C. § 16(i); OEM Br. at 29 n.9. The 1997 DOJ contempt petition arising from that 1994 suit is irrelevant, because post-judgment proceedings do not toll the statute. See Russ Toggs, Inc. v. Grinnell Corp., 426 F.2d 850, 856 n.8 (2d Cir. 1970) (pendency of government action does not include period during which court retained jurisdiction for purposes of modification or enforcement of its order); Sun Theatre Corp. v. RKO Radio Pictures, Inc., 213 F.2d 284, 293 (7th Cir. 1954) (pendency of a government action ends when a consent decree is entered, regardless of the decree's jurisdiction-retaining clause, and regardless of subsequent modifications to it); Leonia Amusement Corp. v. Loew's, Inc., 117 F. Supp. 747, 758-59 (S.D.N.Y. 1953) (reservation of the right of either party to apply for a modification of a consent decree does not change its final character). Nor can DOJ's new 1998 suit against Microsoft toll the statute of limitations as to the 1994 claims, because that suit concerned entirely different conduct in a different time period – Microsoft's bundling of Internet Explorer with Windows. See 15 U.S.C. § 16(i); see also Peto v. Madison Square Garden Corp., 384 F.2d 682, 683 (2d Cir. 1967) (no tolling where challenged conduct is different, even if some of the same defendants are involved);

---

(none of which are identified) voluntarily continued paying per-processor royalties for some period of time Resp. Br. at 34. Those actions, even if proved, would not assist plaintiffs. Because any such payments after 1994 would have been purely voluntary, once the license agreements had been nullified by the consent decree, no OEM was restricted in its conduct by an obligation to pay for any software it did not choose to purchase.

Charley's Tour and Transp., Inc. v. Interisland Resorts, Ltd., 618 F. Supp. 84, 86 (D. Haw. 1985) (same).[16]

Plaintiffs also try to make out a "continuing violation" to excuse the tardiness of their suit. Resp. Br. at 36-37. That argument depends on the assumption of a single conspiracy that has been in existence since before 1994. But plaintiffs do not explain how Microsoft's imposition of per-processor royalties and long-term agreements on all OEMs prior to 1994 can be considered part of the four-party conspiracy they allege here. Nor can they argue that the mere (post-1995) sale of computers at prices purportedly affected by the challenged pre-1994 conduct constitutes an "overt act" establishing a continuing conspiracy. See Eichman v. Fotomat Corp., 880 F.2d 149, 160 (9th Cir. 1989) ("the passive receipt of profits from an illegal contract by an antitrust defendant is not an overt act of enforcement which will restart the statute of limitations") (internal citations omitted); Poster Exchange, Inc. v. National Screen Serv. Corp., 517 F.2d 117, 128 (5th Cir. 1975) ("a newly accruing claim for damages must be based on some injurious act actually occurring during the limitations period, not merely the abatable but unabated inertial consequences of some pre-limitations action") (citing cases). Unlike in the price-fixing example cited by plaintiffs, the sale of computers here is not an overt act carrying out a conspiracy; the relevant acts are 1994 agreements said to have promoted Microsoft's monopoly, and subsequent sales may be affected by those acts but are not part of the conspiracy.

Finally, plaintiffs argue that, even in the absence of proof of a continuing conspiracy, the statute of limitations cannot begin to run until injury to the plaintiffs takes place. Resp. Br. at 36.

---

16/ Even if the 1998 suit tolled the statute of limitations, plaintiffs' recovery would, at a minimum, be limited to the damages directly traceable to conduct that took place during the two-month period between May 18, 1994 (four years prior to the DOJ's institution of the 1998 suit) and July 15, 1994 (when the challenged conduct ceased).

That argument contravenes the Supreme Court's express statement that "a cause of action accrues and <u>the statute begins to run when a defendant commits an act</u> that injures a plaintiff's business." <u>Zenith Radio Corp. v. Hazeltine Research, Inc.</u>, 401 U.S. 321, 338 (1971) (emphasis added); <u>see also</u> <u>id.</u> ("the statute of limitations runs from the commission of the act"); <u>Pace Indus., Inc. v. Three Phoenix Co.</u>, 813 F.2d 234, 237 (9th Cir. 1987) (same).  Indeed, contrary to plaintiffs' assertions, as a general rule "the fact that the [plaintiffs' injuries] have a rippling effect into the future only establishes that they might have been entitled to future damages <u>if they had brought suit within four years of the commission of the last antitrust violation</u>." <u>Peck v. General Motors Corp.</u>, 894 F.2d 844, 849 (6th Cir. 1990) (emphasis added).  That is because "[f]or statute of limitation purposes . . . the focus is on <u>the timing of the causes of injury</u>, i.e., the defendant's overt acts, as opposed to the effect of the overt acts." <u>Id.</u> (emphasis added); <u>see also</u>  <u>DXS, Inc. v. Siemens Medical Sys., Inc.</u>, 100 F.3d 462, 467-68 (6th Cir. 1996); <u>Al George, Inc. v. Envirotech Corp.</u>, 939 F.2d 1271, 1274 (5th Cir. 1991); <u>Airweld, Inc. v. Airco, Inc.</u>, 742 F.2d at 1190 (9th Cir. 1984).[17]

In sum, even assuming that plaintiffs' allegations regarding long-term contracts and per-processor agreements would have been separately actionable if brought earlier, they are now time-barred and thus should not be considered sufficient, along with the more recent non-actionable conduct alleged in the Complaint, to make out a case of a six-year "Section 1 conspiracy to monopolize."

---

<u>17</u>/     Plaintiffs cite <u>Amey, Inc. v. Gulf Abstract & Title, Inc.</u>, 758 F.2d 1486 (11th Cir. 1985), and <u>Klehr v. A.O. Smith Corp.</u>, 521 U.S. 179, 190-91 (1997), to support their reading of <u>Zenith</u>. But the <u>Amey</u> court misconstrued <u>Zenith</u>, relying on language that dealt with the issue of standing and ignoring a clear statement that the statute of limitations runs from the commission of an illegal act. <u>Klehr</u> was a RICO case that did not purport to alter the <u>Zenith</u> rule and has never been so read by any other court.  To the extent that there is tension between the characterization of <u>Zenith</u> in dicta in <u>Klehr</u> and the actual holding of <u>Zenith</u>, the latter must control.

## CONCLUSION

Plaintiffs' conspiracy claim should be dismissed because a careful analysis of the Complaint and their brief makes clear that they do not have a theory of their case that is legally valid, economically plausible, and grounded in facts.  There are also compelling <u>practical</u> reasons for dismissing the case.  Particularly when viewed through the lens of the evidence the Government's case against Microsoft, there is no reason to indulge plaintiffs thinly disguised attempt to subvert <u>Illinois Brick</u>: it is inconsistent with the consolidated action and many comparable cases pending around the country, it will unduly complicate the proceedings this Court, and it ultimately will prove to be a waste of judicial resources.

Respectfully submitted,

_____

William D. Coston
Melissa Landau Steinman
Martin L. Saad
VENABLE, BAETJER, HOWARD
  & CIVILETTI, L.L.P.
1201 New York Avenue, NW, Suite 1000
Washington, DC 20005-3917
(202) 962-4800
*Counsel for Defendant*
*Compaq Computer Corporation*

W. Stephen Smith
MORRISON & FOERSTER
2000 Pennsylvania Ave N.W.
Suite 5500
Washington, DC   20006
(202) 887-1500

Penelope A. Preovolos
MORRISON & FOERSTER
425 Market Street
San Francisco, CA   94105
(415) 268-7000
*Counsel for Defendant*
*PB Electronics, Inc.*

_____

Paul M. Smith
JENNER & BLOCK
601 13th Street, N.W.
Washington, DC 20005
(202) 639-6000

Jerold S. Solovy
Barbara S. Steiner
JENNER & BLOCK
One IBM Plaza
Chicago, Illinois 60611
(312) 222-9350

Samuel R. Miller
FOLGER LEVIN & KAHN LLP
Embarcadero Center West
275 Battery Street, 23rd Floor
San Francisco, CA 94111
(415) 986-2800
*Counsel for Defendant*
*Dell Computer Corporation*