IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| IN RE MICROSOFT CORP. | * | |
| ANTITRUST LITIGATION | * | MDL 1332 |
| | * | |
| | * | |
| NOVELL, INC. | * | |
| | * | |
| v. | * | Civil No. JFM-05-1087 |
| | * | |
| MICROSOFT CORP. | * | |
| | ***** | |

OPINION

This lawsuit, brought by Novell, Inc. against Microsoft, Corp., is the last action pending

in MDL 1332, *In re Microsoft Corp. Antitrust Litigation*.  Earlier in the litigation, on an

interlocutory appeal, the Fourth Circuit affirmed a ruling I had made dismissing Counts II

through V of Novell's complaint on limitations grounds.  These Counts asserted antitrust claims

for harm caused to Novell's software applications as a result of Microsoft's monopolization and

attempted monopolization of the word processing and spreadsheet markets.  The Fourth Circuit

held (as had I) that these claims were not tolled during the pendency of the action brought by the

United States against Microsoft because, unlike the government case, they were based upon

conduct committed by Microsoft in the software applications, not the operating system, market.

Two claims, asserted respectively in Counts I and VI, remain pending: (1) Microsoft

violated § 2 of the Sherman Act by taking anticompetitive actions against, and causing damage

to, software applications owned by Novell for the purpose of obtaining and maintaining its

monopoly in the operating system market; and (2) Microsoft violated § 1 of the Sherman Act by

entering into agreements with third parties "not to license or distribute Novell's office

productivity applications or to do so only on terms that materially disadvantaged those products."

Discovery on the remaining claims has been completed, and the parties have filed cross-motions for summary judgment.  The motions raise two questions: (1) whether Novell continues to own the claims it now asserts or transferred them to Caldera, Inc., and (2) if Novell does continue to own the claims, whether they are viable under the Sherman Act.  For the reasons stated in this Opinion, I find that Novell no longer owns the claims and may not pursue them here.  As a matter of strict analysis, that is the end of the case.  However, in light of the age of MDL 1332 in general and of this lawsuit in particular, I will also address the substantive viability of Novell's claims.  This will enable the Fourth Circuit, upon an appeal of my rulings, to address the antitrust issues presented, in the event that it disagrees with my conclusion relating to the claims ownership issue. As to the antitrust claims, I find that, had Novell not assigned them to Caldera, Count I would have survived Microsoft's summary judgment motion but Count VI would not have survived Microsoft's motion.

I.

A motion for summary judgment should be granted when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). The materiality of facts is determined by the underlying substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute about a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* When considering a motion for summary judgment, a district court draws reasonable inferences and views the evidence in the light most favorable to the non-moving party. *Thompson Everett, Inc. v. Nat'l Cable Adver., L.P.*, 57 F.3d 1317, 1323 (4th Cir. 1995).  Although "[t]he summary

2

judgment standard does not differ when applied to antitrust claims. . . . 'because of the unusual
entanglement of legal and factual issues frequently presented in antitrust cases, the task of
sorting them out may be particularly well-suited for Rule 56 utilization.'" *Bepco, Inc. v. Allied-
Signal, Inc.*, 106 F. Supp. 2d 814, 822 (M.D.N.C. 2000) (quoting *Thompson Everett*, 57 F.3d at
1322).

II.

Under an Asset Purchase Agreement ("APA") dated July 23, 1996, Novell assigned to
Caldera claims "held by Novell at the Closing Date and associated directly or indirectly with any
of the DOS Products . . ."[1]  The term "DOS Products" was defined in the APA to include
Novell's PC operating systems DR DOS and Novell DOS, among other products.  Novell had
previously sold to Corel Corporation its Business Applications Division, which encompassed
various software applications, including WordPerfect (its word processing program), Quattro Pro
(its spreadsheet program), and PerfectOffice (a combination of WordPerfect and Quattro Pro).
In its agreement with Corel, Novell expressly retained "the antitrust claims for harm that
Microsoft caused" to those products.

In my earlier opinion dismissing Counts II through V, I ruled that Novell did not assign
to Caldera the claims asserted in Counts I and VI because those claims focused upon harm
suffered by Novell's software applications, not upon harm suffered by the operating systems
transferred to Caldera.  In reaching that conclusion I stated, "[i]t is a far stretch to infer (and
Microsoft has presented nothing to establish) that simply because DOS competed in the

---

[1] The APA also assigned to Caldera claims "associated directly or indirectly with  . . . Related Technology," and
"Related Technology" was defined to mean technology "that is necessary to the performance by the DOS of their
intended function and purpose."  Microsoft does not argue that the software application programs involved in this
action constituted "Related Technology" within the meaning of the APA.

operating system market, such a claim [for damage to software applications] was either a 'direct' or 'indirect' claims intended to be transferred from Novell to Caldera." *In re Microsoft Corp. Antitrust Litig.*, Civ. JFM-05-1087, 2005 WL 1398643, *1 (D. Md. June 10, 2005). The Fourth Circuit did not review that ruling because it was not certified for interlocutory appeal. *Novell, Inc. v. Microsoft Corp.*, 505 F.3d 302, 306 n.10 (4th Cir. 2007).

Upon further reflection I have decided that my earlier ruling was wrong. Although the claims asserted by Novell in Counts I and VI are for damage caused to it software applications, the reason Microsoft allegedly engaged in the conduct causing the damage was to obtain and maintain its monopoly in the operating system market – the market in which the DOS Products competed. Novell's theory as to those claims is that Microsoft intentionally took actions against Novell's applications because (1) if those applications had retained their popularity, consumers might insist upon purchasing operating systems with which the applications were compatible, thereby threatening Windows 95's market power; and (2) "PerfectOffice," developed by Novell, constituted (or nearly constituted) "middleware," which could have been effectively used with any operating system and that therefore would have "commoditized" Windows 95 and undermined the monopoly Microsoft enjoyed in the operating system market.

In short, Counts I and VI assert claims for damage inflicted upon Novell's software applications through the prism of the operating system market. Hybrid in nature, the claims were ingeniously designed to survive Microsoft's anticipated limitations defense by permitting Novell to argue that the pendency of the government case against Microsoft – which was based upon Microsoft's antitrust violations in the operating system market – tolled limitations.[2] Successful

---

[2] The record suggests, and the parties implicitly agree, that the claims asserted in Counts I and VI were not envisioned until the complaint in this action was prepared, long after the APA was executed. Although

though that argument has been in defeating Microsoft's limitations defense, it is fatal to Novell's

position on the claims ownership issue.  By associating claims for harm to applications with the

operating system market in which the DOS products competed, the argument establishes that the

claims were transferred by Novell to Caldera under the APA.

Reduced to its essence, Novell's primary contention is that all that the APA meant to

assign was claims for *harm* inflicted upon the DOS products.[3]  As previously indicated, I

accepted this argument when making my prior ruling.  However, that is not what the APA itself

actually says was assigned.  The assignment clause does not mention "harm" but rather

"associat[ion]."  Under Utah law, which the parties agree applies to this action by virtue of a

---

contemporaneous memoranda reflect that Novell was aware prior to entering into the APA that it had potential
claims against Microsoft for antitrust damage caused to Novell's software applications, these claims were based
upon Microsoft allegedly having leveraged its monopoly in the operating system market into a monopoly or near
monopoly in the applications markets.  Such claims are qualitatively different from those asserted in Counts I and
VI.  Unquestionably, Novell retained the claims based on Microsoft leveraging its operating system market
monopoly into a monopoly in the applications markets, but, as the dismissal of Counts II through V manifest, they
are time barred.

[3] Novell also contends that the claims it is asserting in Counts I and VI are not "associated" with the DOS Products
because although the DR DOS did compete in the operating system market, it was no longer being marketed and
supported by Novell in October 1994, when the unlawful conduct alleged in this action began.  This contention is
not frivolous but it fails for several reasons.  First, Novell owned DR DOS in October 1994 and its value certainly
would have been affected by anticompetitive activity in the operating system market.  Second, although Novell
announced in September 1994 that it would exit the DR DOS business, according to the allegations made in the
Caldera amended complaint against Microsoft, Novell continued to sell some DR DOS products thereafter.  Third,
both in its original complaint and in the amended complaint filed in its action against Microsoft, Caldera sought,
*inter alia*, an injunction "requiring Microsoft, for a period of ten years, to disclose to Caldera all [application
program interfaces ("APIs")] for any operating system it produces, as well as any modifications, enhancements,
updates, or new versions of such operating systems at the time that such products are released for beta testing."  This
request for relief necessarily was premised upon the fact that the failure of Microsoft to disclose APIs (an important
part of Novell's claim asserted in Count I of this action) was damaging DR DOS.  Fourth, the allegations of
misconduct by Microsoft made in this action were undertaken in a market that already was dominated by Microsoft,
allegedly in part because of anticompetitive actions it had previously taken against DR DOS.  Just as Novell's expert
concedes that in order to have antitrust significance the conduct Microsoft directed against Novell's software
applications must be considered in light of conduct that Microsoft directed against other competitors, (*see* Novell's
Opp. to Microsoft's Mot. for Summ. J. ("Dkt. No. 1952"), Exh. 4 at 6 (Reply Report of Roger G. Noll); Microsoft's
Mem. in Supp. of its Mot. for Summ. J. ("Dkt. 1947"), Exh. 3 at 40–43), so too the actions launched by Microsoft
against various software application producers must be considered against the background of the anticompetitive
conduct it directed against DR DOS in earlier years.  Fifth, Novell's expert asserts that Microsoft was motivated to
act anticompetitively against Novell in part because of Novell's purchase of DR DOS. (*See* Dkt. No. 1952, Exh. 3 at
89 (Declaration of Roger G. Noll).)  All of these facts establish the "association" between the claims asserted in this
action and the DR DOS Product claims assigned to Caldera under the APA.

choice of law provision contained in the APA, a court "look[s] to the language of the contract to determine its meaning and the intent of the contracting parties." *Café Rio, Inc. v. Larkin-Gifford-Overton, LLC*, 207 P.3d 1235, 1240 (Utah 2009). "Only if the language of the contract is ambiguous will . . . [a court] consider extrinsic evidence of the parties' intent." *Id. Accord Webbank v. Am. Gen. Annuity Serv. Corp.*, 54 P.3d 1139, 1144-45 (Utah 2002).[4] Here, there is no ambiguity in the APA. It encompasses all claims "associated directly or indirectly" with the DOS Products.[5]

Novell also relies upon the proposition stated in Restatement (Second) of Contracts Section 201(1) (1981), that "[w]here the parties have attached the same meaning to a promise or agreement or a term of art, it is interpreted in accordance with that meaning." Novell's contention that this rule would be adopted by the Utah Supreme Court is somewhat questionable

[4] Ironically, during the discovery phase of this case, Microsoft took the position that it was entitled to inquire into matters concerning the negotiating history of the APA because under Utah law extrinsic evidence should be considered in making the threshold determination of whether contractual language is ambiguous. In *Ward v. Intermountain Farmers Ass'n*, 907 P.2d 264, 268-29 (Utah 1995), a case now cited by Novell, the Utah Supreme Court did indicate that extrinsic evidence is relevant to an inquiry into ambiguity. However, in *Daines v. Vincent*, 190 P.3d 1269, 1276-77 (Utah 2008), the Utah Supreme Court, while not disavowing the holding in *Ward*, clarified its meaning and stated that "we did not [in *Ward*] intend that a judge allow surrounding circumstances to create ambiguity where the language of a contract would not otherwise permit" and that "a correct application of the *Ward* rule to determine what the writing means begins and ends with the language of the contract." Moreover, as stated in the text, *infra*, the extrinsic evidence cited by Novell as to the meaning of the APA is itself ambiguous and inconclusive.

[5] The inclusion of the word "indirectly" before the words "associated with" in the APA, while not dispositive, underscores the fact that there is no ambiguity in the agreement. Novell attempts to explain that "indirectly" was added to the APA on the ground that Novell did not want to be perceived as being connected with the suit filed by Caldera against Microsoft. According to Novell, a previous draft of the APA had defined the assigned claims as "any and all claims or causes of action associated with any of the DOS Products or Related Technology, including but not limited to any claims or causes of action for copyright or patent infringement, trade secret misappropriation or violation of any applicable antitrust laws." Novell asserts that it was "worried that the specific reference to the antitrust claim would draw attention to Novell's role in instigating the lawsuit." (Mem. of Law in Supp. of Novell's Renewed Mot. for Summ. J. on Microsoft's Affirmative Defenses ("Dkt. No. 1948") at 19.) Apparently, the reason for this concern was that the commercial value of Novell's office productivity applications would be harmed if consumers were led to believe that Novell's applications were not compatible with Windows 95. Of course, to any reasonable person objectively reviewing the APA, "claims indirectly associated" with "DOS Products" does not mean "claims for copyright or patent infringement, trade secret misappropriation or violation of any applicable antitrust laws" related to those products. Moreover, the fact that Novell chose to obfuscate its role in the Caldera litigation, *see Novell, Inc. v. Canopy Group, Inc.*, 92 P.3d 768 (Utah App. 2004), hardly entitles it to challenge the objective meaning of the language it wrote by reference to its own subjective (and secreted) intent.

in light of the fact that the case upon which Novell relies, *Flying J Inc. v. Comdata Network, Inc.*, 405 F.3d 821, 834 n.6 (10th Cir. 2005), predicts that the Utah Supreme Court would adopt Section 201(3)(b), not Section 201(1), of the Restatement (Second).[6]  In any event, under the Restatement rule, in determining the subjective intent of the parties to a contract, a court ordinarily looks only to their contemporaneous conduct, not to what they aver they intended after a controversy with a third party has arisen.  *See, e.g.*, *Alvin Ltd. v. U.S. Postal Serv.*, 816 F.2d 1562, 1565-66 (Fed. Cir. 1987) ("The parties' intent must be gathered . . . from the perspective of a reasonably intelligent person acquainted with the contemporary circumstances." (internal quotations and citations omitted)).  This is both sensible and fair because there is no reason that the law should countenance the parties to an agreement retrospectively placing a subjective interpretation upon the agreement's language, contrary to its objective meaning, to the detriment of a third person who has become embroiled in a dispute with one of the parties to the agreement.

Furthermore, even if I were to consider the extrinsic evidence proffered by Novell, I would not find that it supports Novell's contention about the meaning of the assignment language in the APA because that evidence is itself ambiguous and inconclusive.[7]  Novell points

---

[6] For the Restatement (Second) Section 201(1) to be compatible with Utah case law, it would need to apply only where the express language of the contract is ambiguous.  *See, e.g.*, *Café Rio*, 207 P.3d at 1240 ("Where the language within the four corners of the contract is unambiguous, the parties' intentions are determined from the plain meaning of the contractual language." (internal quotations and citation omitted)).

[7] There is at least one piece of extrinsic evidence that favors Microsoft.  As indicated in note 3, *supra*, in the *Caldera* suit one of the claims for relief asserted by Caldera was for an injunction "requiring Microsoft, for a period of ten years, to disclose to all software developments the APIs for any operating system it produces, as well as any modifications, enhancements, updates, or new versions of such operating systems that the time that such products are release for beta testing."  This request for relief manifests that Caldera was taking the position, as asserted by Novell in this action, that Microsoft's refusal to open APIs for its competitors constituted a violation of § 2 of the Sherman Act.  Novell contends that this request for relief by Caldera is irrelevant for present purposes because Caldera asserted that the refusal to open APIs was harming the DOS Products and that it was not concerned about harm being inflicted upon Novell's software applications by virtue of the same activity.  That may well be true, but the fact that Caldera was requesting an injunction requiring the opening of APIs demonstrates the association (direct

to the testimony of Novell's former General Counsel, David Bradford, that Novell and Caldera never "discussed antitrust claims concerning damage caused to Novell's Business Applications business" in connection with the sale of DR DOS, and the similar testimony of Paul Graf, who represented Caldera when the APA was negotiated, that "[n]either party contemplated their claims 'directly or indirectly' related to 'the DOS Products or Related Technology' would include Novell's antitrust claims for harm to its business applications.'"  The truth of this testimony may be assumed, but its meaning is limited.  I have no doubt that the parties did not discuss – and that the APA did not intend to assign from Novell to Caldera – claims for harm to Novell's software applications caused by unlawful conduct engaged in by Microsoft for the purpose of monopolizing those applications' markets.  Such claims were asserted in Counts II through V of this lawsuit, and they have been dismissed not because Novell does not continue to own them but because they are barred by limitations.  Thus, Bradford's and Graf's statements beg the relevant question:  whether claims for damage to Novell's applications *caused by unlawful conduct designed to impact the operating system market* were encompassed within the "directly or indirectly associated with" language of the APA.  As both parties implicitly agree, the fact of the matter is that any such claims simply were not contemplated, and thus were not discussed, when the APA was negotiated because they were conceptualized and formulated only when it became apparent they would be needed to defeat Microsoft's anticipated limitations defense via the tolling doctrine.[8]

---

or indirect) between the claims assigned to Caldera that it was asserting in its lawsuit and Novell's claims in the present action.

[8] Of course, the fact that Novell had not yet envisioned the claims that it now asserts in this action at the time the APA was executed does not mean the claims were not assigned.  As previously indicated, under Utah law where the language of a contract is not ambiguous, courts are to resolve its meaning by looking within its four corners.  To attempt to identify the potentialities that were known to the contracting parties at the time the agreement was entered into would, in effect, be to inquire into their subjective intentions and undermine the principle that unambiguous

In short, if Novell had intended, as it now argues, to assign to Caldera only claims for

harm inflicted upon the DOS Products and Related Technology, it should have so stated in the

APA.  It did not do so, and the language it in fact employed encompasses the claims that it now

seeks to assert in this action because these claims are "associated directly or indirectly with . . .

the DOS Products."[9]

### III.

I now turn to the merits of the antitrust claims for monopolization in violation of § 2

(Count I) and unreasonable restraint of trade in violation of § 1 (Count VI).  As stated at the

outset of this opinion, I find that, had Novell not assigned them to Caldera, Count I would have

survived Microsoft's Motion for Summary Judgment and Count VI would not have.

### A.

From the early 1980s through the mid 1990s, Microsoft worked with Novell, and other

independent software vendors ("ISVs"), to ensure that Novell's software applications could

function properly on Microsoft's personal computer ("PC") operating systems.  (*See, e.g.*, Dkt.

No. 1952, Exh. 1 (Expert Report of Ronald S. Alepin) at 33.)  Such cooperation was in the

interest of both parties: Microsoft's PC operating systems were able to support Novell's popular

---

contract language must be construed objectively and reasonably.  *See generally II E. Allan Farnsworth*,
Farnsworth on Contracts Section 7.9 (3d Ed. 2004).  Furthermore, this result is consistent with precedent
regarding assignment of antitrust claims.  Although the assignment of antitrust claims must be "express," *see, e.g.*,
*Sullivan v. Nat'l Football League*, 34 F.3d 1091, 1106 (1st Cir. 1994), courts have found valid transfers where "all-
inclusive" language was used.  *See, e.g.*, *Lerman v. Joyce Int'l, Inc.*, 10 F.3d 106, 112 (3d Cir. 1993) (finding valid
assignment where contract language purported to transfer "any and all . . . causes of action, claims and demands of
whatsoever nature").

[9] Microsoft also argues that the claims asserted in Counts I and VI are barred by *res judicata* because they could
have been, and were not, asserted in the Caldera suit.  To the extent these claims were assigned by Novell to Caldera
(as I find they were), I agree with Microsoft that they are barred by *res judicata*.  However, the *res judicata*
argument adds nothing because the assignment of the present claims by Novell to Caldera itself prevents Novell
from asserting them here, *res judicata* concerns aside.  If, however, I am incorrect on the ownership of claims issue,
in my judgment Microsoft's *res judicata* contention fails because (1) Caldera could not have asserted on behalf of
Novell claims Caldera did not possess, and (2) Microsoft now concedes that although Novell had a financial interest
in the Caldera litigation, it did not control that litigation.

applications and Novell's applications were able to better function on the popular Microsoft PC operating systems.

In June of 1994, Novell acquired WordPerfect, Quattro Pro, and GroupWise (an e-mail application). By this time, Microsoft had acquired monopoly power in the PC operating system market, (*see id.* at 4 n.3.), and had begun developing a new operating system, Windows 95. However, particularly after Novell's acquisition of these three applications, Microsoft began to view Novell as a threat to its monopoly in the PC operating system market. (*See* Dkt. No. 1952, Exh. 1 at 9–11 (Alepin Expert Report).) Specifically, the capabilities, popularity, number, and diversity of Novell's software applications "could make Microsoft's operating system irrelevant if [Novell's applications] achieved ubiquity":

> Future versions of WordPerfect combined with Novell's networking technologies . . . would make PerfectOffice a compelling proposition for users in the next generation of computing. . . . [A] new operating system vendor would need only to recruit PerfectOffice to its platform to develop a credible threat to Microsoft's PC operating systems business.

(*Id.*, Exh. 1 at 77 (Alepin Expert Report).) Microsoft executives were well aware of and concerned by this threat. (*See, e.g.*, *id.*, Exh. 54 (Microsoft executive explaining to investor Warren Buffet that "[i]f we own the key 'franchises' built on top of the operating system, we dramatically widen the 'moat' that protects the operating system").)

While Windows 95 was being developed, Novell's cooperative relationship with Microsoft began to fracture. First, Novell complains of Microsoft's conduct regarding Windows 95 "namespace extensions." In 1993 and 1994, prior to the Windows 95 launch, Microsoft "evangelized" among ISVs the use of APIs called "namespace extensions."[10] (*Id.*, Exh. 1 at 12

---

[10] Access to information about Windows 95's APIs—which are "hooks" in an operating system that allow

(Alepin Expert Report).)  These namespace extensions allowed "ISVs to integrate custom namespace objects into the Windows 95 shell namespace" and "provide rich, custom views of data."  In the fall of 1993, Microsoft informed WordPerfect that it would publish/document the namespace extensions.  (*Id.*, Exh. 1 at 85–86 (Alepin Expert Report).)  In June of 1994, Microsoft disclosed to Novell and other ISVs "enough documentation of the namespace extensions 'for people to understand what we're doing and write some code.'"  (*See id.*, Exh. 1 at 87 (Alepin Expert Report) (internal citation omitted).) Novell began to rely on this documentation to develop versions of WordPerfect and Quattro Pro to function on Windows 95. (*See id.*, Exh. 1 at 87–88 (Alepin Expert Report).)  However, in the fall of 1994, Microsoft reversed course and Bill Gates "ordered the withdrawal of the documentation for the namespace extension mechanism . . . ."  (*Id.*, Exh. 1 at 91–92 (Alepin Expert Report).)  Further, "Microsoft told ISVs that the namespace extensions' functionality would soon disappear from [Windows 95]: 'Applications that have architected themselves to achieve this functionality need to remove themselves from the system . . . .'"  (*Id.*, Exh. 1 at 93 (Alepin Expert Report) (internal citation omitted).)  Microsoft's reversal delayed the release and impaired the development of the versions of WordPerfect and Quattro Pro that were optimized for Windows 95.  (*Id.*, Exh. 1 at 11, 14 (Alepin Expert Report).)

Second, Novell alleges that as it was preparing WordPerfect's printing function for Windows 95, Microsoft misled it about what APIs and printing functionality Windows 95 would possess.  (*Id.*, Exh. 1 at 160–63 (Alepin Expert Report).)  "Microsoft's failure to provide this functionality . . . cost Novell substantial resources and degraded its final products' functionality."

---

applications to achieve functionality within that operating system—was critical for ISVs because it allowed them to develop programs that could function within Windows 95.

(*Id.*, Exh. 1 at 163 (Alepin Expert Report).)

Third, Novell alleges Microsoft improperly denied it a logo license for Windows 95. In September of 1994, Microsoft launched its "Designed for Windows 95" logo program, which allowed an ISV to display the Windows 95 logo if the ISV's product met various technical requirements.  (*Id.*, Exh. 1 at 144 (Alepin Expert Report).)  These requirements included the ability to function properly on Windows NT 3.5, Microsoft's operating system for workstations, a market in which Microsoft had only limited success competing.  (*Id.*, Exh. 1 at 148–49 (Alepin Expert Report).)  However, Microsoft also allowed an exemption from the Windows NT-compatibility requirement for products that experienced "incompatibilities . . . attributable to functionality that is significantly different in architecture between Windows 95 and Windows NT."  (*Id.*, Exh. 1 at 151 (Alepin Expert Report) (internal quotations and citations omitted).)  Despite "architectural differences" in fact being the "root cause" of Novell's inability to achieve Windows NT compatibility, Novell was denied an exemption and denied a Windows 95 logo license. (*Id.*, Exh. 1 at 152–54 (Alepin Expert Report).)

Fourth, Novell alleges Microsoft injured GroupWise by "withholding and manipulating MAPI," an API designed to improve the functionality of e-mail applications.[11]  Specifically, Novell alleges that Microsoft evangelized MAPI among ISVs, and then failed to document the MAPI extensions and failed to properly integrate MAPI with Windows 95.  (*See id.*, Exh. 1 at 120–23, 127–34 (Alepin Expert Report).)   These actions allegedly impeded non-Microsoft e-mail applications, such as GroupWise, from achieving optimal functionality. (*See id.*, Exh. 1 at 131–34 (Alepin Expert Report).)

---

[11] For the reasons explained in *infra* Section III.B, I have decided that the conduct directed at GroupWise should not be considered in analyzing of Novell's claims.

Fifth and finally, Novell asserts that Microsoft pressured large application purchasers—such as original equipment manufacturers ("OEMs"), distributors, and resellers—to enter into agreements that precluded or strongly discouraged them from purchasing WordPerfect and Quattro Pro.[12] More specifically:

(1)    In 1995, under "Project Avalanche" agreements, Microsoft sought to "[i]ncrease and sustain North American share for Word and Excel by >10% points" and "[s]ustain Office share at >80% through Office 95 launch." (*Id.*, Exh. 126 at 1; *cf. id.*, Exh. 3 at 107–08 (Noll Expert Decl.).) These agreements (i) provided a 2 to 5 percent rebate to distributors and resellers who increased their "blended share" of Microsoft Word and Excel; (ii) provided a rebate (under 5 percent) to distributors and resellers who increased their overall sales of certain Microsoft software applications; (iii) required distributors and resellers to provide Microsoft with weekly reports of their sales of WordPerfect, Quattro Pro, and other competing products; and (iv) required distributors and resellers to abide by various other requirements for marketing and selling certain Microsoft software applications. (*See id.*, Exh. 3 at 107–08 (Noll Expert Decl.); *id.*, Exh. 123 at B1–B7; *id.*, Exh. 126 at 1, 12, 20–27.) These contracts were designed to reward distributors and resellers who increased their share of Microsoft software applications. (*See id.*, Exh. 126 at 26; *id.*, Exh. 128.)

(2)    Microsoft executed "per system" licenses with OEMs. Under per system licenses, an OEM paid "a negotiated royalty multiplied by a number equal to the larger of (a) the number of full or partial copies of the particular Microsoft product distributed by the OEM during the term of the license or (b) the number of Customer Systems shipped by the OEM during the term of the license." (*Id.*, Exh. 136.) "Costumer Systems" were defined by characteristics such as microprocessor and model name. (*Id.*, Exh. 136.) Novell contends that these agreements "effectively preclude[ed]" the OEMs that agreed to them from licensing Novell's products because "[o]nce under a per system license, an OEM had to develop and market a distinct product line if it wanted to pre-install Novell's applications." (*Id.* at 41.)

---

[12] Although these agreements are the crux of the § 1 claim (Count VI), they may also be considered as anticompetitive behavior in the § 2 analysis (Count I). *See infra* note 16.

(3)     "Microsoft forced OEMs to sign contracts with minimum purchase commitments that substantially exceeded a realistic expectation by the OEM." (*Id.*, Exh. 3 at 100 (Noll Expert Decl.).)  If an OEM fell short of selling enough Microsoft applications to meet its minimum commitment, Microsoft had the right to retain what was the equivalent of a deposit amounting to the unpaid balance on the OEM's commitment.  (*See id.*, Exh. 3 at 100 (Noll Expert Decl.).)  Microsoft often then gave the OEM the choice of forfeiting this deposit or using it as a credit on another contract with Microsoft, "thereby giving the OEM a financial incentive to renew its contract with Microsoft" at the expense of Novell's products. (*See id.*, Exh. 3 at 100 (Noll Expert Decl.).)

In March of 1996, Novell sold WordPerfect and Quattro Pro, but retained ownership of GroupWise.

## B.

Novell has raised an issue of triable fact as to whether Microsoft's Novell-injuring conduct was anticompetitive and whether that conduct caused anticompetitive harm in the PC operating system market.  I therefore find that, if Novell had not assigned its claims via the APA, summary judgment on Count I would have been inappropriate.

In Count I, Novell alleges that Microsoft violated § 2 of the Sherman Act by willfully and wrongfully maintaining its monopoly in the PC operating system market.  The Fourth Circuit described Novell's theory as follows:

> Novell contends that the technological connection between operating systems and applications gives rise to a significant barrier to entry into the operating-systems market and thus protects Microsoft's Windows monopoly.  Novell maintains that its office-productivity applications [such as WordPerfect and Quattro Pro] could perform well on a variety of operating systems and that, during the relevant time period, they were the dominant office-productivity applications in the market.  The thrust of Novell's argument is that its popular applications, though themselves not competitors or potential competitors to Microsoft's Windows, offered competing operating systems the prospect of surmounting the applications barrier to entry and breaking the Windows monopoly.  That is, Novell argues its products could provide a path onto the operating-system playing field for an actual competitor of Windows, because a competing operating system, running the popular Novell software applications,

would offer consumers an attractive alternative to Windows.

*Novell*, 505 F.3d at 308.  Furthermore, Novell argues that its package of office productivity applications contained middleware and included a desktop shell which could potentially allow PC users to "live" in that desktop shell in lieu of operating in Windows 95, thereby "threat[ening] to become an alternative platform for applications programs that would reduce the need for end-users to upgrade their operating system in order to obtain new application features." (*See* Dkt. No. 1952, Exh. 3 at 9 (Noll Expert Decl.).)

As a result of the threat Novell's applications posed, Novell argues, as detailed above, that Microsoft engaged in the following anti-competitive conduct:

(1) Withdrawing access to information about, and otherwise changing course regarding, the Windows 95 namespace extensions, thereby delaying and impairing Novell's development of the versions of WordPerfect and Quattro Pro that were optimized for Windows 95.

(2) Misleading Novell about Windows 95 print functionality, thereby increasing WordPerfect's costs and decreasing its functionality.

(3) Refusing to grant a Windows 95 logo license for certain Novell software applications.

(4) Manipulating APIs to harm GroupWise.

(5) Entering into licensing agreements with OEMs, distributors, and resellers that discouraged and/or prevented OEMs and distributors from purchasing Novell's applications.

As a preliminary matter, I agree with Microsoft that the Complaint failed to provide notice that Novell was basing its claims in part on Microsoft's treatment of GroupWise, and therefore any such allegation is not properly a part of this action.  A complaint need only contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting FED. R. CIV. P. 8(a)(2)).  Although "specific facts are

15

not necessary," the Complaint must "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).  The Complaint in this case limits itself to anticompetitive conduct directed at applications sold by Novell in March of 1996, which would plainly exclude GroupWise.  (*See* Novell's Complaint ("Compl.") ¶ 2 (emphasis added).)  Although the Complaint refers to the anticompetitive treatment of multiple "office productivity applications" in addition to WordPerfect, (*see, e.g.*, *id.* ¶¶ 5, 105), simply pluralizing "office productivity applications," without any further specificity, is insufficient to put Microsoft on fair notice that Novell would allege antitrust violations based on Microsoft's treatment of GroupWise.  While WordPerfect and Quattro Pro were discussed in some detail (*see, e.g.*, *id.* ¶¶ 32–37, 51–56, 62–63), GroupWise was not even mentioned in the Complaint. Nor am I moved by the fact, relied upon by Novell, that Microsoft pursued discovery about GroupWise.  What material is subject to discovery and what conduct may serve as the basis of a claim are two distinct inquiries with different standards.  Further, it would be unfair to penalize Microsoft for engaging in a cautious and thorough discovery strategy.

With that matter out of the way, I turn now to the applicable legal framework for this monopolization claim.  To violate § 2 of the Sherman Act,[13] the defendant must (1) have monopoly power in the relevant market and (2) engage in monopolizing conduct—that is, "willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historical accident."  *Verizon Commc'n Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 407 (2004) (quoting *United*

---

[13] Section 2 reads: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony . . . ."  15 U.S.C. § 2.

*States v. Grinnell Corp.*, 384 U.S. 563, 570–71 (1966)); *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 596 n.19 (1985) (same).  To prove the second element, the plaintiff generally must show that the defendant (a) engaged in anticompetitive conduct that (b) caused anticompetitive harm in the relevant market.[14]  *See Metronet Serv. Corp. v. Qwest Corp.*, 383 F.3d 1124, 1131 (9th Cir. 2004) (noting that plaintiff must prove that defendant "(1) possessed monopoly power in the relevant market, (2) willfully acquired or maintained that power through exclusionary conduct and (3) caused antitrust injury"); *Data Gen. Corp. v Grumman Sys. Support Corp.*, 36 F.3d 1147, 1182 (1st Cir. 1994), *abrogated on other ground by Reed Elsevier, Inc. v. Muchnick*, 130 S. Ct. 127 (March 2, 2010) ("'Exclusionary conduct' is defined as 'conduct, other than competition on the merits or restraints reasonably necessary to competition on the merits, that reasonably appears capable of making a significant contribution to creating or maintaining monopoly power.'" (internal citations omitted)).  However, these last two issues—anticompetitive conduct and causation/anticompetitive harm—are not neat, distinct inquiries, but often involve overlapping considerations and analyses. *Cf., e.g.*, *Aspen Skiing*, 472 U.S. 585.

Because Microsoft's monopoly power in the relevant market is undisputed (Dkt. No. 1947 at 4 n.3), Microsoft would be liable for monopolization under § 2 if it willfully and wrongfully maintained its monopoly—that is, engaged in anticompetitive conduct that caused anticompetitive harm.

---

[14] Some courts break a monopolization analysis into three elements: (1) monopoly power, (2) willful acquisition/maintenance of monopoly power (or "anticompetitive conduct"), and (3) causation. *See, e.g.*, *Microsoft Corp.*, 253 F.3d 34, 44, 50–79 (D.C. Cir. 2001); *Metronet Serv. Corp.*, 383 F.3d at 1131.  Regardless of how the elements are organized, the substantive analysis remains the same.

17

1.  <u>Microsoft's Anticompetitive Conduct</u>

Novell has raised a genuine question of material fact concerning whether Microsoft's behavior, taken as a whole, was anticompetitive.

Microsoft attacks Count I by arguing that that Novell has not presented evidence that Microsoft did anything beyond refusing to cooperate with Novell, and refusing to assist a competitor is not anticompetitive conduct in violation of § 2.

Although a monopolist generally has a right to refuse to cooperate with a competitor, this right is not unqualified: a refusal to cooperate may be anticompetitive if it is an "attempt[] to exclude rivals on some basis other than efficiency[.]"  *See Aspen Skiing Co.*, 472 U.S. at 600–01, 605 (internal citations and quotations omitted); *accord Data Gen. Corp.*, 36 F.3d at 1183 (citing *Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451 (1992)).  That said, courts should be "very cautious" in recognizing exceptions to the right to refuse to cooperate "because of the uncertain virtue of forced sharing and the difficulty of identifying and remedying the anticompetitive conduct by a single firm."  *Trinko*, 540 U.S. at 407.

In determining whether a refusal to cooperate is impermissible, a court may consider the entirety of the monopolist's pattern of conduct, the potential impact on consumers, and the monopolist's motive—for example, whether the monopolist had a legitimate business justification for its actions or sacrificed short-term profits in an effort to destroy a competitor. *See id.* at 409 (holding that a refusal to cooperate did not violate § 2 because (i) defendant did not remove itself from a previously voluntary course of cooperation or refuse to sell a product at its retail price, (ii) "the services allegedly withheld were not otherwise marketed or available to the public[,]" and (iii) "the existence of a regulatory structure [the Telecommunications Act of 1996]

18

designed to deter and remedy anticompetitive harm [in the industry at issue]" diminished the

likelihood of antitrust harm); *Aspen Skiing Co.*, 472 U.S 585 (holding that a monopolist-ski

mountain owner's refusal to continue offering a multi-day lift pass with a competitor mountain

could violate § 2 because (i) they had offered the pass successfully for years; (ii) the monopolist

refused to even let the competitor buy the monopolist's lift tickets at retail price; (iii) the pass

had great appeal among consumers; (iv) elimination of the pass undermined the smaller

competitor's ability to compete; and (v) the facts suggest that the monopolist "was willing to

sacrifice short-run benefits and consumer goodwill in exchange for a perceived long-run impact

on its smaller rival").[15]

   As an initial matter, it is not entirely clear that Microsoft's conduct was merely a refusal

to cooperate: Novell has presented evidence that Microsoft affirmatively misled Novell about

Windows 95 and entered into anticompetitive agreements with OEMs.  *Cf. Olympia Equip.*

*Leasing Co. v. W. Union Telegraph Co.*, 797 F.2d 370, 376–77 (7th Cir. 1986) (in explaining the

right to refuse to cooperate, noting that antitrust law generally only imposes negative, not

positive, duties).

   Even assuming Microsoft's conduct should be characterized as a refusal to cooperate,

there is a question of fact about whether it was anticompetitive under *Aspen* and *Trinko*.

Microsoft's conduct ran contrary to the preferences of operating system consumers.  Just as

skiers would have preferred the multi-day pass in *Aspen*, so too would PC users have preferred

an operating system that could immediately and optimally support popular Novell applications

---

[15] The *Trinko* Court noted that "*Aspen Skiing* is at or near the outer boundary of § 2 liability. . . ."  The Court
explained that "[t]he unilateral termination of a voluntary *(and thus presumably profitable)* course of dealing
suggested a willingness to forsake short-term profits to achieve an anticompetitive end. . . [and] the defendant's
unwillingness to renew the ticket *even if compensated at retail price* revealed a distinctly anticompetitive bent."
*Trinko*, 540 U.S. at 409 (internal citations omitted) (emphasis in original).

such as WordPerfect.

Further, Novell has presented evidence of predatory motives. Just as consumer demand for the multi-day pass would have increased the monopolist's short-term profits in *Aspen*, refraining from misleading Novell about the namespace extensions and print functionality may have increased Microsoft's short-term profits by increasing Windows 95's consumer appeal via allowing Novell's popular applications to achieve better functionality on it. (*Cf.* Dkt. No. 1952, Exh. 3 at 11 (Noll Expert Decl.).)  A fair inference arises that inhibiting WordPerfect's and Quattro Pro's ability to achieve functionality on Windows 95 was an effort to "sacrifice short-run benefits and consumer goodwill in exchange for a perceived long-run [anticompetitive impact]." *See Aspen*, 472 U.S. at 610–11.  This inference is particularly believable in light of the substantial concern within Microsoft that popular applications might undermine Microsoft's monopoly in the PC operating system market. (*See, e.g.*, Dkt. No. 1952, Exh. 54.)  Further evidence of this anticompetitive motivation is found in:

(1) The history of voluntary, and therefore presumably profitable, Microsoft-Novell cooperation—both generally over the years and specifically in sharing API information pertaining to Windows 95—to optimize application functionality on Microsoft's operating systems. *See Trinko*, 540 U.S. at 409; *see also Olympia Equip.*, 797 F.2d at 377 (distinguishing *Aspen* in part because "[t]here is no evidence that suppliers [like the defendants] customarily provide their customers with [the information the deprivation of which plaintiffs allege gave rise to an antitrust violation] . . . .").

(2) The denial of the Windows 95 logo license, despite the purported availability of an exemption for the type of problems that Novell alleges caused the incompatibility. *Cf. Trinko*, 540 U.S. at 409 (distinguishing *Aspen* in part because "the services allegedly withheld were not otherwise marketed or available to the public").

(3) The minimum purchase agreements and per system licenses with OEMs, both of which made it harder for WordPerfect and Quattro Pro to access the OEM market.[16]

[16] "Even though exclusivity arrangements are often analyzed under § 1, such exclusionary conduct may also be an element in a § 2 claim." *LePage's Inc. v. 3M*, 324 F.3d 141, 157 (3d Cir. 2003).  Just because the agreements with the OEMs do not give rise to a § 1 claim, *see infra* Section III.C, it does not necessarily follow that those agreements do not amount to anticompetitive conduct, or are at least evidence of anticompetitive motives, under § 2. *See*

Microsoft argues that "if a monopolist does extend a helping hand, though not required to do so, and later withdraws it . . . does he incur antitrust liability?  We think not."  (Dkt. No. 1947 at 32 (internal marks omitted) (quoting *Olympia Equip.*, 797 F.2d at 376).)  Microsoft's alleged conduct here, however, is distinguishable from the conduct in *Olympia Equipment*.  Microsoft did not just withdraw a charitable helping hand; rather, Microsoft allegedly first cooperated in an effort to improve its own product, subsequently misled Novell into relying on information provided pursuant to that cooperation, and then withdrew its cooperation after Novell reasonably relied on Microsoft's representations.

Microsoft also argues that it had legitimate business reasons—fostering and benefiting from innovative software development—for its actions.  Although courts should be wary of interpreting antitrust laws in a way that hampers innovation, under the circumstances presented here I am not persuaded by Microsoft's argument.  Fostering innovation did not require Microsoft to deny Novell the Windows 95 logo license, nor did it necessitate misleading Novell about the APIs and print functionality.  In fact, API innovations arguably would have been more valuable for both consumers and Microsoft if the ISVs had been able to use them to develop applications for Windows 95.  *See Data Gen. Corp.*, 36 F.3d at 1183 ("In general, a business justification is valid if it related directly or indirectly to the enhancement of consumer welfare.").  As Novell's expert has explained, "Microsoft ha[d] no plausible business justification for its actions.  The technical acts that undermined the functionality of competing applications were

---

*Microsoft*, 253 F.3d at 70 ("[E]xclusive contracts, in certain circumstances, may give rise to a § 2 violation even though the contracts foreclose less than the roughly 40% or 50% share usually required in order to establish a § 1 violation.").

unnecessary and did not improve the functionality or reduce the cost of Microsoft products."[17]

(Dkt. No. 1952, Exh. 3 at 11 (Noll Expert Decl.).)

In short, although, after examining the evidence, a fact-finder may agree with Microsoft

that its actions were not anticompetitive under § 2, Novell has presented sufficient evidence to

raise a genuine question of fact on this issue.

2.   The Anticompetitive Harm Caused by Microsoft's Anticompetitive Conduct

As discussed above, to prove a monopolization claim under § 2, the plaintiff generally

must prove not only that the defendant's conduct was anticompetitive, but also that it caused

anticompetitive harm in the relevant market.  *See Metronet*, 383 F.3d at 1131; *Microsoft Corp.*,

253 F.3d at 78–80; *Thompson Everett*, 57 F.3d at 1325.  More specifically, the plaintiff must

establish that it suffered injury caused by conduct which damaged the competitive process itself.

*See, e.g.*, *Thompson Everett*, 57 F.3d at 1325 (describing when a private party may sue for

violations of antitrust laws, pursuant to § 4 of the Clayton Act).

In most § 2 cases, this analysis hinges on whether the exclusionary conduct harmed

competition in the market in which the plaintiff was competing with the defendant.  *See, e.g.*,

---

[17] Microsoft points to two of my prior opinions to argue that "Microsoft is not required to disclose information to its competitors about new Windows operating systems under development."  I have held, in cases brought under the "essential facilities" doctrine, that Microsoft had no antitrust obligation to share information about Windows 95 with ISVs.  *See In re Microsoft Corp. Antitrust Litig.*, 274 F. Supp. 2d 743, 745–46 (D. Md. 2003) (in so holding, noting that "to require one company to provide its intellectual property to a competitor would significantly chill innovation" and "the essential facility doctrine has never been interpreted to deny a person the right to gain temporary benefits from innovations to its own products"); *see also Daisy Mountain Fire Dist. v. Microsoft Corp.*, 547 F. Supp. 2d 475, 490 (D. Md. 2008) ("[E]ssential facility claims involving tangible assets are quite different from claims involving technical innovation, and plaintiff fails to provide a compelling argument for applying the doctrine to technological innovations or information.").  However, in the case at hand, Novell is not proceeding under the essential facilities doctrine. Further, Novell has presented evidence that Microsoft did more than just refuse to disclose information about Windows 95.  It has also raised a genuine question of fact about whether Microsoft mislead Novell about characteristics of Windows 95 and about what information it would provide in advance of Windows 95's launch.

*Microsoft Corp.*, 253 F.3d at 79; *LePage's*, 324 F.3d at 160–62.  In this case, Novell's unique § 2 theory makes the inquiry more complicated: Novell must prove that the specific Microsoft conduct which caused injury to Novell's applications also caused anticompetitive harm in the *PC operating system market*.

To satisfy this causation requirement, a plaintiff needs to show that the conduct at issue "contribut[ed] significantly to a defendant's continued monopoly power."[18]  *See Microsoft*, 253 F.3d at 80 (at least in an equitable enforcement action as opposed to an action for money damages, holding that to prove causation plaintiff must prove the conduct was "reasonably capable of contributing significantly to a defendant's continued monopoly power"); *see also Data Gen. Corp.*, 36 F.3d at 1182 ("'Exclusionary conduct' is defined as 'conduct, other than competition on the merits or restraints reasonably necessary to competition on the merits, that reasonably appears capable of making a significant contribution to creating or maintaining monopoly power.'" (internal citations omitted)); *cf. Morgan*, 892 F.2d at 1361–63 (in rejecting a § 2 claim arising from alleged predatory pricing, (1) suggesting that § 2 liability requires that the pricing have a "measurable impact on [plaintiff's] overall viability as a competitor[,]" and  (2) "find[ing] insufficient evidence" that the pricing "had any more than a negligible impact on [plaintiff's] viability as a competitor").

Under this "contributed significantly" standard, plaintiffs need *not* "present direct proof that a defendant's continued monopoly power is precisely attributable to its anticompetitive conduct."  *Microsoft Corp.*, 253 F.3d at 79.  To require such proof would "require that § 2

---

[18] At times, Microsoft seems to argue that Novell must prove that Microsoft's conduct had a "substantial" anticompetitive impact in the operating system market, (*see* Dkt. No. 1947 at 26), which I would view as a more rigorous test than the contributed significantly standard. Increasing this burden may risk undermining the principle that "antitrust laws are for the benefit of competition." *Cf. Morgan v. Ponder*, 892 F.2d 1355, 1360 (8th Cir. 1989) (quoting *Ball Mem'l Hosp. v. Mut. Hosp. Ins., Inc.*, 784 F.2d 1325, 1338 (7th Cir. 1986)).

liability turn on a plaintiff's ability or inability to reconstruct the hypothetical marketplace absent a defendant's anticompetitive conduct[,]" which "would only encourage monopolists to take more and earlier anticompetitive action." *Id.* at 79.  When a firm has engaged in anticompetitive conduct, courts should be reluctant to demand too much certainty in proving that such conduct caused anticompetitive harm because "[t]o some degree, 'the defendant is made to suffer the uncertain consequences of its own undesirable conduct.'" *Id.* (quoting 3 PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 651c, at 78).

Microsoft argues that Novell's experts never expressly stated that, but for the actions that harmed WordPerfect and Quattro Pro, competition would have been enhanced in the PC operating system market.  Rather, Dr. Roger Noll, Novell's expert on this issue, merely concluded that there was anticompetitive harm caused by the combination of the conduct directed at Novell's software applications and the anticompetitive conduct directed at Netscape, Java, and other third party applications.

Although Dr. Noll implied that the conduct that injured Novell's software applications by itself caused anticompetitive harm in the PC operating system market,[19] it is true that he only formally concluded that such conduct contributed significantly to anticompetitive harm in light of the conduct directed at third parties.  (*See* Dkt. No. 1952, Exh. 4 at 28 (Noll Expert Reply).) In his deposition—in response to repeated questioning from Microsoft's counsel about whether the conduct directed at Novell, in and of itself, caused "a significant or substantial impact on competition"—Dr. Noll stated, "I have not analyzed the effect of each specific act by Microsoft on competition in the market for operating systems.  I have analyzed the pattern, the totality of

---

[19] (Dkt. No. 1952, Exh. 4 at 32 (Noll Expert Reply) ("I do not agree that Professor Murphy has proven that the acts against Novell alone had no effect on competition for the x86 operating systems . . . .").)

the actions by Microsoft on the market for operating systems."  (Dkt. No. 1947, Exh. 3 at 40.)

Shortly thereafter, the following exchange occurred:

> [Microsoft's Counsel:] Have you analyzed the aggregate of Microsoft's conduct that was directed against Novell's office productivity applications in order to ascertain whether that universe, that smaller universe, just conduct against Novell's office productivity applications, had some adverse impact on competition in the market for operating systems? . . .
>
> [Dr. Noll:] Had Microsoft behaved differently to all other kinds of applications of middleware vendors than it behaved towards Novell. . . .  But all the other producers of middleware and applications had – they had dealt with them in a pro-competitive way – and facilitated the development that – of high-quality applications of middleware that were not produced by Microsoft that ran on the Windows platform, then – then I suspect there would have been no adverse effect of knocking Novell out of the industry from the actions against Novell, but that's – that's counter [f]actual.

(Dkt. No. 1947, Exh. 3 at 40–43.)

Even taking that answer into account, I conclude that Dr. Noll's proposed testimony raises a genuine issue of fact regarding whether the conduct directed at Novell was a significant contributor to anticompetitive harm in the PC operating system market.  Novell has no obligation to create some "hypothetical market place," in which none of the other ISVs or applications had been weakened by anticompetitive conduct, and then prove that the conduct at issue would still have significantly contributed to anticompetitive harm in that hypothetical market.  *Cf. Microsoft Corp.*, 253 F.3d at 79.  It would be contrary to the purpose of § 2 to immunize a monopolist for anticompetitive conduct, which in fact significantly contributed to anticompetitive harm, simply because that harm was caused by conduct directed at multiple small threats, none of which could prove that the conduct directed at any single firm would have by itself significantly contributed to the defendant's monopoly if none of the other small firms had been similarly weakened.  *See*

*supra* note 18; *Microsoft Corp.*, 253 F.3d at 79.[20]  Rather, Novell need only prove that the conduct that harmed its software applications contributed significantly to Microsoft's monopoly in the PC operating system market considering all the characteristics of that market at the time, including the condition of other ISVs and applications.

To be sure, Novell cannot piggy-back on the anticompetitive harm caused by conduct directed at third parties without actually showing the conduct which injured its applications had an anticompetitive impact as well.  But Novell is not doing so. Despite Microsoft's assertions to the contrary, implicit in Dr. Noll's opinion is the conclusion that conduct directed at Novell, in and of itself, caused some anticompetitive harm in the PC operating system market.  Dr. Noll's deposition statement that knocking Novell out of the market alone would have "no adverse effect," when viewed in context, is properly understood as Dr. Noll agreeing that eliminating Novell's software applications from the market, on its own in some hypothetical market, would not have undermined Microsoft's monopoly position.  Such a conclusion is not inconsistent with a finding that Microsoft's actions toward Novell were a significant contributor to anticompetitive harm in the PC operating system market in light of the weakened state of other applications and ISVs.  (*Cf., e.g.*, Dkt. No. 1952, Exh. 3 at 9–11 (Noll Expert Decl.); *id.*, Exh. 4 at 6–7, 28 (Noll Expert Reply).)  A reasonable person may disagree with Dr. Noll, but the decision whether or not

---

[20] (*See also* Dkt. No. 1952, Exh. 4 at 27 (Noll Expert Reply) ("In a 1000-firm market, the harm to any one competitor would not cause harm to competition, but that is irrelevant to ascertaining whether the entire pattern of conduct against all 1000 firms caused anticompetitive harm.").)

Microsoft seems to concede that, under some circumstances, the anticompetitive harm caused by a defendant's anticompetitive conduct toward multiple small competitors could be aggregated to reach a significant contribution finding in the relevant market.  Microsoft distinguishes itself from such a hypothetical defendant, however, by asserting that its conduct toward Novell was fundamentally different than the anticompetitive conduct Microsoft directed against other ISVs and applications.  This argument is unpersuasive.  I am not convinced that the conduct directed at the other ISVs is distinguishable in any material way from the conduct directed at Novell.  Regardless, I do not think a defendant can avoid antitrust liability by engaging in "different" anticompetitive conduct toward each of its small competitors.

to do so is within the province of a jury.

Accordingly, but for Novell selling its claims under the APA, I would have denied Microsoft's Motion for Summary Judgment on Count I.

### C.

I will now finally address Count VI.  I find that, even if Novell had not assigned this claim, Microsoft would be entitled to summary judgment because the agreements at issue either were not exclusive, were not otherwise anticompetitive, or did not substantially foreclose competition in any market.

Count VI alleges that Microsoft violated § 1 of the Sherman Act[21] by entering into "agreements with OEMs and others not to license or distribute Novell's office productivity applications or to do so only on terms that materially disadvantaged these products" thereby "unreasonably restrain[ing] trade by restricting the access of Novell's office productivity applications to significant channels of distribution[.]"  (Compl. ¶ 175.)

There is some indication that the parties believe that Count VI concerns only restraining trade in the *software applications markets*, not the *operating system market*. Both parties have briefed the issue as if the operating system market was irrelevant and Microsoft argues that I, in response to Microsoft's earlier motion to dismiss, tolled Count VI at least in part because it concerned agreements with OEMs (suggesting that Microsoft *may* believe that Count VI's tolling was unrelated to its connection to the operating system market).

If this is the parties' view of the matter, it is understandable in light of (i) Count VI's failure to mention the operating system market, (Compl. ¶¶ 174–77), (ii) my brief explanation as

---

[21] Section 1 reads in part: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1.

to why Count VI was tolled, *In re Microsoft Corp. Antitrust Litig.*, 2005 WL 1398643,  at *1 ("Count VI is based upon Microsoft's exclusionary agreements with OEMs, which allegedly were in [sic] unreasonable restraint of trade. Although Microsoft does not expressly concede the point, such agreements also were a subject of the government case. Thus, limitations has been tolled as to the claim asserted in Count VI."), and (iii) the fact that § 1, in comparison with § 2, is sometimes less focused on proving a particular anticompetitive impact in a particular market.

The Fourth Circuit, however, apparently believed that Count VI was tolled because Novell alleged unreasonable restraint of trade in the operating system market (though the court may not have actually reached the issue).[22]  *See Novell*, 505 F.3d at 306–07.  In contrast, the Fourth Circuit recognized that Counts II through V arose from allegations of anticompetitive impact in the software applications markets.  *Id.* ("Because Counts II through V allege injury that is not specifically alleged in the DOJ complaint, Microsoft argued these claims were not tolled by the DOJ complaint and thus were time-barred. Microsoft sought dismissal of Novell's claims of injury to competition in the PC operating-systems market . . . in Counts I and VI on different grounds [antitrust standing and claim ownership].")  If Novell could prevail on Count VI by proving merely substantial foreclosure in the software applications markets, without proving restraint of trade in the operating system market, Microsoft would have had a persuasive argument that Count VI was not "based in whole or in part" on the government case and thus should not have been tolled.  Accordingly, I am of the view that Novell must prove that the

---

[22] The Fourth Circuit explained: "Counts I and VI . . . are predicated on the theory that Microsoft's conduct injured competition in the market for PC operating systems, a market in which Novell did not directly compete. . . . Section 5(i) of the Clayton Act provides that government anti-trust proceedings toll the statute of limitations for private antitrust actions 'based in whole or in part on any matter complained of' by the government. Novell's Counts I and VI are indeed based on Microsoft's anticompetitive conduct in the PC operating-systems market, which was at issue in the DOJ complaint." *See Novell*, 505 F.3d at 306–07.

agreements at issue in Count VI have unreasonably restrained trade in the *operating system market*.[23]

Novell has not even attempted to present evidence on this point.[24]  Rather, Novell has briefed the issue as if it only needed to prove restraint of trade—in this case, substantial foreclosure—in the software applications markets.  In any event, although I believe Novell's failure to show restraint of trade in the operating system market dooms Count VI, because of the confusion surrounding this issue I will nonetheless evaluate whether Microsoft's conduct substantially foreclosed competition in the software applications markets. I find Novell has failed to meet its burden here as well.

    a.   Substantial Foreclosure Framework

Although Novell never expressly frames it as such, I read Count VI as essentially an allegation of exclusive dealing.[25]  More specifically, I understand Count VI as alleging that

---

[23] In its brief before the Fourth Circuit, Microsoft explained the procedural posture and history of Count VI:

> Because Counts I and VI allege harm in the same PC operating system market at issue in the DOJ Complaint, Microsoft did not argue that those two claims were time-barred. . . . There was some confusion in the district court concerning what market(s) are at issue in Count VI. Although Count VI does not specify a market, it alleges that Microsoft entered into exclusionary distribution agreements in violation of [§ 1]. . . . [S]uch a claim requires proof of harm to "competition as a whole within" at least one antitrust market. Novell provided no indication that Count VI might pertain to the PC operating system market (as opposed to the alleged applications markets) until oral argument, at which point Microsoft's counsel immediately responded that to the extent that were so, then Count VI should be dismissed for the same reasons as Count I.

Brief of Defendant-Appellant Microsoft Corp. at *12–*13, *13 n.4, *Novell, Inc. v. Microsoft, Corp.*, Nos. 06-1134, 06-1238, 2006 WL 1348322 (4th Cir. Apr. 13, 2006) (internal citations omitted).

[24] Novell may have been able to prove restraint of trade in the operating system market by, in part, establishing substantial foreclosure in various software applications markets. To do so, however, Novell would have to prove more than just substantial foreclosure in those software applications markets; it would also have had to point to evidence showing how and why that substantial foreclosure in fact restrained trade in the operating system market.

[25] "Exclusive dealing occurs when . . . a buyer . . . agrees to purchase, license or lease all or a substantial portion of its requirements of a product or service exclusively from a particular seller."  WILLIAM C. HOLMES, ANTITRUST LAW HANDBOOK § 2:19 (2009).

Microsoft violated § 1 by entering into agreements with purchasers—OEMs, distributors, and resellers—which *de facto* committed those purchasers to buy software applications exclusively, or almost exclusively, from Microsoft.

Agreements violate § 1 when they unreasonably restrain trade. *See, e.g.*, *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 49 (1977). Exclusive dealing agreements that are alleged to violate § 1 are evaluated under the Rule of Reason, which balances the procompetitive justifications against the anticompetitive harm. *See, e.g.*, HOLMES, *supra* note 25. The *Tampa Elec. Co v. Nashville Coal Co.*, 365 U.S. 320, 327–30 (1961) substantial foreclosure framework basically serves as a proxy for the Rule of Reason in analyzing exclusive dealing allegations.[26] *Cf. Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1301 (9th Cir. 1982) (the *Tampa Electric* framework "clearly is to determine the anticompetitive effects of exclusive-dealing arrangements"). Under *Tampa Electric*, § 1 liability requires the plaintiff to prove that (1) the agreements in question were in fact exclusive, and (2) the exclusive dealing substantially lessened competition—that is, the agreements foreclosed competition in a substantial share of the relevant market.[27] *See, e.g.*, *Tampa Elec.*, 365 U.S. at 327–30.

---

[26] Although *Tampa Electric* involved a Clayton Act claim, its analysis pertains to exclusive dealing under § 1 of the Sherman Act as well. *See Tampa Elec.*, 365 U.S. at 335 ("We need not discuss the respondents' further contention that the contract also violates § 1 and § 2 of the Sherman Act, for if it does not fall within the broader prescriptions of § 3 of the Clayton Act it follows that it is not forbidden by those of the former."). Some "[c]ourts and commentators disagree as to whether [the *Tampa Electric* test] outlaws a broader range of conduct than does the rule of reason drawn from § 1 of the Sherman Act." *Bepco*, 106 F. Supp. 2d at 827. I believe (1) that exclusive dealing claims under the Clayton Act and the Sherman Act (§ 1) are either subject to the same standard or that the Clayton Act is broader and (2) that the analytical framework for exclusive dealing claims under § 1 is the same as that articulated in *Tampa Electric*. *See, e.g.*, *Twin City Sportservice*, 676 F.2d at 1301–02 (expressly authorizing use of *Tampa Electric* to analyze exclusive dealing under § 1); *United States v. Microsoft Corp.*, 87 F. Supp 2d 30, 52–53 (D.D.C. 2000), *rev'd on other grounds by* 253 F.3d (utilizing *Tampa Electric*, or something close to it, in analyzing a § 1 claim); *Masimo Corp. v. Tyco Health Care Group, L.P.*, 2006 WL 1236666, at *4 n.2, *4–*8 (C.D. Cal. 2006) (unpublished) (utilizing *Tampa Electric*, or something close to it, in analyzing a § 1 claim and noting "it is easier to meet the threshold of foreclosure for a [Clayton Act] violation that it is for a § 1 violation" (citing *Twin City Sportservice*, 676 F.2d at 1304 n.9)).

[27] Section 1 only covers "contract[s], combination[s] . . ., or conspiracy[ies]." In contrast to the pattern of unilateral

30

b.  <u>Project Avalanche Agreements Lacked Exclusivity and Anticompetitiveness</u>[28]

To be considered "exclusive" under antitrust laws, an agreement must either expressly

preclude a party from doing business with the defendant's competitors, or highly incentivize or

have the practical effect of exclusivity.  *See LePage's*, 324 F.3d at 157–58 (in analyzing a § 2

claim, noting that "unilaterally imposed quantity discounts can foreclose the opportunities of

rivals when a dealer can obtain its best discount only by dealing exclusively with the dominant

firm" (quoting quoting 3A PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶

768b2, at 148)); *Concord Boat Corp. v. Brunswick Corp.*, 207 F.3d 1039, 1058–59 (8th Cir.

2000) (holding that discount purchase agreements that did not require buyers to commit to

buying a seller's products for any specified time period were not "exclusive" because buyers

_____

conduct that was considered in analyzing the § 2 claim in Count I, agreements between Microsoft and third parties are the only allegedly anticompetitive conduct that may be considered in assessing the anticompetitive harm in Count VI.

[28] Microsoft also argues that the Project Avalanche agreements may not form the basis of Count VI because (1) "[h]ad Novell alleged harm to competition in channels other than the OEM channel, that allegation would have been barred by the statute of limitations because it would not have been based in whole or in part on any matter complained of in the Government case" and (2) Novell did not include such allegations in its Complaint.

As to Microsoft's first argument, a claim arising from the Project Avalanche agreements may still have been tolled because Novell alleges that those agreements caused harm in the PC operating system market.  *See Novell*, 505 F.3d at 307 (quoting 16 U.S.C. § 16(i)) ("Section 5(i) of the Clayton Act provides that government antitrust proceedings toll the statute of limitations for private antitrust actions 'based in whole or in part on any matter complained of' by the government. Novell's Counts I and VI are indeed based on Microsoft's anticompetitive conduct in the PC operating-systems market, which was at issue in the DOJ Complaint."); *see also Novell*, 2005 WL 1398643, at *3 (internal citation omitted) ("The governing test is whether the matters complained of in the private action 'bear a real relation' to a matter complained of in the government suit.").

I also am unpersuaded by Microsoft's second argument.  Again, a complaint need only contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  *Erickson*, 551 U.S. at 93 (quoting FED. R. CIV. P. 8(a)(2)).  Although "specific facts are not necessary," the Complaint must "'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Id.* (quoting *Twombly*, 550 U.S. at 555). Novell's Complaint put Microsoft on fair notice that it would bring claims based on agreements in the finished goods channel.  The Complaint included a section entitled "Other Distribution Channels," in which Novell alleged "anticompetitive tactics" in "the following channels: independent retailers that sell to individual and small businesses; independent or loosely affiliated resellers that sell to larger organizations . . .; and direct sales to government agencies, large corporations, and other large organizations." (Compl. ¶¶ 132–33.)  Presumably in an effort to strengthen its argument about the relatedness between Count VI and the government's suit, Novell only highlighted the OEM agreements in opposing the Motion to Dismiss, and accordingly both this Court and the Fourth Circuit focused on the OEM agreements as the crux of Count VI.  Nonetheless, the fact that the Complaint itself challenges non-OEM agreements leads me to conclude that I should consider the allegations about the Project Avalanche agreements.

31

"were free to walk away from the discounts at any time"); *Masimo Corp.*, 2006 WL 1236666, at 3, *5–6 (holding that, where defendant gave substantially larger discounts to a hospital if it satisfied over 90 percent of its need for "pulse oximetry systems" with purchases from the defendant, the jury reasonably concluded that agreements were exclusive because defendant "in practical effect, offered hospitals their best discount only if they dealt with [defendant] exclusively"); *Microsoft Corp.*, 87 F. Supp 2d at 52–53, *rev'd on other grounds by* 253 F.3d (finding a contract to be exclusive where it imposed "severe shipment quotas and promotional restrictions for third-party [products]"); *see also R.J. Reynolds Tobacco Co. v. Phillip Morris Inc.*, 199 F. Supp. 2d 362, 387 (M.D.N.C. 2002) ("[Exclusive dealing] arrangements typically involve requirements contracts, non-competition clauses, and agreements giving discounts in exchange for exclusivity.").

Novell has not raised a genuine issue of fact about whether the Project Avalanche agreements with distributors and resellers were exclusive. These agreements were not typical exclusive agreements such as requirements contracts or non-competition agreements. Unlike in *Masimo*, Microsoft did not offer its best discount only if distributors dealt exclusively, or close to exclusively, with Microsoft. Like any discount, the more the distributor purchased the discounted products, the greater it benefited from the discount; but there was no particularly appealing benefit hinging on exclusivity or anything close to it. Nor did these agreements directly penalize distributors and resellers for selling non-Microsoft products. Rather, Microsoft simply offered distributors a modest rebate for increasing their sales and "blended share" of Microsoft products. (*See* Dkt. No. 1952, Exh. 123.) Incentivizing increased sales and share, at least to the extent that these agreements did, hardly has the "practical effect" of exclusivity. In

fact, as Microsoft points out, distributors subject to these agreements were also responsible for 48 percent of Novell's sales in 1995. *Cf. R.J. Reynolds*, 199 F. Supp. 2d at 390 ("Plaintiffs . . . have been successful in securing merchandising contracts with [stores subject to a CMO3 contract with the defendant], which suggest that [the product] sold in CMO3 stores is an inappropriate figure for the foreclosure analysis.").

Although their lack of exclusivity alone may doom their viability as a basis for § 1 liability, *see supra* note 26, the Project Avalanche agreements are also not anticompetitive by any other measure. First, these agreements warrant "less cause for anticompetitive concern" because they were "imposed on distributors rather than end users." *Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1163 (9th Cir. 1997). "If competitors can reach the ultimate consumers of the product by employing existing or potential alternative channels of distribution it is unclear whether such restrictions foreclose from competition any part of the relevant market." *Id. Accord Microsoft Corp.*, 87 F. Supp. 2d at 53 (finding exclusive agreements with distributors did not foreclose a substantial share of the market because internet browser developers could always sell browsers directly to end-users). Further, these agreements basically entail price-cutting, which is particularly likely to have procompetitive and pro-consumer benefits.

In short, because the Project Avalanche agreements were not exclusive or otherwise anticompetitive, they may not form the basis of Novell's § I claim.

      c.  <u>Agreements with OEMs Did Not Substantially Foreclose Competition</u>

As discussed above, to succeed on a § 1 claim under *Tampa Electric*, a plaintiff must prove that the defendant's conduct foreclosed competition in a "substantial" share of the relevant market. *See, e.g.*, *Tampa Elec.*, 365 U.S. at 327–28; *R.J. Reynolds*, 199 F. Supp. 2d at 387. Substantial foreclosure depends on many factors—the parties' market strength, the degree of exclusivity, business justifications for the agreement, duration of the agreement, barriers to entry in the market, etc.—but requires that the agreements at issue cover at least 20 percent of the relevant market (and usually significantly more than that).[29] *See Tampa Elec.*, 365 U.S. at 328–29, 334–35; *Microsoft*, 253 F.3d at 70 (noting "the roughly 40% or 50% share usually required in order to establish a § 1 violation");  *Bepco*, 106 F. Supp. 2d at 828 (21.5 percent and 18.5 percent "fall short of any value presumed to be substantial and lie on the margin of what is considered to be significant");  *R.J. Reynolds*, 199 F. Supp. 2d at 387–88, 391–92 (noting that the lowest coverage courts and commentators have found significant is 20 percent and that courts have found agreements covering up to 50 percent of the market to *not* be substantial).

Because the Project Avalanche agreements are not exclusive or otherwise anticompetitive, to survive summary judgment on Count VI Novell must raise a genuine issue about whether the per system and minimum purchase agreements between Microsoft and OEMs resulted in substantial foreclosure.[30]  *But cf. R.J. Reynolds*, 199 F. Supp. 2d at 387–88 (holding that Phillip Morris offering retailers discounts in exchange for advantageous advertising space was not exclusive dealing but nonetheless "us[ing] the substantial foreclosure analysis typically

---

[29] "The relevant market for this purpose includes the full range of selling opportunities reasonably open to rivals . . ." *Omega Envtl.*, 127 F.3d at 1162 (quoting 2A PHILLIP E. AREEDA & HERBERT HOVENKAMP, ANTITRUST LAW ¶ 570b1, at 278).

[30] This assumes, without deciding, that these agreements with OEMs would in fact be considered exclusive or anticompetitive.

used in exclusive dealing cases").  However, Novell has not presented evidence that these agreements covered close to twenty percent of any software applications market, and it has therefore failed to meet its burden.  (*See* Dkt. No. 1947, Exh. 45.)  In fact, Novell does not seem to contest Microsoft's assertion that the OEM agreements covered at most 10 percent of any relevant market.  (*See id.*, Exh. 45; Dkt. No. 1952 at 43–45.)  Even if 10 percent could ever amount to substantial foreclosure, which I do not believe it could, Novell has failed to point to any market factor significant enough to support a substantial foreclosure finding with such a small segment of the market covered.[31]

In sum, because Microsoft's agreements with OEMs did not foreclose a substantial share of any software applications market—and the Project Avalanche agreements were not exclusive or otherwise anticompetitive—a § 1 claim here would not survive summary judgment even if the issue was restraining trade in the software applications markets. Furthermore, Novell has not met its burden of providing evidence that Microsoft's conduct created an unreasonable restraint in the PC operating system market, and for that reason alone Count VI would have failed even if Novell had not assigned it to Caldera.[32]

---

[31] The § 1 legality of these minimum purchase and per system agreements is distinguishable from the Section 1 legality of Microsoft's minimum purchase, per system, per copy, and per processor agreements with OEMs covered by Judge Jackson's consent order in 1995.  In that case, the OEM agreements concerned the distribution of PC operating systems, a market in which OEMs control a substantially greater percentage of the distribution channels than they do in the various software applications markets.  *See United States v. Microsoft*, 1995 WL 505998 (D.D.C. 1995); *see also United States v. Microsoft Corp*, 159 F.R.D. 318, 322 n.9 (D.D.C. 1995) ("In the first half of 1994, 80% of Windows units sold by Microsoft were through OEMs."), *rev'd by* 56 F.3d 1448 (D.C. Cir.).  Consequently, anticompetitive or exclusive OEM agreements in the PC operating system market foreclosed a much greater amount of competition.

[32] Microsoft also argues that Novell "abandoned" Count VI because it failed to offer expert evidence of the damages it suffered as a result of the conduct alleged in Count VI.  (*See* Dkt. No. 1947 at 44.)  Because Count VI may be resolved on other grounds, I did not reach this issue.

DATE: March 30, 2010                              _____/s/_____
                                                  J. Frederick Motz
                                                  United States District Judge